**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | |
|---|---|
| DARRELL EDEN, on behalf of himself and all others similarly situated, | ) ) ) |
| | ) Case No.: |
| Plaintiff, | ) ) **CLASS ACTION** |
| | ) |
| vs. | ) **COMPLAINT PURSUANT TO 42 U.S.C.** ) **1983** |
| | ) |
| BRADLEY COUNTY, TENNESSEE; | ) **DEMAND FOR JURY TRIAL** |
| SHERIFF ERIC WATSON, in his official | ) |
| and individual capacities; CAPTAIN | ) |
| GABRIEL THOMAS, in his official and | ) |
| individual capacities; JOHN DOE, in his | ) |
| official and individual capacities; JANE | ) |
| DOE, in her official and individual | ) |
| capacities, | ) |
| | ) |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff, Darrell Eden, brings this complaint against (1) Bradley County, Tennessee ("Bradley County"); (2) Eric Watson in his official capacity as (former) Sheriff thereof and in his individual capacity; (3) Captain Gabriel Thomas of the Bradley County Sheriff's Office ("BCSO"), in his official and individual capacities; (4) BCSO corrections deputy John Doe, in his official and individual capacities; and (5) BCSO corrections deputy Jane Doe, in her official and individual capacities, on behalf of himself and all others similarly situated, for damages and declaratory and injunctive relief. Plaintiff would allege as follows:

### INTRODUCTION

1.     Plaintiff brings this action pursuant to 42 United States Code section 1983 to enforce his rights—and those of the putative class defined below—under the Eighth and Fourteenth Amendments to the United States Constitution. In addition, plaintiff alleges—again, on

behalf of himself and on behalf of members of the putative class—pendent state-law causes of action for (1) gross negligence, (2) ordinary negligence (on various bases), and (3) punitive damages.

2. Plaintiff and members of the putative class are current and former inmates or pretrial detainees (collectively, "Inmates") of the Bradley County Justice Center (a/k/a the Bradley County Jail) (the "Jail") who were or could be denied constitutionally adequate medical care by the BCSO specifically, and Bradley County more generally.

3. Specifically, in recent years, medical care has often (1) simply not been made available to Inmates at all, and (2) when offered, been so patently deficient as to violate the Eighth and Fourteenth Amendments to the United States Constitution.

4. BCSO officials have routinely disregarded known and unjustifiable risks of serious harm, both in the medical context and otherwise, to Inmates, who routinely endured significant—even life-threatening—injuries while confined in the Jail or in the custody of BCSO, some of which resulted in further injury or death.

5. Despite numerous indisputable indicia that the medical care being offered to Inmates at the Jail was and is woefully inadequate—including (1) numerous prisoner deaths and dozens of lawsuits, many of which have resulted in settlements, (2) repeated failure of state jail certification inspections for a variety of reasons, including those related to overcrowding and the provision of medical care, and (3) explicit legislative deliberations concerning the inadequacy of care offered to Inmates—the BCSO and other elements of the Bradley County government, including the Bradley County Mayor ("Mayor") and Bradley County Commission ("County Commission") have knowingly and deliberately (1) failed to take corrective action to address those deficiencies and (2) permitted those

2

deficiencies to continue with (a) actual knowledge that they would lead to further impermissible injuries or (b) conscious disregard or recklessness as to those outcomes.

6. More specifically, despite knowledge that the medical care provided at the Jail by Quality Correctional Health Care ("QCHC"), acting in concert with the understaffed and undertrained BCSO corrections division, was entirely inadequate and had resulted in serious harm—and death—to numerous Inmates, Bradley County has failed to increase its budgetary outlays in areas touching on prisoner medical care, including adequate (1) staffing, training, and supervision of corrections deputies with respect to Inmate medical care (even though the corrections deputies are heavily involved in the procedures related thereto), and (2) staffing of the Jail by medical personnel, whether employed by QCHC or otherwise.

7. These failures have been exacerbated by—and are all the more blameworthy—because they have occurred simultaneously with an enormous increase in the Jail's average daily population, which has been dangerously over the Jail's capacity for years.

8. In addition, Bradley County has evidenced its aversion to provide the funding necessary to ensure constitutionally adequate medical care for Inmates by devising and implementing a policy (at least unofficially) by which Jail personnel would release arrestees and Inmates requiring medical care on their own recognizance (commonly referred to as an "OR release" or simply an "OR") for the deliberate purpose of avoiding their constitutional and statutory obligations to provide prisoners in their custody with medical care.

## JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction over this case pursuant to 28 United States Code sections 1331 and 1343.

10.    The Court has supplemental jurisdiction of plaintiff's state law claims pursuant to 28 United States Code section 1367.

11.    Venue in this judicial district is proper pursuant to 28 United States Code section 1391(b) because defendants have their official residence in this judicial district and a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this judicial district.

## PARTIES AND OTHER PERSONS RELEVANT TO THIS ACTION

12.    Plaintiff, Darrell Eden, who resides at 926 Charlotte Avenue, Chattanooga, TN 37421, is a former pretrial detainee who was booked into the Jail on or about September 20, 2017 on a DUI charge (in connection with a car accident), which was subsequently dismissed. Mr. Eden was denied medical care of any kind while confined in the Jail, which (1) exacerbated injuries he sustained in the car accident (including seven broken ribs (two of which were displaced fractures), a broken ankle, and a broken finger), (2) subjected him to unnecessary pain and suffering, and (3) given his significant, diagnosed pre-existing conditions, exposed him to a substantial risk of serious bodily injury or death.

13.    Bradley County is a county in the State of Tennessee.

14.    Eric Watson is the former Sheriff of Bradley County, Tennessee, having been defeated by Steve Lawson in the Republican primary election on May 1, 2018. Sheriff Watson was elected to that position in August 2014 and assumed office on September 1, 2014.

4

15. Steve Lawson is the current Sheriff of Bradley County, who was elected on May 1, 2018 and assumed office on September 1, 2018.

16. Gabe Thomas is an employee of the BCSO who served as BCSO Captain of Corrections under Sheriff Watson and currently serves (under Sheriff Lawson) as BCSO Captain of Support Services.

17. John Doe is the BCSO corrections deputy responsible for Mr. Eden's intake into the Jail on September 20, 2017 and transporting him to the booking area, who did not procure medical assistance for Mr. Eden despite his obvious injuries and repeated requests.

18. Jane Doe is the BCSO corrections deputy who brought Inmates in the booking area blankets and lunch on September 20, 2017, who did not procure medical assistance for Mr. Eden despite his obvious injuries and repeated requests.

19. In their official and related capacities, Sheriff Watson, Captain Thomas, and John and Jane Doe acted under color of state law and their office and within the course and scope of their employment.

## FACTS

### Applicable Facts Concerning the Bradley County Government

20. Bradley County's population was approximately 105,560 as of 2017.

21. Bradley County's legislative body is a fourteen-member board of county commissioners (the "County Commission"), vested with legislative and policy-making (including budgetary and taxing) powers.

22. Bradley County's executive is a County Mayor, who is a non-voting *ex officio* member of the County Commission (and all of its committees).

23.  The County Mayor's primary responsibility is financial management, and he or she is responsible, *inter alia*, for compiling a budget for all county departments, offices, and agencies, which is presented to and voted upon by the County Commission.

24.  Bradley County's budget, in the aggregate, was as follows for the following years:

   a.  2014-2015 - $133,524,129.00

   b.  2015-2016 - $133,732,645.00

   c.  2016-2017 - $139,791,118.00

   d.  2017-2018 - $144,990,131.00

25.  Bradley County's Sheriff is elected for a four-year term, and the responsibilities of the office include "charge and custody" of the Jail and the prisoners committed therein.

26.  On information and belief, the Sheriff is responsible for promulgating and enforcing the policies and procedures ("General Orders") that govern every aspect of the Jail's operation.

27.  The County Commission has the duty to make the appropriations necessary for the operation of the BCSO, including salaries, equipment, and all other necessities, and, when necessary, is empowered to appropriate county funds to supply a shortage of fees to pay the expenses of the Sheriff.

28.  The Sheriff interacts with the County Mayor and County Commission regarding the BCSO budget and any amendments thereto. Specifically, the Sheriff, in coordination with the County Mayor, submits a budget request, which the County Commission reviews and approves.

29.  However, Bradley County's discretion with regard to funding the BCSO is limited by Tennessee law, which provides as follows

6

Notwithstanding any other law to the contrary, county governing bodies shall fund the operations of the county sheriff's department. The sheriff may appoint such personnel as may be provided for in the budget adopted for such department. No county governing body shall adopt a budget absent the consent of the sheriff, which reduces below current levels the salaries and number of employees in the sheriff's department. In the event a county governing body fails to budget any salary expenditure which is a necessity for the discharge of the statutorily mandated duties of the sheriff, the sheriff may seek a writ of mandamus to compel such appropriation.

Tenn. Code Ann. § 8-20-120.

30.     In addition, Tennessee law provides that "The county legislative body in any county shall make the necessary appropriation and pay to the sheriff of its county the maximum salary fixed by § 8-24-102, and the authorized expenses fixed by law for the operation of the sheriff's office, including the salary of all the sheriff's deputies."  Tenn. Code Ann. § 8-24-103.

31.     Gary Davis has been the Bradley County Mayor since 1998.

32.     Over approximately the last thirty years, Bradley County, Tennessee has had five sheriffs: (1) Dan Gilley (from 1987 through 2006), (2) Tim Gobble (from 2006 through 2010), (3) Jim Ruth (from 2010-2014), (4) Eric Watson (from 2014-2018), and (5) Steve Lawson (who assumed office on September 1, 2018).

33.     A chart displaying the various Bradley County government positions is attached as Exhibit A.

## Applicable Obligations of Counties to Prisoners under Tennessee Law and Reimbursement for State Prisoner Medical Care

34.     In addition to the standards of medical care guaranteed by the Eight and Fourteenth Amendments to the United States Constitution, which form the basis for the instant class action and are addressed *infra*, Tennessee law provides numerous guidelines for prisoner

7

medical care that guide state, local, and private agencies and entities in Tennessee with regard to same.

35.     Under Tennessee law, "[t]he county legislative bodies alone have the power, and it is their duty, to provide medical attendance for all prisoners confined in the jail in their respective counties."  Tenn. Code Ann. § 41-4-115(a).

36.     In the event that a jail is incapable of providing adequate medical care to an inmate, it must transfer that prisoner to a jail that is capable of providing such care, or, in the event that emergency medical care is required, ensure that the inmate receives it. *See* Tenn. Op. Atty. Gen. No. 02-015, at *2 (2002).

37.     In addition, when a prisoner is indigent,

> the responsibility for payment of [his] medical expenses should be decided between the county and the medical provider . . . . regardless of who pays, a prisoner is entitled to medical care, and the government agency, in whose custody the prisoner is placed, is responsible for insuring that the prisoner obtains any such needed medical care.

Tenn. Op. Atty. Gen. No. 89-133, at *1-2 (1989) (citing U.S. Const. Amend. XIV; Tenn. Code Ann. § 41-4-115).

38.     Under Tennessee law, county jails do not have the authority to refuse to accept an arrestee, including one with a medical complaint or obvious injury, even in the event of jail overcrowding or some similar circumstance (such as the intent to avoid paying for inmate medical care).  *See* Tenn. Op. Atty. Gen. No. 02-015, at *1-2 (2002); *see also* Tenn. Op. Atty. Gen. 94-041 (1994) (holding that "[a] sheriff does not have the authority to refuse to accept [an arrestee], just as the sheriff does not have the authority to refuse to accept a person formally committed to the jail by issuance of a mittimus").

8

39. Local governmental entities, acting in conjunction with the county sheriff, are obligated by law to comply with certain minimum standards in the maintenance and operation of local jails, and Tennessee has created the Tennessee Corrections Institute ("TCI") to, *inter alia*, (1) "[e]stablish minimum standards for local jails . . . including, but not limited to, standards for physical facilities and standards for correctional programs of treatment, education and rehabilitation of inmates and standards for the safekeeping, health and welfare of inmates," and (2) inspect on an annual basis local jails to establish compliance with those standards and report failures to do so.  Tenn. Code Ann. § 41-4-140(a).

40. The TCI standards aggregate the various legal requirements to which county jails are subject in aid of policy and operational practice and represent what the state considers the acceptable practices and the minimum conditions of confinement.

41. The TCI standards concern a variety of topics pertinent to jail operation, including the requisite physical plant, administration and management, personnel requirements, discipline, sanitation and maintenance, record-keeping, and medical services.

42. The TCI standards define Type I facilities as those which house inmates for over seventy-two hours; this category includes the Jail.

43. With respect to jail personnel, the TCI standards require, *inter alia*, that new corrections deputies receive orientation and instruction concerning the minimum standards, and those persons whose primary duties include inmate contact must complete a forty-hour basic training regimen and a certain amount of additional in-service training annually.

44. Specifically, the TCI standards require, *inter alia*, that

> Prior to assuming duties, all detention facility employees, support employees and non-facility support staff shall receive orientation training regarding the functions and mission of the facility under the supervision of a qualified detention officer. This training may be accomplished through classroom

9

instruction, supervised on-the-job training, an individual review of policies and procedures, or any combination of the three and shall include:

(a) Facility policies and procedures;

(b) Suicide prevention;

(c) Use-of-force;

(d) Report writing;

(e) Inmate rules and regulations;

(f) Key control;

(g) Emergency plans and procedures;

(h) Cultural diversity;

(i) Communication skills; and,

(j) Sexual misconduct.

TCI Standards Ch. 1400-01-.06.

45.     With regard to medical services, the TCI standards require, *inter alia*, that:

a.   the local government funding agency have in place a contract with a medical services provider for inmate care;

b.   providers be notified in instances where an inmate may be in need of medical treatment, which notification must be documented;

c.   medical decisions be the "sole province" of the health-care provider and "shall not" be countermanded by non-medical personnel;

d.   health care staff shall work in accordance with the profession-specific job descriptions approved by the health authority;

e.   non-medical personnel assessing or treating inmates shall do so pursuant to written standing or direct orders by authorized personnel;

10

f.  continuity of care is required from admission to transfer or discharge from the facility, including referral to community-based providers, and jail medical personnel must give community-based providers appropriate information in accordance with consent requirements,

g.  prior to release from custody or transfer, inmates with known serious health conditions shall be referred to available community resources by the facility's health care provider currently providing treatment;

h.  "receiving screening" shall be performed (and recorded on a printed screening form) on all inmates upon admission to the facility and before placement in the general housing area, which shall include checks for (i) a serious illness, (ii) a comatose state, (iii) obvious wounds, (iv) prescribed medications, and (v) a mental health/suicide risk assessment;

i.  for inmates housed for longer than two weeks, a more complete examination must be performed;

j.  jails have suicide prevention plans and protocols in place;

k.  inmates with chronic medical conditions (*e.g.*, diabetes, hypertension, and mental illness) shall receive periodic care by qualified providers in accordance with individual treatment plans, including medication monitoring and laboratory testing; and

l.  the health authority shall develop and approve adequate protocols for identifying and evaluating major risk management events related to

11

inmate health care, deaths, preventable adverse outcomes, and serious

medication errors.

TCI Standards Ch. 1400-01-.13.

46.    With regard to the right to telephonic communications for arrestees booked into the Jail,

the TCI standards require, *inter alia*, that:

> At the time of booking, a telephone shall be available within the receiving
> or security area.  The detainee shall be allowed to complete at least one (1)
> telephone call to the person of his/her choice. Pursuant to T.C.A. § 40-7-
> 106(b), no person under arrest by any officer or private citizen shall be
> named in any book, ledger, or any other record until after the person has
> successfully completed a telephone call to an attorney, relative, minister,
> or any other person that the person shall choose, without undue delay. One
> (1) hour shall constitute a reasonable time without undue delay.

TCI Standards Ch. 1400-01-.14

47.    Counties that contract with the state to house prisoners in local jail are entitled to recover

from the state a significant portion of the cost of medical treatment incurred by state

prisoners housed in the jail, including hospitalizations and emergency treatment.

**Capacity of the Jail**

48.    A county jail may hold pre-trial detainees, those convicted of misdemeanors, locally

sentenced felons, backup felons, and others, such as federal prisoners under the

jurisdiction of the US Marshal's Office and Immigration and Customs Enforcement

(ICE).

49.    Counties in Tennessee may choose to contract with the state to house state inmates or not,

and non-contracting counties are entitled to request that the Tennessee Department of

Corrections ("TDOC") take physical custody of felons housed in local jails (sentenced to

more than one year) within fourteen days of the request.

12

50. The Jail, which is owned and funded by Bradley County but operated by the Bradley County Sheriff (who has "custody and charge" of it by statute), was built to house 408 Inmates.

51. On information and belief, at all times relevant to this Lawsuit, Bradley County has had (discretionary) contracts with the federal government (specifically the Department of Justice ("DOJ")) and State of Tennessee to house federal and state prisoners (in addition to local pre-trial detainees and other persons confined at the Jail).

52. Captain Thomas has noted that federal prisoners "are a significant revenue source."

53. Sheriff Watson has boasted of negotiating a new contract with the DOJ whereby the *per diem* for housing and transporting federal prisoners was increased from $49.60 to $58.00 and $15.66 to $17.50, respectively.

54. The state *per diem* for housing prisoners is approximately $39.00.

55. The average cost to house an Inmate at the Jail per day is $73.77 according to Bradley County budget estimates.

56. As explained in greater detail below, at all times relevant to this lawsuit, the Jail has been operating above its capacity, to a greater or lesser degree.

### Personnel Issues at the BCSO/Jail – Overcrowding, Understaffing, and Lack of Adequate Training

57. According to the relevant Bradley County budget, from 2010-2013, the Jail (1) housed an average of 386 Inmates per day, and (2) employed seventy correctional deputies certified by the State of Tennessee (and approximately twenty-five additional full-time personnel at the Justice Center).

13

58.    On August 26, 2013, then-Sheriff Ruth testified at a deposition that, as of that date, BCSO employed approximately seventy-nine corrections deputies, and that it was "hard to keep enough of them on the job."

59.    In addition, then-Sheriff Ruth testified on that date that BCSO (1) experienced significant employee turnover, such that some employees "had to leave" and others left "for better jobs," and (2) was "almost continually in the process of hiring somebody new."

60.    Similarly, on information and belief, Bradley County Commissioners Terry Cawood and Howard Thompson have stated that Jail understaffing has been "chronic" through several administrations (or made substantially similar remarks).

61.    According to the Bradley County budgets, the average number of Inmates housed per day held steady for the years 2013-2015 (at approximately 390).

62.    The Bradley County budget allocation for corrections deputies and staff was as follows for the following fiscal years:

    a.  2012-2013 - $2,854,169.00;

    b.  2013-2014 - $2,953.423.00;

    c.  2014-2015 - $3,006,448.00.

63.    According to the relevant Bradley County budget, in the fiscal year 2015-2016, the average number of Inmates housed daily rose to *480*, an increase of 18.75%.

64.    According to the Bradley County budget, in the same fiscal year (2015-2016), the reported number of Tennessee certified correctional deputies rose from seventy to seventy-five, and the number of fulltime staff increased from ninety-five to 102, an increase of approximately 6.86%.

65. The Bradley County budget allocation for corrections deputies for the fiscal year 2015-2016 was $3,065,318.00, an increase of approximately 1.92%.

66. According to the relevant Bradley County budget, in the fiscal year 2016-2017, the average number of Inmates housed daily rose to *520*, with the same number of Tennessee-certified correctional deputies and fulltime staff.

67. According to the relevant Bradley County budget, in the fiscal year 2017-2018, the average number of Inmates housed daily decreased to *503*, with the same number of Tennessee-certified correctional deputies and fulltime staff.

68. Current Corrections Division Captain Alan Walsh stated that, as of September 7, 2018, there were *570* Inmates housed in the Jail, down from *611* the previous week.

69. On information and belief, BCSO patrol and corrections deputies earn (and have earned) *substantially less* money than their counterparts in the Cleveland Police Department ("CPD"), and earn less money than sheriff's deputies in neighboring counties, including Polk County, Tennessee ("Polk County").

70. As of 2016, Polk County's population was approximately 16,772, approximately 16% of Bradley County's population.

71. Polk County's 2018-2019 budget was approximately $34,000,000.00, approximately 24% of Bradley County's budget for the same fiscal year.

72. On May 1, 2018, in an interview with local radio station 104.1, Sheriff Watson noted that (1) the BCSO had a fifteen-million-dollar budget, (2) although he had increased the salaries of patrol deputies from approximately $32,000.00 per annum to $34,000.00 per annum and corrections deputies from approximately $26,000.00 per annum to $29,000.00

15

per annum, the BCSO was still "way behind" other agencies with respect to benefits and salary for deputies.

73.     Bradley County's budgets do not appear to contain a line item for correctional deputy training expenses or a similar budget item.

74.     On information and belief, at all times relevant to this lawsuit, in part because of high turnover rates, the BCSO has not consistently ensured that corrections deputies have received TCI-compliant basic and in-service training (and/or training adequate to ensure that they interact with Inmates properly, including with respect to the provision of Inmate medical care).

75.     In addition, on information and belief, the BCSO has not maintained adequate records of such training for corrections deputies, *i.e.*, records demonstrating that all corrections deputies are given TCI-mandated training (or other training that would teach corrections deputies how to ensure that Inmates receive medical care that is compliant with TCI standards (or is otherwise adequate)).

### Medical Care Offered at the Jail by QCHC

76.     On information and belief, QCHC contracts with approximately sixty facilities in Tennessee, Mississippi, Alabama, and Georgia, employs over three hundred persons, and provides medical care for thousands of inmates.

77.     Since 2009, QCHC has been the sole provider of Inmate health care at the Jail. The Health Services Agreement ("HSA") entered into at that time (and corresponding Bradley County budgetary outlay) for prisoner medical and dental care was $651,384.00.

78.     The HSA provided that it was "based on the assumption that the [Jail] will average 408 [I]nmates monthly," and "[i]f the [I]nmate population exceeds 430 in a three-month

16

consecutive time span QCHC reserves the right to enter into negotiation for additional

compensation."

79.    With regard to initial medical care, the HSA states as follows:

> The responsibility of QCHC for medical care of a prisoner commences
> with the booking and physical placement of said prisoner into the [Jail].
> All services examinations and medical services will be conducted within a
> reasonable time of the request for care. Each incoming detainee will
> undergo a preliminary health screening approved by the Medical Director
> that will include medical and mental health screening. *Performance of the*
> *screening will be completed by BCSO staff members that have been*
> *trained by the Medical Director.* The nursing staff will review the intake
> screenings on a daily basis and triage medical or mental needs, concerns,
> or requests as appropriate.
>
> (emphasis added).

80.    With regard to training of BCSO personnel by QCHC, the HSA provides that:

> QCHC will provide annual training courses in Cardiopulmonary
> Resuscitation (CPR), Sudden Custody Death Syndrome and Suicide
> Prevention. Such annual training courses will be scheduled by County and
> QCHC at a mutually agreed upon time and location.

81.    On information and belief, the BCSO and QCHC have not (1) consistently ensured that

all corrections deputies engaged in prisoner "intake" have received such training or (2)

maintained adequate records documenting that training.

82.    With regard to staffing, the HSA provides as follows, in pertinent part:

> Section 2.1 Staffing. QCHC shall provide medical and support personnel
> reasonably necessary for the rendering of primary health care services to
> prisoners at the [Jail] as described in and required by this Agreement. The
> personnel provided by QCHC will include the following:
>
> (a) Corporate Medical Director/CEO. The Corporate Medical
>     Director/CEO will be available at all times to the
>     administrative staff of County and to the administrative staff
>     of the Facility. Home phone numbers and cellular phone
>     numbers will be provided by this individual to all necessary
>     administrative contacts.

17

(b) Physician/Nurse Practitioner. A licensed physician and/or a Nurse Practitioner will be at the Facility one day 4 hours per week. During the time that a physician is not at the Facility, a physician or Nurse Practitioner will be available on call.

(c) Registered Nurse. 1 [full-time employed] Registered Nurse (RN)

(d) Licensed Practical Nurse. 5 [full-time employed] Licensed Practical Nurse[s] (LPN).

83. In addition, the HSA provides that (1) QCHC's CEO will meet with the Sheriff and Jail command staff on a quarterly basis to review, *inter alia*, quality assurance reports, expenses, and other matters, (2) QCHC will furnish reports that contain (at a minimum) monthly and year-to-date statistical information related to, *inter alia*, services provided and Inmates treated, (3) QCHC shall provide to the County certain reports relating to services rendered under the contract, and (4) the clinic manager (a registered nurse) will meet weekly (or at least monthly) with the Bradley County Sheriff, Jail Administrator, or a designee, to review activities and provide updates of services or needs.

84. On July 1, 2013, Bradley County entered into a subsequent three-year HSA with QCHC, Inc., which was extended for an additional one-year term (through June 30, 2017).

85. The Bradley County budget allocation for medical and dental services (*i.e.*, payment for the contract with QCHC) was as follows for the represented fiscal years:

d. 2012-2013 - $678,363.00;

e. 2013-2014 - $700,595.00;

f. 2014-2015 - $700,595.00;

g. 2015-2016 - $743,395.00;

h. 2016-2017 - $743,395.00.

18

86. On information and belief, the HSAs between QCHC and Bradley County placed a cap of $75,000.00 per annum on expenditures for medical care provided to Inmates offsite (*e.g.*, if they were transported to a hospital following a fight or serious medical event).

87. According to QCHC Vice President and Chief Operating Officer Justin Barkley, QCHC endeavors to provide as much medical care as possible "inside the jail," and has the capacity for certain kinds of radiology (including x-rays) and lab work/blood testing.

88. On July 12, 2017, the BCSO sought requests for Inmate health-care proposals, received two such proposals, and ultimately recommended "proceeding with negotiation of an agreement with QCHC, Inc. as the lowest and best bid for the [I]nmate health services requested."

89. On August 7, 2017, the County Commission authorized the County Mayor Davis to (1) negotiate with QCHC another HSA for an initial term of one year with the option of two additional one-year renewal terms to provide Inmate health services for the Jail and the Workhouse for $1,095,000.00, and (2) upon successful negotiation, enter into an agreement subject to those terms.

90. Thirteen of fourteen County Commissioners approved the proposal (one was absent).

91. That additional outlay included the provision of medical expenses for Inmates of the 127-bed Brian K. Smith Workhouse (the "Workhouse"), in addition to medical expenses for Jail Inmates.

92. In discussions concerning the QCHC contract following Sheriff Lawson's election, the County Commission, Mayor Davis, and Sheriff Lawson have considered whether to renew the contract with QCHC or put it out for bid. Mayor Davis noted that the present QCHC contract cost significantly more than the previous contract, and Sheriff Lawson

19

stated that (1) it was important for Bradley County to get the "best deal" it could, (2) he wanted to keep Inmates at the Jail for most medical treatment, and (3) he would form a committee to see where the BCSO could cut back to save taxpayer money.

93. According to the "Inmate medical care" web page present during Sheriff Watson's tenure, QCHC has demonstrated an "ability to provide a high level of medical care at a reasonable cost," and addresses medical needs "around the clock by a staff of dedicated medical professionals."

94. In addition, the page stated the medical unit "has facilities for medical examinations and dental procedures," and that "[m]ost medical conditions and illness[es] [could] be treated in the facility without taking an [I]nmate to an offsite medical facility."

95. QCHC and/or the Jail charged [I]nmates for medical care received during their incarceration, including (1) $10.00 for a "sick call," (2) $15.00 for a "doctor visit," (3) $15.00 for "dental service," (4) $25.00 for "an emergency room visit by police vehicle," $50.00 for "an emergency room visit by ambulance," (6) $25.00 for "lab services," and (7) $15.00 for "X-rays."

96. On information and belief, two ambulances were previously based at the Jail but are no longer in operation.

97. On information and belief, at all times relevant to this lawsuit, only two medical doctors are authorized to practice at the Jail, and a medical doctor is physically present there only once a week for approximately four hours.

98. On information and belief, at all times relevant to this lawsuit, pursuant to the various iterations of the HSA, the Jail is principally staffed on a day-to-day basis by licensed practical nurses ("LPNs").

20

99. On information and belief, at all times relevant to this lawsuit, on an average day, three nurses were on staff during first shift and one nurse during second and third shift, respectively.

100. According to a former LPN employed by QCHC at the Jail, it is plausible that Inmates in dire need of medical care could go untreated because of medical staff shortages.

101. On information and belief, at all times relevant to this lawsuit, corrections deputies did not, and/or were often unable to, inform Jail/QCHC medical staff about prisoner injuries or health complaints.

102. On information and belief, at all times relevant to this lawsuit, family members of Jail Inmates routinely called the Jail to complain that Inmates were not receiving adequate treatment.

## Public Service Record of Eric Watson Prior to His Election as Sheriff of Bradley County

103. Mr. Watson joined the BCSO in 1999 as a deputy and worked in the courts division. Following the election of Tim Gobble, he was promoted to lieutenant, and, after the election of Jim Ruth, captain.

104. Mr. Watson claims to be a graduate of, *inter alia*, the following law-enforcement related programs: the (1) Tennessee Bureau of Investigation ("TBI") State Academy (where he was class president), (2) Tennessee Sheriff's School, (3) Tennessee Law Enforcement Academy, (4) United States Marshal Service Academy,

105. In addition, from 2006 until 2014, Mr. Watson was a member of the Tennessee House of Representatives, where he represented Tennessee's 22nd District, encompassing Meigs, Polk, and part of Bradley Counties.

Case 1:18-cv-00217-CHS   Document 1   Filed 09/18/18   Page 21 of 73   PageID #: 21

106.  While serving as a Representative, Mr. Watson was, *inter alia*, (1) Chairman of the House Judiciary Committee and Criminal Justice Committee, (2) a member and co-Chair of the National Conference of State Legislatures' Standing Committee on Law, Criminal Justice, and Public Safety, and (3) the Tennessee Criminal Justice Coordinating Council.

107.  In addition, he was (1) in 2010 awarded the Tennessee Fraternal Order of Police's "Outstanding Service Award" and the Tennessee County Officials' Association's "Outstanding Representative Award," and (2) named "2011 Legislator of the Year" by the Tennessee District Attorneys General Conference.

108.  During legislative sessions, Mr. Watson was simultaneously obligated to work forty hours per week in Bradley County in the courts division and serve as a state legislator in Nashville, and some in the BCSO, including then-Sheriff Ruth, questioned his ability to fulfill his obligations in his (paid) BCSO position.

109.  In 2011, then-Captain Watson resigned from his position at the BCSO in lieu of termination at then-Sheriff Ruth's invitation when the BCSO determined that he had falsified timesheets, and then-Chief Deputy Wayne Bird wrote: "Not to be rehired – veracity/integrity."

**Law Enforcement and Corrections Credentials of Gabe Thomas**

110.  According to the former BCSO website, "Captain Thomas has had extensive training in jail operations and corrections management. . . . [and] some of his specialized training has included: Criminal Law, Crisis Intervention, Self-Defense Tactics, Search and Seizure Procedures, Suicide Prevention, Inmate Behavior Modification, Jail Safety and Security, and Conflict Resolution."

111.    In addition, Captain Thomas holds certifications from both the DOJ's National Institute of Corrections and the TCI as a Certified Jail Administrator and is a graduate of the Tennessee Law Enforcement Executive Development School sponsored by the Federal Bureau of Investigation and the State of Tennessee.

### Eric Watson's Election as Sheriff and Immediate Policy Changes

112.    In August 2014, Mr. Watson was elected Sheriff of Bradley County, Tennessee and, on or about September 1, 2014, assumed office.

113.    In his inaugural address, Sheriff Watson promised a "new spirit" and a "new direction," and noted that (1) his inspection of the Jail had uncovered "serious structural and unhealthy problems that ha[d] been left unrepaired," and (2) he had "immediately" requested that the County Commission inspect the Jail to make them aware of the deficiencies.

114.    Sheriff Watson has stated that he had two priorities when elected: "to get the bad guys off the streets and do it using the most conservative budget possible."

115.    Sheriff Watson made several immediate policy changes to the BCSO and has stated that he formulated a "three-year plan" of improvement to the Jail.

116.    Sheriff Watson reduced BCSO supervisory staff by fifteen positions, which he claimed saved approximately $863,000.00 and permitted him to increase the number of deputies (including an increase of corrections deputies from ninety to ninety-seven).

117.    In addition, Sheriff Watson increased the salaries of patrol and corrections deputies, as discussed *supra*, which he contended made BCSO salaries "competitive."

118.    Sheriff Watson repeatedly touted his commitment to improving BCSO "efficiency" without requiring a tax increase.

23

119.    In addition, he ordered Captain Thomas to review the Jail's prison-ministry programs and policies and, following that review, noted his disappointment that, "due to a shortage of corrections personnel, opportunities for faith-based visitation had been limited."

120.    Based on that review, he requested that Captain Thomas develop a plan "in which faith-based ministries visits [could] take place seven days a week from 6am to 6pm," which was made possible by "fully staffing the Corrections Division."

121.    On information and belief, Sheriff Watson did not make any changes related to the provision of medical care to Inmates or any training or staffing related thereto.

**Recurring Issues in the Bradley County Jail During Sheriff Watson's Tenure (and After)—**
**Failed TCI Inspections, Overcrowding, Jail Refusal of Arrestees, and**
**Prisoner Injuries, Untreated Illnesses, Deaths, and Lawsuits**

122.    During Sheriff Watson's time in office, the Jail was plagued by failed TCI inspections, overcrowding, severe injuries to and deaths of Inmates (caused by inadequate medical care and otherwise), jail maintenance problems, inadequate staffing and training, and general mismanagement, coupled with a cavalier—even contemptuous—attitude toward prisoner safety and medical care on part of Sheriff Watson, Captain Thomas, BCSO corrections deputies, and other corrections personnel.

123.    As noted above, Sheriff Watson believed at the time he assumed office in September 2014 that the Jail was deficient in a variety of ways, including through understaffing, and he (purportedly) acted to increase the number of staff at the Jail and to inform the County Commission of deficiencies in its physical plant.

124.    On October 16, 2014, Jail Inmate Jimmy Newell filed a complaint against Sheriff Watson and two corrections deputies, *inter alia*, on grounds of excessive force used against him in the Jail during the tenure of both Sheriffs Ruth and Watson (including an alleged

"brutal assault" in October 2014, during Sheriff Watson's tenure, by corrections deputies while he was handcuffed and shackled).

125.   The United States District Court for the Eastern District of Tennessee dismissed his complaint, but the United States Court of Appeals for the Sixth Circuit reversed and remanded concerning those excessive-force claims, and Bradley County ultimately settled with Mr. Newell.  The parties filed a joint stipulation of dismissal on August 23, 2018.

126.   On October 28, 2014, Inmate Joey Ray died from Wegener's Disease after QCHC personnel (including Dr. Bates and QCHC LPNs Brenda Roberts and Lydia Shadden) ordered him placed on observation for labored breathing but failed to place him in observation.

127.   In the ensuing lawsuit against, *inter alia*, Bradley County, QCHC, and QCHC personnel Dr. Bates and LPNs Roberts and Shadden, the United States District Court for the Eastern District of Tennessee denied QCHC's motion to dismiss the claims against Dr. Bates and LPNs Roberts and Shadden, holding that a plausible claim for deliberate indifference was alleged against them.  Mr. Ray's estate ultimately dismissed the case voluntarily, and, on information and belief, it was settled.

128.   On December 25, 2015, Christopher Yarber was confined in the Jail for contempt of court related to a truancy matter and, on December 26, 2015, was attacked by another Inmate, resulting in, *inter alia*, a "burst fracture" on his L1 vertebrae, multiple other fractured vertebrae, a punctured and partially collapsed left lung, fractures on the left 10th and 11th posterior ribs, multiple lacerations, abrasions, and contusions, and a concussion

plus nausea and vomiting (all of which injuries were initially diagnosed two days after he had sustained them, following his release from the Jail).

129.    In the ensuing lawsuit (against, *inter alia*, Sheriff Watson and Captain Thomas), Mr. Yarber alleged that, although he reported those injuries to BCSO corrections deputies, he was provided no medical treatment.  Mr. Yarber died while his lawsuit was pending, and Bradley County settled with his widow.

130.    On March 16, 2016, Hershel C. Dover was arrested on (1) a violation-of-probation charge in Bradley County (specifically, failure to pay court fines and probation fees and contact his probation officer) and (2) possession of marijuana.  Mr. Dover's family informed the arresting officer that he (1) suffered from severe diabetes such that he required an insulin injection three times daily, (2) required a diet that would not cause his blood glucose to spike, and (3) needed to eat regularly.  The officer assured them that he would pass on that information to Jail personnel.

131.    While incarcerated at the Jail, Mr. Dover was not given the necessary injections of insulin, and, after a QCHC nurse observed him vomit blood, he was placed in a cell.  The next morning, (1) Mr. Dover was discovered on the floor of his cell without a pulse and covered in vomit (specifically, coffee-ground emesis, indicative of upper gastrointestinal bleeding) and was transported to a hospital and pronounced dead, and (2) an autopsy revealed significantly elevated blood glucose and a stomach void of food and medication.

132.    On or about March 29, 2016, Mayor Davis informed the County Commission Finance Committee that the number one budget request decrease for 2017-2018 was $275,000.00 from the BCSO.

133. On or about April 28, 2016, Billy Joe Rogers was confined in a cell with other Inmates. On information and belief, one or more BCSO corrections deputies tossed a "care package" into the cell and encouraged the prisoners to determine whose it was, and, in the ensuing melee, Mr. Rogers was severely beaten and suffered severe blunt force damage to the head. When they discovered him, BCSO corrections deputies ORd him so that Bradley County would not bear the cost of his medical treatment. Mr. Rogers died from his injuries on April 29, 2016, and the autopsy report stated that the cause of death was "[r]upture of saccular aneurysm of supraclinoid right internal carotid artery, due to blunt force injuries of head."

134. A resulting lawsuit attributed his assault with an "unregulated gang problem," and claimed that BCSO personnel "secreted or destroyed" video and audio evidence of the assault and witness statements of corrections deputies and Inmates.

135. On information and belief, at some point in 2016, Justin Christopher Presley brought suit against Bradley County, claiming that Jail personnel (1) knew that he was mentally compromised and a suicide risk but allowed him to jump from a high place in the jail and severely injure himself and (2) placed him on an OR bond without his knowledge or participation so that the county would not have to pay his medical bills.

136. On or about August 18, 2016, the Jail failed its TCI inspection. Among other issues, the TCI report identified deficiencies in the physical plant, security, discipline, sanitation/maintenance, food service, mail, hygiene, the supervision of Inmates, and medical services.

137.   Mayor Davis was copied on the letter from TCI Executive Director Beth Ashe informing Sheriff Watson of the failure and was provided with a copy of the report documenting the specified deficiencies, including those concerning Inmate medical care.

138.   With respect to the physical plant, the report noted that (1) the booking cells were being used as housing because of overcrowding, and (2) there was a lack of supplies, including uniforms and bedding, for the prisoners, many of whom were forced to sleep on the floor.

139.   At that time, the booking area was being used to house an average of forty or more Inmates for several weeks at a time, despite not being certified as inmate housing by TCI.

140.   With respect to discipline, the report stated that no documentation showed that the Inmates were being provided Disciplinary Rules and Sanctions during the booking process.

141.   With respect to hygiene, the report noted that, *inter alia*, no documentation showed that Inmates were receiving (1) clothing during the booking/intake process, or (2) mattresses, blankets, sheets, or bath-sized towels.

142.   With respect to supervision of Inmates, the report noted that (1) the facility security check logs were not being conducted within an hour from the previous check on a consistent basis, (2) the documentation reviewed was very vague and did not include a description of what was going on in the area checked, (3) the suicide observation and restraint chair checks were not being conducted within the specified time parameters and were vaguely documented, and (4) the forms being used by the officers had check times preset and were not authorized by Jail administration.

143.   With respect to medical services, the report noted, *inter alia*, that (1) "[t]he medical intake screening questions are not being filled out on a consistent basis during the

Booking/Intake process," (2) "[t]here [was] no consistent documentation showing that the Inmates were being informed of the medical copays, sick call, and the grievance process during the Booking/Intake process," and (3) medical supplies and equipment were not being inventoried on a regular basis.

144.    The report further noted that, (1) pursuant to the HSA (in its then-current iteration), QCHC provided "all the [I]nmate medical services" at the Jail, (2) "the annual meeting with the [Jail] and health care provider was conducted by Dr. Johnny Bates MD, Captain Gabe Thomas, and Superintendent Allen Walsh on January 27, 2016," and (3) "[t]he [Jail] also meets with QCHC on a monthly basis to review operational needs."

145.    The report further noted that the facility classification process was "very difficult to achieve" because of overcrowding "throughout the facility," and most of the deficiencies listed in the report were due to (1) "the continued overcrowding situation [27% above the certified capacity, *i.e.*, *558* prisoners in a facility certified for 408 prisoners]," and (2) "a shortage of staff at times to fill all the designated [p]ost[s] on a consistent basis."

146.    In addition, the report "strongly recommended" that the Jail "purchase temporary correctional grade stack type bunks to give to all the Inmates sleeping on the floor with mats," and noted that Mayor Davis, the County Commission, and Sheriff Watson were expecting the new (127-bed) Workhouse to be completed in April 2017 "to help reduce the overcrowding situation."

147.    As of that approximate time, only sixty-seven BCSO/Jail corrections positions (out of the specified ninety-two) were filled.

148.    On or about August 19, 2016, immediately following the TCI report's issuance, it was reported that approximately seventy-five Inmates (for whom there was no housing,

clothing, bedding, or other hygiene supplies) were being housed in the booking area, and Captain Thomas "froze" admissions into the Jail, which he reportedly noted would "tick off" district attorneys and others, telling the CPD and BCSO that there was no room for new prisoners, and, if they made arrests, their arrestees would be "sitting in their cars."

149.    Upon hearing of the incident, County Commissioner Dan Rawls characterized it as a "failure to improvise" on the BCSO's part and stated that he did not see "how they [could] do what [they were] doing," because they could not "just keep those guys in [their] car[s]."

150.    In addition, at that time, BCSO Chief Deputy Brian Smith "ordered jail personnel to never turn away anyone surrendering to an outstanding warrant" after Captain Thomas ordered a man attempting to surrender on an outstanding warrant to return later.

151.    On September 19, 2016, Ralph Lee Nelms was arrested and confined in the Jail. Although he was behaving erratically, displaying suicidal behavior, and had been placed in a suicide-observation unit visible to BCSO corrections deputies, some of those deputies covered the window of the unit with a sheet, and he hanged himself with a cloth gown with straps that had been left in the room.

152.    The BCSO corrections deputies involved in the incident were ultimately indicted on charges related to falsifying records and failing to perform their duties in connection with Mr. Nelms's suicide.

153.    The TCI conducted a reinspection of the Jail on October 6, 2016, and found that the BCSO had corrected some of the Jail's operational deficiencies—specifically, the booking area was no longer being used for housing, the booking and Inmate areas had been cleaned, and some showers, sinks, and toilets had been repaired.

154. In addition, the TCI found that the BCSO had begun documenting that (1) Inmates were receiving clothing, bedding, and bathing supplies, (2) hourly security checks were being conducted, and (3) the suicide observation and restraint chair checks were being conducted within specified time parameters.

155. However, the TCI determined that the Jail was still substantially overcrowded (23% above capacity) and understaffed, and health and sanitation issues remained. The TCI gave the BCSO until December 7, 2016 to correct the Jail's remaining deficiencies.

156. Then-Chief Deputy Brian Smith noted that the repairs continued, and that he and Captain Thomas recognized the importance of maintaining TCI certification and immediately drafted a plan to address the issues identified in the August 2016 inspection.

157. The reported number of BCSO/Jail corrections positions had risen to eighty-three as of November 2016.

158. In November 2016, an unsigned letter from a BCSO employee accused Sheriff Watson, *inter alia*, of (in addition to nepotism, improper use of employee services for personal benefit, and forgery of employee signatures) deceptively reassigning employees to the understaffed Jail in advance of the December 7, 2016 TCI re-inspection so as to make it appear that the BCSO had corrected Jail understaffing.

159. Specifically, (1) although the Jail was supposed to have ninety-two corrections deputies and/or other personnel, only a few days prior to the submission of that letter, only sixty-four were actually employed there, and (2) BCSO moved twelve (or more) employees from the fugitive/transport unit, garage, and other positions to the Jail.

160. Also in November 2016, the County Commission voted to monitor Jail maintenance and staffing more closely, and Law Enforcement Committee Chairman Jeff Yarber stated that

Case 1:18-cv-00217-CHS   Document 1   Filed 09/18/18   Page 31 of 73   PageID #: 31

"[a]t the end of the day, the buck stops with us. . . . You've got to be careful not to micromanage an elected official, but you do have oversight."

161. In early March 2017, a "blue feud" erupted between the CPD and the BCSO over the BCSO's refusal to book arrestees at the Jail, following a March 1, 2017 incident in which BCSO corrections deputies refused to accept two heavily intoxicated men, stating that they needed to be "treated" for that intoxication at a local hospital before they could be jailed. Those men were transported to a local hospital "unarrested."

162. That refusal angered CPD officers, who escalated their arrests (and subsequent drop-offs for booking at the Jail), in an effort to create problems for the Jail.

163. On March 14, 2017, Thomas Creek was arrested and taken to the Jail, which refused to accept him for "medical reasons," at which time he was released from custody. He was subsequently transported to and then released from a local hospital.

164. His body was recovered weeks later in Polk County, and it was determined that he had been murdered by being shot in the head.

165. His mother related that (1) he had complained of cellulitis in his legs (and had slightly elevated blood pressure) as he "knew that complaining he was sick was a 'get-out-of-jail free' card," (2) it was the second or third time the Jail had refused to accept him, and (3) no officer had accompanied him to the hospital.

166. On March 28, 2017, the BCSO refused to book Jardarius Hudgins (arrested on violation-of-probation warrants related to two counts of aggravated burglary, theft over $10,000.00, and reckless endangerment) in the Jail because he had a cut on his arm that required stitches.

167. Specifically, BSCO Lieutenant Carol Edwards stated that Mr. Hudgins would be "redirected for medical care" and that the Jail was "not taking him in." CPD Officer Bradley Colbaugh gave Lieutenant Edwards a copy of Tennessee Attorney General Opinion No. 02-015—directing that a county jail has may not refuse to take custody of an arrestee under any circumstances. Lieutenant Edwards (1) refused to accept or review that opinion, stating that she was following Bradley County policy and (2) instructed her subordinates to refuse to accept the paperwork and to keep the door to the Jail "shut all night."

168. The CPD had no choice but to release Mr. Hudgins.

169. Following that incident, on April 5, 2017, the CPD and BCSO officials and Bradley County Attorney Crystal Freiberg met to discuss the situation. Following that meeting, the BCSO revised the Jail's policy as follows:

> When the arresting deputy arrives with an arrestee, the intake Deputy will observe the arrestee for any signs of obvious injury, profuse bleeding, and the degree of intoxication. If the degree of intoxication would prohibit the arrestee from walking into the jail on his/her own or the injury requires immediate attention, the shift Lieutenant will be notified. If the shift Lieutenant feels the arrestee needs to be taken to the hospital, 911 dispatch will be notified by corrections staff to render care for the inmate. If the arrestee refuses medical treatment at the hospital, the Corrections Deputy will provide booking personnel with a medical refusal form from the hospital.

170. In a subsequent statement, Ms. Freiberg wrote that "The Bradley County Sheriff's Office is aware that the Bradley County Jail must accept all persons arrested pursuant to law by the Sheriff's Office or any City Police Officers. . . . Bradley County does not 'refuse' [I]nmates." She further wrote that the Jail's contract medical staff decides whether any prisoner requires emergency medical care.

171.    On information and belief, this change in policy caused the Jail's medical costs to increase, with the result that QCHC began to cut back on the number of Inmates it sent to the hospital so as to minimize costs to the BCSO.

172.    For example, the BCSO began releasing injured Inmates (*e.g.*, in fights) on an "OR" basis, which the BCSO used as a ground not to pay for the medical care rendered.

173.    As discussed *infra*, Gary Lee Lipps, Jr. was arrested on April 16, 2017.  BCSO deputies transported Mr. Lipps to Tennova Healthcare ("Tennova") where they marked the "payor" line as "self-pay" rather than "BCSO."

174.    On information and belief, (1) Mr. Lipps requested that Tennova bill the BCSO and was told that it was BCSO's decision, and (2) BCSO deputies left Mr. Lipps unattended/unguarded at Tennova so that BCSO would not be responsible for the medical bill.  One or more deputies subsequently returned and transported Mr. Lipps to the Jail.  Mr. Lipps was ultimately billed $11,000.00 for the treatment he received.

175.    On May 22, 2017 Mr. Barkley (of QCHC), made a presentation to the County Commission.

176.    He addressed, *inter alia*, the concern of the some County Commissioners that Inmate medical costs had surpassed the $75,000.00 limit for offsite care by $42,000.00.

177.    On June 14, 2017 BCSO advisor/Jail maintenance director (and former Bradley County Sheriff) Dan Gilley resigned as the Jail's maintenance director, a post he had assumed in 2016.

178.    Specifically, Mr. Gilley stated that he

> d[id] not see how we [could] possibly address all of the needs that will impact certification in time for the follow-up inspection thirty days later. . . . After receiving a conditional certification by TCI in December that was based on

34

completing much work on the housing area that remains undone, the odds are
we will not be certified for 2017-18.

179. Mr. Gilley further stated that the three people on the maintenance staff had "performed miracles" with the budget they had, but that "[i]t is a plain and simple fact that this facility was not designed to operate safely and securely with only a little over one-half of the staff it needs."

180. At a contemporaneous meeting of the County Commission, Sheriff Watson stated that, although (1) the Jail was built to house a maximum of 408, it then held 520, and (2) recommended staffing was ninety-two corrections deputies, it was then sixty-six (although up from 57 in 2010).

181. County Commissioner Dan Rawls stated that he received a list from Captain Thomas naming eighteen persons whose salaries were paid from the corrections budget but who did not appear to work in that department, such that approximately $800,000.00 was allegedly spent on Jail staffing by corrections deputies when, in fact, it was not. Sheriff Watson responded that whoever had given Commissioner Rawls the list "doesn't know what he's talking about."

182. Commissioner Rawls further stated that the Jail's staffing shortage needed to be remedied "so we don't get in trouble with the state and have something stupid happen like the jail gets closed."

183. Sheriff Watson responded that "[t]he TCI is not going to come in here and threaten to shut us down."

184. At that meeting, Committee Chairman Jeff Yarber opined that the Jail's understaffing was related to overcrowding and maintenance problems, and that the County needed

35

options besides incarceration for, *inter alia*, nonviolent offenders, a position with which at least some County Commissioners agreed.

185.    On information and belief, prior to the end of the fiscal year on June 30, 2017, the BCSO transferred money from other budgetary line items into the medical line.

186.    On July 11, 2017 the BCSO posted a recruiting advertisement for seven new corrections deputy positions.

187.    On July 27, 2017, Bradley County opened the Brian K. Smith Workhouse, which, on information and belief, contained 127 additional beds and was expected to help alleviate overcrowding at the Jail.

188.    On September 20, 2017, plaintiff Darrell Eden was unconstitutionally denied medical care at the Jail, as set forth *infra*.

189.    On or around November 8, 2017, the TCI recertified the Jail.  In response, Sheriff Watson stated:  (1) "Our agency is proud, yet humble, that our jail has never been decertified after a yearly inspection and recognizes the importance of maintaining TCI certification," and (2) "[n]ot only does this certification validate that the Bradley County Jail has met all standards set by the Tennessee Corrections Institute, but provides documented evidence to the community that our jail is operated efficiently and effectively."

190.    The report showed that many of the problems identified in the 2016 TCI inspection report had been corrected, and that the workhouse's opening had reduced the overcrowding of male prisoners.  The report noted that the female prisoners remained at 35% above capacity and stated that the Jail would retain its certification if it the TCI board approved an updated plan of action.

36

191.    The reported number of BCSO/Jail positions reportedly held steady at eighty-three.

192.    On December 7, 2017, the Tennessee Comptroller of the Treasury ("Comptroller") issued a "no-findings" audit report with regard to the BCSO. In response, Sheriff Watson boasted that the BCSO had "kept our jail certified when some said it could not be done, purchased state-of-the-art equipment for our officers to use, successfully began operations of a workhouse, and record[ed] some of the highest arrest rates as well as crimes-solved rates in the history of the [BCSO]."

193.    On January 4, 2018, BCSO's Captain of the Criminal Investigations Division, Steve Lawson, resigned his position and announced his candidacy for the office of Bradley County Sheriff, stating that "time ha[d] come for him to separate himself from [the Watson] administration," because he "no longer respect[ed] or believe[d] him."

194.    Then-Candidate Lawson was highly critical of Sheriff Watson for a variety of reasons, and attacked, *inter alia*, his "continued lack of leadership."

195.    With respect to overcrowding, then-Candidate Lawson wrote that he would (1) "work daily with Corrections supervision to see if an overcrowding problem is looming and prepare immediately to resolve the issue," (2) consistently brief the County Commission on any overcrowding issues and work together on a plan for the future if an overcrowding problem continues to exist," and (3) "face any overcrowding problems with common sense solutions, working with the District Attorney's Office to address the issues by using alternative sentencing or punishment."

196.    On January 21, 2018, BCSO Chief Deputy Brian Smith and Director of Human Resources Arnold Botts resigned their respective positions.

37

197. On January 27, 2018, Sheriff Watson released a direct video appeal to voters. In that appeal, he stated, *inter alia*, that, when he assumed office, the Jail was not properly maintained and did not deserve certification, but that he had formulated a successful "three-year plan" to correct it. In addition, he again touted his commitment to "efficiency," promised that he would not increase taxes, and noted that the BCSO had returned money to Bradley County's general fund each year.

198. On or about February 27, 2018, the TCI performed a surprise inspection of the Jail.

199. TCI inspectors (again) found Inmates housed in holding cells in the booking area without uniforms, hygiene supplies, or bedding.

200. Inmates were (again) being housed permanently in the booking area and (again) sleeping on concrete floors on dilapidated mattresses.

201. In addition, the report (again) recommended that the BCSO purchase stackable bunks, repair broken sinks, toilets, and showers, and a leaking roof.

202. The report further noted that security check logs were (again) not being done hourly, as required, and (again) suicide observation and restraint chair checks were not being performed in the required time.

203. The report (again) attributed the deficiencies to overcrowding, and the inspector opined that "most of the deficiencies listed in the report are due in large part to the continued overcrowding in the booking and male [I]nmate housing areas along with a shortage of staff at times to fill the designated post[s] on a consistent basis."

204. Sheriff Watson also blamed the deficiencies on overcrowding, this time attributing that overcrowding to the 151 state Inmates then confined to the Jail.

205. With respect to those state Inmates, he claimed that the BCSO had made "numerous written requests" to TDOC for state-prisoner transfers.

206. In response, a spokesperson for TDOC stated that Sheriff Watson's comments were "the first that [TDOC had heard] about" transfer requests, and the department was "really dumbfounded" because it "did not have requests from him that say we have not responded to his inquiries."

207. Indeed, TDOC records showed that (1) Sheriff Watson had requested a transfer of three prisoners to a state prison on February 22, 2018, and a transport team did so the following day, and (2) more generally, that TDOC had been responsive to transfer requests from the BCSO.

208. The TDOC spokesperson further said that TDOC contacted Sheriff Watson after reading the story and offered to receive prisoners from the Jail. In response to that offer, Sheriff Watson gave the state sixty male prisoners and thirteen or fourteen female prisoners (which amounted to approximately $85,000.00 per month in revenue for housing state prisoners).

209. TDOC prisoner-transport buses have reinforced windows, a barrier between the driver and prisoners, and prisoners often are tethered to the bus with chains.

210. On information and belief, Sheriff Watson arranged to have the seventy-four prisoners transported to the Bledsoe County Correctional Complex in what was essentially a school bus, which lacked a safety cage for driver and guard, wired windows, or tether points for prisoner shackles. While those prisoners were being transported, the bus blew a front tire, necessitating a rapid response from various law enforcement agencies.

Case 1:18-cv-00217-CHS   Document 1   Filed 09/18/18   Page 39 of 73   PageID #: 39

211.    In early March 2018, Sheriff Watson requested that the County Commission authorize a movement of $36,000.00 from the deputy salaries and equipment portion of the BCSO budget to supply Inmates with towels, soap, and bunks following the February 2018 TCI inspection.

212.    County Commissioners asked why the transfer was necessary given the thousands spent the previous year to correct similar (or identical) issues and noted that the BCSO budget had been increased by over one million dollars in the previous three-and-a-half years.

213.    County Commissioner Thomas Crye opined that the Jail was understaffed and "overfilled on state prisoners, and the consequence is our citizens that are arrested are placed in holding cells with no clothes. . . . [t]he d-mn dogs and cats over at the SPCA get treated better than that."

214.    In response to that remark, County Commissioner Charlotte Peak stated that County Commissioner Crye had "come over to the dark side with [her]" concerning the need for decent Inmate treatment.

215.    On March 8, 2018, Christians for Accountable Leadership, a local political action committee, complained that Sheriff Watson had endangered public safety by (1) in May 2017, transporting nine convicted state felons (whose crimes included vehicular homicide, methamphetamine manufacture, burglary, and aggravated assault), unguarded and in civilian clothes to a local Baptist church to show how Sheriff Watson's prison ministries had changed their lives, and (2) on July 4, 2017, permitting "trusties" (Inmates with special status and privileges) to work at a fireworks show, again in civilian clothing, during which time one such trusty apparently took a photo (posted on Facebook) with an attendee.

216. A contemporaneous investigation revealed that BCSO was unable to provide records documenting such prisoner releases and work assignments, including the May and July 2017 excursions.

217. TDOC confirmed the prisoners' identities and sentences, and a spokesman stated that (1) he could not think of any circumstances in which he would allow unsecured felons out of prison in civilian clothes, and (2) TDOC expects local jails to follow its policies concerning state Inmates.

218. In a March 2018 debate with then-candidate Lawson, Sheriff Watson responded to questions concerning Jail overcrowding by noting that, because the TCI inspections are not announced, the TCI could generally find problems given Inmates' destructive tendencies (specifically concerning mattresses, toilets, and showers).

219. Sheriff Watson further opined that:

> It's always going to be a problem[;] it's never going be solved, unless we just go back to the old days and just take the mattresses away from them, just treat 'em like they used to in the '50s and '60s where you get the water hose and the fire hydrant and hook it up and just spray 'em down . . . . You can't do that no more. They have more rights than the schools. It's sad.

220. In response to a question about balancing capital costs of expansion with the income earned by housing state prisoners, Sheriff Watson opined: "It's just going to get worse until America gets God back into our school system and families get serious about meeting around the table and praying over the dinner at night."

221. Then-candidate Lawson responded to the same question by stating that he would consult with the County Commissioners about predicted jail populations over a series of years and determine whether adding more cells was warranted.

41

222. Sheriff Watson defended his decisions concerning the Jail ministries programs, stating: "I stand on the rock, they can challenge my faith all they want to, but I know one thing, that the [I]nmate program has changed lives, and I'm going to continue it, I'm not going to stop it because of some stupid, ignorant people in this county."

223. On or about the same date, Sheriff Watson issued a "Faith in Practice" press release, which read as follows:

> If God and my community grant me a second term, I plan to extend the faith-based programs and help even more individuals through my Christian faith and values-driven leadership. It's rewarding to see how many people we've helped through bringing ministry to the Bradley County Jail, and I look forward to helping many more.

224. At an April 3, 2018 re-inspection of the Jail, the TCI found that the Jail had failed to meet all minimum standards but that it could retain its certification if the TCI approved an updated plan of correction.

225. On April 5, 2018, Sheriff Watson boasted that one of the "first things [he] did when [he] took office was dramatically reduce overhead," and that he was "committed to using the least amount of taxpayer dollars necessary to protect our community."

226. On or about April 19 or 20, 2018, an Inmate at the Bradley County Jail died; according to a contemporaneous BCSO press release, he "started having medical issues and was transported to a local hospital by Bradley County Emergency Medical Services, where he later died."

227. District Attorney Steve Crump stated that "from all appearances," it did not "look to be the kind of case that's going to take forever to get back; but we'll need to get the autopsy and toxicology results back before we can say what happened."

42

228. BCSO Communications Director James E. Bradford, Jr. stated to the press that the Inmate's name would be released after his next of kin had been notified.

229. As of the filing of this complaint, Bradley County has yet to publicly identify that Inmate or the circumstances surrounding his death.

230. In early May 2018, then-candidate Lawson defeated Sheriff Watson in the GOP primary (although he did not assume office until September 1, 2018).

231. He immediately noted that, while the BCSO corrections budget had 100 listed salaries, only seventy people were actually working in the Jail. He stated that he would consider returning some of those persons to the Jail, and that improving Jail conditions was "one of his first priorities," which he would accomplish through "four and eight year plans for staffing, training, equipment, and goals to give the [County Commission]."

232. On May 25, 2018, the Jail was put on "lockdown" because the Jail staff was inadequate to ensure security. The prisoners were put on lockdown, and the jail ministry programs were shut down because of danger to prisoners, corrections deputies, and the public.

233. County Commissioner Jeff Yarber (chairman of the Law Enforcement Committee) reported that he was told that (1) some corrections deputies were on medical leave, (2) more than a half-dozen positions were unfilled, and (3) BCSO administration had made the decision to transfer corrections deputies from the Jail to positions as court security officers.

234. In addition, County Commissioner Yarber stated that, of the sixty-eight corrections officers actually working at the Jail, more than forty (approximately 60%) were first-year probationers who were supposed to be supervised by senior personnel.

43

235. County Commissioner Yarber further opined that (1) BCSO corrections deputies' salaries and benefits should be improved, and (2) if BCSO was short a position, "[the Sheriff] should come and ask [the County Commission] for that position."

236. Finally, as the county budget process was then underway, he planned to ask if there were money for an increased corrections budget.

237. On June 27, 2018, dozens of (as many as fifty-five) federal Inmates staged a protest (which dispatch records characterized as a "riot") over the quality of the Jail's food, and approximately a dozen SWAT officers, two police dogs, and an ambulance arrived to address the situation.

238. On July 3, 2018, the County Commission approved the Bradley County budget, but there was no tax increase.

239. On July 10, 2018, a Jail Inmate was injured in a fight with another Inmate and airlifted to an area hospital; the BCSO declined any further comment, purportedly because of federal privacy laws (*i.e.*, HIPAA).

240. On July 11, 2018, a female Inmate at the Jail who had been placed on suicide watch (and was in a "conscious, but confused state") attempted to hang herself and then jumped from a bunk and injured her feet after which time she was transported by ambulance to a local hospital.

241. On August 20, 2018, Fawn Zanette Branham died in the Jail, which, on information and belief, resulted from a drug overdose.

242. In a "farewell" Facebook post, Sheriff Watson boasted, *inter alia*, that the BCSO had returned over $600,000.00 to the Bradley County general fund.

44

243. On September 1, 2018, Sheriff Lawson was sworn in as the Bradley County Sheriff. The same day, he ordered a sweep of the Jail, which revealed, *inter alia*, razors, a shank, illicit medication, matches, lighters, a case of "hooch," and a tattoo gun.

244. On September 4, 2018, Sheriff Lawson stated that his first priority was to reduce Jail overcrowding, noting that, when he took custody on September 1, 2018, there were 581 Inmates (in the 408-bed facility).

245. As noted above, as of September 7, 2018, there were 570 Inmates housed in the Jail, down from 611 the previous week.

246. On September 7, 2018, Sheriff Lawson met with the County Commission's Law Enforcement Committee to discuss needs at the Jail and identified the following as his "top priorities": (1) a new control board (*i.e.*, the master equipment for door locks throughout the Jail), (2) improved property rooms, (3) sewer system improvements, (4) building and equipment maintenance, and (5) washers and dryers.

247. It does not appear that Sheriff Lawson identified Inmate medical care or staffing, training, and or supervision of BCSO corrections deputies as "top" priorities (or even priorities).

248. On September 11, 2018, another Inmate died at the Jail.

249. BCSO Director of Media and Public Relations Adam Lewis claimed on that date that the BCSO had notified District Attorney Steve Crump and the TBI, but did not identify the Inmate and stated that "[n]o other details could be released at [the] time," but that a "more detailed press release would be sent as soon as possible."

250. As of the date of the filing of this complaint, the BCSO has submitted no such "more detailed press release."

251. On information and belief, Bradley County was sued approximately twenty-seven times during Sheriff Watson's tenure, and many of the lawsuits resulted in substantial settlements (*e.g.*, Bradley County settled with Mr. Nelms's estate for approximately $475,000.00).

## Sheriff Watson's Tenure Was Marked by Controversy and Allegations of Wrongdoing and Criminality

252. Apart from his role in the decisions and events affecting prisoner well-being and health care discussed herein, numerous controversies and allegations of improper (and illegal) conduct—including abuse of power and financial improprieties with public funds—marked Sheriff Watson's administration.

253. At best, those scandals distracted him from the actual responsibilities of his job, including the proper care of prisoners and, at worst, reveal a pattern of improper conduct logically extending to the consciously inadequate provision of medical care to Inmates during his tenure.

254. During Sheriff Watson's tenure, his wife became a bail bondsman, violating (or flirting with violations of) Tennessee law, which prohibits the spouse of a sheriff from serving as a bail bondsman if the spouses commingle funds. *See* Tenn. Op. Atty. Gen. No. 14-80 (2014).

255. Although he denied any wrongdoing (on the ground that he and his wife maintained separate bank accounts and kept separate finances, although they resided at the same home and both were listed on the mortgage and deed), she experienced unusual success for a rookie bail bondsman and, on multiple occasions, used BCSO resources in aid of that business (*e.g.*, accompanying Sheriff Watson to a pre-scheduled DUI roadblock with regard to which she wrote substantially more bail bonds than competitors).

256. In addition, on information and belief, BCSO personnel retaliated against at least one competitor agent who complained about favoritism toward Ms. Watson. Specifically, they falsely stated that a judge had revoked her bonding authority and denied her the courthouse privileges that other bail bondsmen were afforded.

257. In 2016, American Atheists, Inc. ("American Atheists") sued Sheriff Watson in his official capacity for violating the Establishment Clause of the First Amendment to the United States Constitution by promoting Christianity on the official BCSO Facebook page and censoring comments critical of Christianity and Sheriff Watson. American Atheists dismissed the case after Bradley County agreed to pay it $41,000.00 ($15,000.00 in damages and $26,000.00 attorney's fees) and ensure that the BCSO Facebook page would no longer be used to promote any given religious belief or organization.

258. On information and belief, in 2016, Sheriff Watson (1) assisted the release of a female Inmate (arrested on a robbery charge) with whom he had a personal relationship, specifically by requesting that multiple judges lower her bond (which one judge called "unusual") and, (2) after she was rearrested, released her early on furlough.

259. A BCSO whistleblower accused Sheriff Watson of forging employee names on meal receipts and paying BCSO employees to pick up automobiles Sheriff Watson had purchased for himself.

260. The Bradley County Mayor threatened to shut down county officials' access to credit cards after an audit revealed that their use was improperly documented; the BCSO was the greatest offender with respect to such use.

261. On or about April 15, 2017, Sheriff Watson ordered BCSO Sergeant Jason Brock to order into the sally port female Jail Inmate Stephanie Anderson, whom he accused of spreading

rumors about his wife, *i.e.*, that she had been "arrested for meth." He ordered that prisoner to inform the other Inmates that the rumors were untrue and threatened to lock down her pod (Pod I) if the rumors did not cease immediately. He then ordered Sergeant Brock to (1) return Ms. Anderson to Pod I, and (2) put the other Pod I Inmates on roll call and inform them that his wife had not been arrested for meth. Sergeant Brock did as ordered and locked down the Inmates when he had finished.

262. The next day, April 16, 2017—Easter Sunday—Sheriff Watson radioed dispatch at 9:55 a.m. to ask for outstanding warrants for Mr. Lipps (mentioned *supra*), a "bail skip" for whom his wife had written a $2,000.00 bond in February 2017.

263. Thereafter, he embroiled twelve law enforcement personnel from four separate agencies and two states—seven BCSO deputies, two K-9s, two Polk County, Tennessee deputies, two Murray County, Georgia deputies, and one Georgia State Patrol trooper—in a multistate manhunt for Mr. Lipps.

264. Driving an unmarked black BCSO Tahoe (in which his wife was also present as a passenger), Sheriff Watson (clothed in shorts and a t-shirt) pursued Mr. Lipps into the State of Georgia, where he had no jurisdiction.

265. He pulled over a motorist he thought was Mr. Lipps, drew and pointed his firearm at the motorist, opened the motorist's driver's-side door, and forcibly pulled him out of the car. The motorist, in fact, was not Mr. Lipps. A video of the encounter is available at https://www.youtube.com/watch?v=iJfheeaoPok.

266. Sheriff Watson and BCSO deputies subsequently apprehended Mr. Lipps (who was unarmed), at which time he was pummeled and bitten on the thigh (resulting in nine puncture wounds six inches in length) by a K-9 German Shepherd called "Joker."

48

267. In July 2017, Sheriff Watson was indicted on six counts of knowingly holding or using forged or falsified car titles in connection with unlicensed used car sales, booked into the Jail, and posted bond on six felony counts.

268. On or about August 22, 2017, the County Commission voted to move forward with a forensic audit of the BCSO in order to investigate the various allegations of financial irregularities, including credit-card misuse and missing money.

269. These and other imbroglios resulted in a years-long TBI investigation into Sheriff Watson (which was closed in 2018).

### Allegations Specific to Plaintiff and Putative Class Representative Darrell Eden

270. Mr. Eden has a significant medical/surgical history and a number of current serious health problems, including: hypertension, hypoglycemia, gastrointestinal disease and bleeding (and a colectomy), diverticulosis, hernia, transient ischemic attack, chronic obstructive pulmonary disease ("COPD"), emphysema, right lung dysfunction, and blood clots; removal of upper lobe of right lung, removal of 1/3 of colon, appendectomy, and hernia repair. In addition, Mr. Eden's right lung adheres to his chest wall.

271. In combination, these impairments are very challenging for Mr. Eden and make many activities of daily living difficult.

272. Despite his impairments, Mr. Eden is employed full-time in the health-care industry, specifically as an x-ray technologist at Tennova Healthcare in Cleveland, Tennessee.

273. On the evening of September 19, 2017, Mr. Eden consumed Ambien and a small amount of alcohol because he had difficulty sleeping.

274. He rose on the morning of September 20, 2017, prepared breakfast for himself and his wife, and drove to work.

275. While driving to work (at a speed of approximately seventy miles per hour), Mr. Eden fell asleep and hit a concrete wall on White Oak Mountain on I-75 in Bradley County.

276. In this crash, he broke his finger (on his right hand), his left ankle, and seven ribs (two of which were displaced fractures), and also likely suffered a concussion. Photographs of Mr. Eden's injuries taken after his release from the Jail (on September 20, 2018) are attached collectively as Exhibit B.

277. A Tennessee Highway Patrol ("THP") State Trooper (the "Trooper") arrived at the scene.

278. Mr. Eden informed the Trooper that he had consumed Ambien and a small amount of alcohol the previous evening. The Trooper administered a field sobriety test to Mr. Eden (who was likely concussed, certainly disoriented, and had a broken ankle, finger, and seven ribs), who did not pass it. Accordingly, the Trooper arrested him for DUI.

279. At some point while he was in the custody of the Trooper, Mr. Eden texted his wife that he had not arrived at work and asked for a list of his medications. In addition, he informed his employer that he would not be coming in to work that day.

280. Thereafter, the Trooper transported him to the Jail.

281. While they were in the Jail parking lot, the Trooper summoned an emergency medical technician to administer a blood test to Mr. Eden (but not to evaluate or treat him medically).

282. The Trooper then remanded him to the custody of the Jail.

283. At all times while at the Jail, Mr. Eden was in substantial pain from the injuries he sustained in the car accident, and it was very difficult for him to walk on his broken ankle or use the hand with the broken finger.

50

284. In addition, his broken ribs were painful and presented special dangers given his pulmonary health problems.

285. The booking/intake corrections deputy (John Doe) required Mr. Eden to surrender his glasses and shoes, which made navigation and walking even more difficult.

286. No one at the Jail performed a medical screening or completed a medical intake form (per BCSO policy) upon his arrival in booking.

287. In addition, on information and belief, no BCSO corrections deputies informed the shift lieutenant of Mr. Eden's obvious injuries, as required by the BCSO policy set forth *supra*.

288. During this period of time, Mr. Eden's wife ("Mrs. Eden") ascertained that he had been arrested for DUI and was being held in the Jail. Because of his extensive health problems, she was very concerned.

289. Accordingly, sometime on the morning of September 20, 2017, she called the Jail and informed the BCSO about those health problems, including his emphysema and COPD.

290. The BCSO personnel to whom she spoke assured her—dishonestly, or, at a minimum, inaccurately—that a medical team had evaluated or would evaluate Mr. Eden. She was told that the BCSO would release Mr. Eden at around 5:00 p.m. that afternoon.

291. Because of Mr. Eden's medical background and training, he was very concerned for his safety and feared that, absent appropriate treatment, his well-being (and even his life) were in serious jeopardy.

292. In particular, he was concerned that, because of his emphysema, his right lung's adherence to his chest wall, and his broken ribs (which he surmised from the pain were

broken), a pneumothorax (collapsed lung) or puncture of the lung by a fractured rib could render him incapable of breathing and cause him to suffocate and die.

293. Accordingly, he expressed his health concerns to a male BCSO corrections deputy (John Doe) (indeed, to several BCSO deputies) and requested transport to the hospital multiple times. John Doe informed him that he would be evaluated by a medical team.

294. After approximately an hour and a half, Mr. Eden still had not been evaluated by a medical team.

295. During that period of time, multiple BCSO corrections deputies came into and left the booking area, and Mr. Eden repeatedly requested medical care.

296. Among those corrections deputies was a female corrections deputy, who entered the room twice, once to bring blankets and then to bring lunch to those Inmates being held in the booking area.

297. Mr. Eden asked her both times when the medical team would arrive to evaluate him, but she ignored him, refusing even to look at him.

298. Despite his repeated requests, Mr. Eden was never medically evaluated or otherwise cared for by anyone at the Jail, with the exception of his fellow Inmates.

299. Fortunately for Mr. Eden, those fellow Inmates were able and willing to assist him.

300. For example, they helped him to stand and to use the toilet, which he could not do on his own power.

301. The difficulty of that task was compounded by the fact that it was difficult to undo the drawstrings on his medical scrubs because of his broken finger and lack of balance resulting from his broken ankle.

52

302.  Had those fellow Inmates not been inclined to assist him, Mr. Eden would have been unable to use the toilet.

303.  In addition, Mr. Eden believes that, without the help and observation of his fellow Inmates, he could have died given, *inter alia*, his multiple broken ribs in combination with his emphysema, and it is likely that, without their help, Mr. Eden would have suffered increased injury, up to and including death.

304.  In addition to requesting medical care and/or an evaluation, Mr. Eden informed corrections deputies on multiple occasions that he needed to call his wife, but each corrections deputy he asked refused his reasonable request, despite the Jail's legal obligation to provide him with a telephone call without undue delay (*i.e.*, not longer than one hour after intake).

305.  Sometime on the afternoon of September 20, 2017, Mr. Eden was permitted to meet with a bail bondsman. When the bail bondsman subsequently met with Mrs. Eden (then waiting outside of the Jail for Mr. Eden's release), he informed her that Mr. Eden might be released early because he "was in bad shape."

306.  Unfortunately, Mr. Eden was not released early, and, on information and belief, was released sometime after 5:00 p.m.

307.  Only after he had met with the bail bondsman (on the afternoon of September 20, 2017) was Mr. Eden booked into the Jail.

308.  When that occurred, he was fingerprinted (including on his broken finger), just a few minutes before he was released.

309. At the time Mr. Eden was released, a BCSO corrections deputy managed to procure a wheelchair, which he used to transport Mr. Eden to Mrs. Eden's car, in what Mr. Eden has characterized as the first kindness shown to him that day by any BCSO personnel.

310. Mrs. Eden drove Mr. Eden directly to Erlanger East Hospital ("Erlanger East"). At that point, he was coughing up blood and was admitted immediately.

311. Because Erlanger East's CT scanner was not functioning, and it was determined that Mr. Eden required a CT scan immediately, Erlanger personnel transferred him via stretcher and ambulance to the Baroness Erlanger Emergency Department ("Erlanger Downtown").

312. Mr. Eden was admitted to Erlanger Downtown in serious condition with diagnoses of, *inter alia*, bilateral rib fracture and left ankle fracture, and medical providers, *inter alia*, administered morphine.

313. The admitting physician at Erlanger Downtown wrote as follows:

> In my professional medical judgment as a board-certified physician or other qualified personnel, this patient presents with an emergency medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy; serious impairment to bodily function, or serious dysfunction of a body organ or part.

314. Mr. Eden was subsequently diagnosed with a fracture of the second metacarpal bone in his right hand.

315. Following Mr. Eden's discharge from Erlanger Downtown, he was transported to Health South Rehab, where he remained, on information and relief, for approximately ten to fourteen days.

316. While there, the medical personnel restricted him for a time in a wheelchair, and taught him how to navigate using a special walker (designed to accommodate his broken finger).

317.   Mr. Eden subsequently had a "stair-lift" chair installed in his home because he could not use the stairs.

318.   As noted above, Mr. Eden's DUI charge was ultimately dismissed.

## CLASS ALLEGATIONS

319.   Plaintiff brings this claim on behalf of himself and, pursuant to Rules 23(b)(1)-(3) of the Federal Rules of Civil Procedure, a class of

> **All persons formerly or currently incarcerated in the Jail under the supervision of the BCSO who have been denied the minimum medical care acceptable under the Eighth and Fourteenth Amendments to the United States Constitution.**

This class of persons (the "Inmate Class") excludes defendants and any members of their immediate family, as well as immediate family members of the judges.

320.   Plaintiff seeks relief from the wrongdoing of defendant Bradley County for himself and for all members of the Inmate Class through Rule 23 of the Federal Rules of Civil Procedure.  The putative class meets the statutory prerequisites of Federal Rule of Civil Procedure 23(a), as set forth herein.

321.   As discussed above, while the Jail's capacity is 408 Inmates, the average daily number of Inmates over approximately the last two to three years has stood at a much higher figure—according to Bradley County figures, 480 in 2015-2016, 520 in 2016-2017, and 503 in 2017-2018, although snapshot figures, (*e.g.*, 558, as determined by the TCI in August 2016) suggest the actual figures were higher and, indeed, in recent weeks, the number of Inmates in the Jail has been as high as 611, according to the BCSO.

322.   In addition, as the Jail houses, *inter alia*, pre-trial detainees, misdemeanor convicts, locally sentenced felons, backup felons, "contract" state felons, and "contract" federal prisoners, Inmate turnover is high, and Inmates are located across the state and beyond,

both in correctional facilities and outside of them. As the facts discussed above strongly indicate, of the Inmates housed in the Jail during the relevant period, there are likely dozens to hundreds of members of the Inmate Class. Therefore, members of the class are so numerous that joinder would be impracticable.

323. The number and identity of putative class members is ascertainable through discovery. Notice to class members can be given through various means, including (1) the already-established channels the BCSO uses to communicate with individuals in its custody, and (2) publication through various media, including newspapers, the internet, and other public organs.

324. Plaintiff's claims are typical of the claims of the Class, as Bradley County's policies and practices have applied to all former Inmates and apply to all current Inmates (and, by extension, to all members of the Inmate Class). Plaintiff will fairly and adequately represent the interests of all Class members and does not have any interests antagonistic to those of the Class. Plaintiff has retained counsel with experience in class action and constitutional litigation.

325. The Inmate Class members' claims involve many common questions of both law and fact. The facts relevant to this action are:

    a. The policies of Bradley County—through the actions of the County Mayor and County Commission (both express and unwritten or customary)—concerning funding for:

        i. staffing of the Jail (specifically as it bears on Inmate medical care);

        ii. training for and supervision of corrections deputies and other corrections staff (specifically as it bears on Inmate medical care); and

       iii.  Inmate medical care;

b. within its funding parameters, the BCSO's operational decisions and policies (both express and unwritten or customary) concerning:

       i.  staffing of the Jail (specifically as it bears on Inmate medical care);

       ii.  training for and supervision of corrections deputies (specifically as it bears on Inmate medical care); and

       iii.  the provision of medical care to Inmates in conjunction with QCHC; and

c. the actors involved in these various decisions.

326.  The injuries sustained by plaintiff and all putative class members flow from a common nucleus of operative fact:

a. The Bradley County legislative arm's knowing and deliberate failure, over a period of years and despite ample cause for concern, to ensure that

       i.  the Jail's capacity corresponded with the Inmate population (specifically as any overcrowding bears on Inmate medical care);

       ii.  the BCSO had means to adequately staff the Jail and train and monitor those staffing it (specifically as it bears on Inmate medical care); and

       iii.  the contract in place with a medical services provider (and the resources provided thereto) was sufficient to ensure that Inmates received constitutionally adequate medical care;

b. the BCSO's knowing, willful—and even malicious—policies and operational decisions concerning

       i.  the number of Inmates housed in the Jail pursuant to state and federal contracts;

ii. deputy allocation among and between various departments of the BCSO;

iii. training and supervision of corrections deputies and other staff;

c. The injuries sustained by plaintiff and all putative class members involve common questions of law concerning the right of plaintiff and Inmate Class members to receive adequate medical care and Bradley County's obligations under the Eighth and Fourteenth Amendments to the United States Constitution.

327. This action may be maintained as a class action pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure because (1) there are almost certainly dozens, or even hundreds, of class members, and (2) the prosecution of separate actions by individuals would create a risk of inconsistent judgments or other adjudications, which could establish irregular or inconsistent standards of conduct by future Bradley County officials, employees, and other agents.

328. In addition, the prosecution of separate actions by individual members could result in adjudications with respect to those individuals that could impair the ability of other members to protect their interests.

329. Further, this action may be maintained as a class action pursuant to Rule 23(b)(2) because Bradley County's policies and practices that form the basis of this complaint apply generally to all members of the Inmate Class. Whatever particular injuries—and damages—the individual class members have sustained as a result of unconstitutionally inadequate medical care, Bradley County's custom or policy actually and proximately caused them, and prospective injuries to Class members can be remedied by Class-wide injunctive and declaratory relief.

330. Further, this action may be maintained as a class action pursuant to Rule 23(b)(3) because (1) questions of law and fact common to members of the Inmate Class—set forth above—predominate over questions affecting only individual members, and (2) a class action will be superior to other available methods for fairly and efficiently adjudicating the controversy. Specifically:

   a. Members of the Inmate Class do not stand to appreciably benefit from individually controlling the prosecution of separate actions;

   b. There is currently little or no pending litigation concerning the violation of Inmates' constitutional rights (and related state law causes of action) against Bradley County;

   c. It is eminently reasonable to concentrate the litigation in this forum, which is the forum in which the situs of the actions and injuries addressed herein exists and will remain; and

   d. A class action concerning these matters will be achievable in an orderly and just fashion.

## CAUSES OF ACTION

### Count I: 42 United States Code Section 1983 – Violations of the Eighth and Fourteenth Amendments to the United States Constitution

**(as to Bradley County, Sheriff Watson, in his official and individual capacities, Captain Thomas, in his official and individual capacities, and John and Jane Doe, in their official and individual capacities)**

331. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

332. Bradley County violated Mr. Eden's rights under the Eighth and Fourteenth Amendments to the United States Constitution, and that violation was caused by and is directly attributable to (1) its illegal official budgetary policy, (2) its policy of inadequately training and supervising corrections deputies and other Jail personnel with respect to

59

Inmate medical care, and (3) its entrenched custom of tolerating and/or acquiescing in federal rights violations, both with respect to Inmate medical care and otherwise.

333.     At all times relevant hereto, Sheriff Watson, Captain Thomas, and John and Jane Doe were acting under color of state law and their office and in the course and scope of their employment.

### Bradley County's Violation of Mr. Eden's Constitutional Rights

334.     The Eighth Amendment to the United States Constitution, incorporated as to the states through the Fourteenth Amendment to the United States Constitution, provides that all citizens, including members of the Inmate Class, may not be subjected to cruel and unusual punishments.

335.     When he was booked in the Jail, Mr. Eden was suffering from objectively identifiable, serious medical needs, including broken bones and the substantial risk of severe bodily harm or death posed by, *inter alia*, his emphysema/COPD and other conditions, particularly under the circumstances (*i.e.*, being kept in an overcrowded booking area without any medical attention or supervision at all).

336.     Those conditions were both (1) diagnosed by physicians as mandating treatment and (2) so obvious that even laypersons would easily recognize the need for a doctor's attention.

337.     John Doe and Jane Doe (and almost certainly other BCSO corrections deputies and personnel) (1) were made aware, in explicit terms, on multiple occasions, by multiple persons, of Mr. Eden's serious medical needs, (2) on information and belief, drew the inference that Mr. Eden faced substantial health risks, and (3) consciously, unreasonably, wantonly, and callously disregarded those risks.

60

338. In addition, on information and belief, BCSO corrections deputies violated their own policy by failing to (1) to medically evaluate Mr. Eden immediately upon booking, (2) ensure that a "medical intake form" was completed, or (3) notify the shift lieutenant concerning Mr. Eden's injuries, all of which are BCSO responsibilities pursuant to its policies and under the contract with QCHC.

339. As a result of that deliberate indifference, Mr. Eden (1) suffered a great deal of unnecessary pain, (2) suffered a worsening of his injuries, and (3) was exposed to a substantial, unwarranted, and unnecessary risk of severe bodily harm or death.

<u>Bases for Bradley County's *Monell* Liability</u>

<u>Illegal Official Policy or Legislative Enactment</u>

340. In its official legislative enactments and policies pertaining to funding of the BCSO, Bradley County (specifically the County Mayor and County Commission) have deliberately chosen to underfund the BCSO and Jail such that those entities are unable to provide constitutionally adequate medical care to Inmates at the Jail.

341. That lack of funding has resulted in the following conditions at the Jail, which are directly connected with the failure to provide Mr. Eden (and other members of the putative class) with the requisite level of medical care: (1) inadequate staffing of the Jail with health care providers such that the number of those providers is incommensurate with the Inmate population (particularly beginning in 2015-2016), (2) BCSO salaries inadequate to hire and retain adequate numbers of corrections deputies to staff the Jail, and (3) resources inadequate to ensure that the BCSO corrections deputies who *are* hired receive training and supervision commensurate with their responsibilities, particularly as they pertain to Inmate medical care.

61

342. The County Commission and County Mayor were aware at all relevant times of these deficiencies.

343. The repeated decisions—following debate and discussion—in the face of such knowledge, to permit the dangerous and unreasonable state of affairs to persist amounts to a deliberate course of action chosen from among various alternatives.

### Failure to Train and/or Supervise

344. For its part, under Sheriff Watson's administration, the BCSO utterly failed to ensure that the corrections deputies it employed were adequately trained with respect to Inmate medical care (and Inmate safety more generally), as evidenced by the repeated constitutional violations and numerous Inmate deaths that plainly resulted from the nonfeasance and malfeasance of BCSO corrections deputies.

345. Both Sheriff Watson and Captain Thomas bear direct responsibility for the training and supervision of the corrections deputies under their authority, with respect to Inmate oversight and care, both medical and otherwise.

346. As noted above, on information and belief, the BCSO has failed to provide and properly document that corrections deputies consistently underwent even the TCI-training protocols, which represent the *minimum* level of training required to maintain jail certification.

347. Given the numerous documented instances of Inmate mistreatment, suffering, and death, the training received by corrections deputies and supervision by superiors, including Sheriff Watson and Captain Thomas, was plainly inadequate to the critical task of ensuring that Inmates received proper (*i.e.*, constitutionally adequate) medical care.

348. In addition, as County Commissioner Yarber noted in spring 2018, of the sixty-eight corrections deputies apparently then actually staffing the Jail, approximately 60% were first-year probationers required to be supervised by senior personnel (but who were not being so supervised).

349. Despite that pattern of occurrences, neither the BCSO (nor any other arm of the Bradley County government) has acted to improve training for corrections deputies or to bring their training into compliance with even the minimum standards set forth by the TCI and required by law.

350. In addition, (1) there is a clear history of failures by the BCSO/Jail personnel to address repeated complaints of constitutional violations pertaining to treatment of Inmates, including medical care, and (2) it is plainly obvious that the failure to train corrections deputies with regard to addressing Inmate medical care would hazard violations of the Eighth and Fourteenth Amendments.

351. Accordingly, the failures to train and supervise amounted to deliberate indifference to Inmates' rights.

352. In addition, the failures to train and supervise were directly and clearly connected with the failures of John Doe and Jane Doe to ensure that Mr. Eden received medical attention, which caused and/or aggravated his injuries.

#### Existence of a Custom of Tolerance or Acquiescence of Federal Rights Violations

353. In addition to (1) the County Mayor and County Commission's knowing, deliberate, and illegal decisions to underfund medical care, staffing, and training, and (2) the BCSO's failure to train and supervise its employees properly with respect to Inmate medical care, unconstitutional mistreatment of prisoners regarding their medical care has become an

unofficial custom in Bradley County, which tolerates federal rights violations as a matter of course.

354.   There is a clear pattern of mistreating prisoners at the Jail, including through depriving them of adequate medical care.

355.   The County Mayor, County Commission, and BCSO are all well aware of those actions, inactions, and problems, which have persisted for years and show no sign of abating, and their repeated deliberate decisions amount to tacit approval of the dangerous and unconstitutional *status quo*.

356.   That tacit approval is more than a collection of sloppy or reckless oversights—instead, it evinces obvious, deliberate indifference to the harm being caused to Inmates' constitutional rights by the BCSO.

357.   Bradley County's (1) illegal policies, (2) failure to train and supervise, and (3) custom of tolerating or acquiescing in federal rights violations—both singly and in combination— are the moving force behind the violation of Mr. Eden's constitutional rights and his resulting injuries.

358.   Accordingly, Bradley County is liable to Mr. Eden under 28 United States Code section 1983.

## Liability of John Doe and Jane Doe under Section 1983

359.   For the reasons explained above, Mr. Eden's suffered a deprivation of his Eighth and Fourteenth Amendment rights at the hands of Bradley County and its agents and employees.

360.   Those rights were clearly established at the time of the violation.

361. The actions taken with respect to Mr. Eden were objectively unreasonable in light of those clearly established rights.

362. A reasonable officer would have understood that failing to ensure that Mr. Eden received any medical care at all in view of his severe injuries, communicated health conditions, and repeated requests resulted in a violation of those rights.

363. Accordingly, John and Jane Doe are liable to Mr. Eden under section 1983 in their individual capacities, as they were acting under color of state law and their office at the time of their actions and inactions concerning Mr. Eden.

## Liability of Sheriff Watson and Captain Thomas under Section 1983

364. For the reasons explained above, Mr. Eden suffered a deprivation of his Eighth and Fourteenth Amendment rights at the hands of Bradley County and its agents and employees.

365. Those rights were clearly established at the time of the violation.

366. The actions taken with respect to Mr. Eden were objectively unreasonable in light of those clearly established rights.

367. By statute, Sheriff Watson has custody of the Jail, and Captain Thomas, his direct subordinate, was given authority over corrections and the Jail.

368. Both Sheriff Watson and Captain Thomas were intimately familiar with the significant, documented deficiencies of Inmate care, particularly in the booking area, and were directly empowered to ensure and responsible for ensuring that the policies they had put or left in place were being followed by their subordinates.

369. Per the HSA, Sheriff Watson and Captain Thomas were to meet with QCHC on a quarterly basis to discuss Inmate medical care, review reports concerning treatment, and

65

meet with the clinic manager on a weekly (or at least monthly) basis to review activities and Inmate needs.

370. Sheriff Watson and Captain Thomas were made aware by the TCI that Inmate intake forms were not being completed as required, and that the booking area was continually and severely overcrowded.

371. In short, Sheriff Watson and Captain Thomas knew that Inmates like Mr. Eden were not being medically treated but affirmatively chose to allow the situation to persist.

372. Under the circumstances, such conduct amounts to an implicit authorization, approval of, or acquiescence in John and Jane Doe's unconstitutional conduct concerning Mr. Eden.

373. Accordingly, Sheriff Watson and Captain Thomas are liable to Mr. Eden under section 1983 in their individual capacities.

## Count II:  Willful and Wanton Conduct and/or Gross Negligence

**(as to Bradley County, Sheriff Watson, in his official and individual capacities,
Captain Thomas, in his official and individual capacities,
and John and Jane Doe, in their official and individual capacities)**

374. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

375. A county is liable for the actions of Sheriff's deputies under Tennessee Code Annotated sections 8-8-302 and 8-8-303.

376. At all times relevant to this action, Sheriff Watson, Captain Thomas, and John and Jane Doe were acting under color of state law and of their office and in the course and scope of their employment.

377. In refusing to see that Mr. Eden received any medical care at all in view of his severe injuries, communicated health conditions, and repeated requests, John and Jane Doe evinced such an entire want of care that would raise a presumption of a conscious

indifference to the consequences, whether that conduct is characterized as an act or an omission to act.

378.     Put another way, their conduct evinces a conscious and heedless recklessness toward Mr. Eden's rights that is properly characterized as wanton.

379.     Accordingly, John and Jane Doe are individually liable for Mr. Eden's injuries on a theory of willful and wanton conduct and/or gross negligence.

380.     As set forth above, Sheriff Watson and Captain Thomas were completely aware (*inter alia*, through failed TCI inspections, frequent meetings with QCHC personnel, a slew of lawsuits and settlements, repeated Inmate deaths, and the like) of the Jail's deficiencies, including the deficiencies of staffing, training, supervision, and Inmate medical care, yet failed to take actions necessary to correct those deficiencies and remove the substantial danger to which Inmates were exposed.

381.     In knowingly operating the Jail in a fashion that made it likely that Inmates like Mr. Eden (and Mr. Eden himself) would not receive necessary medical care—*i.e.*, through policy, inadequate training and supervision of corrections deputies, and encouraging a culture of recklessness concerning Inmate safety—Sheriff Watson and Captain Thomas evinced such an entire  want of care that would raise a presumption of a conscious indifference to the consequences, whether that conduct is characterized as an act or an omission to act.

382.     Put another way, their conduct evinces a conscious and heedless recklessness toward Mr. Eden's (and other Inmates') rights that is properly characterized as willful, wanton, reckless and/or malicious.

383.     As a direct and proximate cause of the willful, wanton conduct and gross negligence of Sheriff Watson, Captain Thomas, and John and Jane Doe, Mr. Eden suffered injuries.

67

384.    Accordingly, Sheriff Watson and Captain Thomas are individually liable for Mr. Eden's injuries on a theory of willful and wanton conduct and/or gross negligence.

385.    Bradley County is also liable for Mr. Eden's injuries caused by the actions (and/or inactions) of Sheriff Watson, Captain Thomas, and John and Jane Doe pursuant to Tennessee Code Annotated sections 8-8-302 and 8-8-303.

### Count III: Negligence – Ordinary Negligence, Negligence *Per Se*, Negligent Training and Supervision

**(as to Bradley County, Sheriff Watson, in his official and individual capacities, Captain Thomas, in his official and individual capacities, and John and Jane Doe, in their official and individual capacities)**

386.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

387.    At all times relevant to this action, Sheriff Watson, Captain Thomas, and John and Jane Doe were acting under color of state law and of their office and in the course and scope of their employment.

388.    Prison and jail officials have a common-law duty to exercise ordinary and reasonable care for the protection of the persons in their custody, and their conduct must be reasonably commensurate with an Inmate's known condition.

389.    This duty includes the duty to ensure that Inmates have access to proper medical treatment.

390.    On information and belief, BCSO personnel, including Sheriff Watson, Captain Thomas, and John and Jane Doe, did not follow (or cause to be followed) the BCSO procedures concerning Inmate intake medical screening or treatment, which track those established by the TCI.

391.    That failure constitutes (1) a breach of their duty under Tennessee Code Annotated section 41-4-140(a) (and the TCI regulations promulgated thereunder)—and hence,

68

negligence *per se*—and (2) an ordinary breach of the standard of care, especially because their conduct clearly indicates a total lack of solicitude for Mr. Eden's obvious, serious, and life-threatening injuries.

392. In addition, Sheriff Watson and Captain Thomas had a duty to train and supervise their subordinates at the BCSO to ensure compliance with (1) BCSO and TCI policies and procedures (including the General Order), and (2) the standard of care corrections deputies owe to an Inmate more generally.

393. By failing to ensure that John and Jane Doe (and other corrections deputies) were properly trained and supervised, Sheriff Watson and Captain Thomas breached their duty to Mr. Eden.

394. Given their lack of training and supervision and the foreseeability of the harm to Inmates that would likely result from inadequately trained and supervised correctional personnel, Sheriff Watson and Captain Thomas (and Bradley County) knew or should have known that John and Jane Doe (and other inadequately trained and supervised employees) were unfit for their jobs.

395. As discussed above, those breaches of duty (1) exacerbated injuries Mr. Eden sustained in the car accident, (2) subjected him to unnecessary pain and suffering, and (3) given his significant pre-existing conditions, exposed him to a substantial risk of serious bodily injury or death.

396. Sheriff Watson, Captain Thomas, and John and Jane Doe's actions were the direct and proximate cause of Mr. Eden's injuries.

397. Bradley County is vicariously liable under Tennessee's Governmental Tort Liability Act, Tennessee Code Annotated section 29-20-101, *et seq.*, for all of the negligent actions and

inactions of its agents and employees described above, including, specifically, Sheriff Watson, Captain Thomas, John Doe, and Jane Doe.

### Count IV: Punitive Damages

**(as to Bradley County, Sheriff Watson, in his official and individual capacities, Captain Thomas, in his official and individual capacities, and John and Jane Doe, in their official and individual capacities)**

398. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

399. At all times relevant to this action, Sheriff Watson, Captain Thomas, and John and Jane Doe were acting under color of state law and of their office and in the course and scope of their employment.

400. Punitive damages are available for the negligence and gross negligence of defendants pursuant to Tennessee Code Annotated sections 8-8-302 and 8-8-303, and Bradley County is liable for punitive damages for the actions or inactions of its agents or employees on a theory of vicarious liability or *respondeat superior*.

401. In failing to see that Mr. Eden was given proper medical care as described above, John and Jane Doe acted with intent, malice, and/or recklessness concerning him.

402. Bradley County (and its agents and employees) were reckless in supervising and training John and Jane Doe, and that reckless supervision and training proximately caused Mr. Eden's injuries.

403. Sheriff Watson and Captain Thomas authorized the actions of BCSO corrections deputies concerning Inmate health care (including intake/booking-related health care and procedures), which authorization (1) encompassed John and Jane Doe's actions concerning Mr. Eden and (2) was given with reckless disregard that it could result in the injury to Mr. Eden.

404. In failing to ensure proper training for and supervision of John and Jane Doe (and other corrections deputies) Sheriff Watson and Captain Thomas acted with intent, malice, and/or recklessness toward Mr. Eden and other members of the putative class.

405. Sheriff Watson and Captain Thomas were employed in management capacities (*i.e.*, were vested with authority to set policy and exercise control, discretion, and independent judgment over a significant scope of BCSO's policy and activities) at the time they committed the acts and omissions pertaining to reckless training and supervision.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, plaintiff requests the following relief:

1. Issuance of service of process to defendants;

2. A declaration that the suit may be maintained as a class action pursuant to Rule 23(a) and 23(b)(1)-(3) and issuance of an order (1) certifying that it may be maintained as a class action, (2) appointing plaintiff and his counsel to represent the class, and (3) directing that reasonable notice of this action be given by Bradley County to all members of the Inmate Class;

3. That the Court grant any reasonable request to amend this complaint to conform to the discovery and evidence obtained in this class action;

4. Empanelment of a jury to try this matter;

5. An award to each plaintiff class member of compensatory damages in an amount to be proved at trial;

6. Pursuant to Tennessee Code Annotated sections 8-8-302 and -303, and 29-39-104, an award to each plaintiff class member of punitive damages for the intentional, malicious, and reckless conduct of Bradley County and all persons acting in concert therewith—including

Case 1:18-cv-00217-CHS   Document 1   Filed 09/18/18   Page 71 of 73   PageID #: 71

agents, officers, employees, and persons and entities with whom it is in privity of contract—under color of state law and of their office and in the course and scope of their employment.

7. A declaration that the policies, practices, and procedures of Bradley County described herein were and are in violation of the rights of plaintiff and members of the Inmate Class under the Eighth and Fourteenth Amendments to the United States Constitution, which prohibit it and all persons acting in concert therewith from inflicting cruel and unusual punishments (including the deprivation of medical care for serious medical needs);

8. A preliminary and permanent injunction that enjoins Bradley County, its agents, employees, officials, and all persons acting in concert with them under color of state law, from subjecting members of the Inmate Class to the unconstitutional policies and practices described herein;

9. An order mandating that Bradley County and its agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as is practicable, a plan—that comports with the advice of medical and correctional experts and the applicable standard of care—to eliminate the substantial risks of serious harm to which members of the Inmate Class are presently exposed;

10. Award plaintiff and members of the Inmate Class their reasonable attorney's fees pursuant to 42 United States Code section 1988;

11. An award of costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure;

12. An award of pre- and post-judgment interest in the amount of ten percent (10%) per annum pursuant to Tennessee Code Annotated section 47-14-123 in an amount according to the proof presented at trial; and

13. An award to plaintiff and Inmate Class members of all such further relief as the Court may

deem just and proper.

Dated: September 18, 2018.                         Respectfully submitted,

                                                    By: /s/ C. Scott Johnson
                                                    C. Scott Johnson, BPR No. 019810
                                                    William J. Rieder, BPR No. 026551
                                                    Joseph Alan Jackson II, BPR No. 030203
                                                    SPEARS, MOORE, REBMAN & WILLIAMS, P.C.
                                                    601 Market Street, Suite 400 | P. O. Box
                                                    1749
                                                    Chattanooga, TN  37401-1749
                                                    Telephone: (423) 756-7000
                                                    Facsimile:  (423) 756-4801
                                                    csj@smrw.com
                                                    wjr@smrw.com
                                                    jaj@smrw.com

                                                    By: /s/ J. Allen Murphy, Jr.
                                                    J. Allen Murphy, Jr. BPR No. 019146
                                                    (application for admission and *pro hac vice*
                                                    motion forthcoming)
                                                    LAW FIRM OF J. ALLEN MURPHY, JR.
                                                    3555 Keith Street, Suite 213
                                                    Cleveland, TN 37312
                                                    Telephone: (423) 790-7310
                                                    Facsimile:  (423) 790-7312
                                                    allen@jallenmurphy.com