**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

DARRELL EDEN; RANDY BACON;
ESTATE OF CHRISTOPHER BROWN;
through personal representative Paula Rhea
Brown; ESTATE OF MARTIN
CHOUINARD, through administrator *ad
litem* April Hancock; SANDRA
CULBERTSON; ESTATE OF DENISE
CULPEPPER, through personal
representative April Richard; LAURA
FULLER; ESTATE OF BRANDON GASH,
b/n/k Harry and Sheryl Gash; BENJAMIN
NEWTON HANNAH, AMANDA
LENNIE; SHELBY LONG; TERA
MILLER; BRYAN WAMPLER; and
SHARON WATERS, on behalf of himself
and all others similarly situated; and
AVERY L. SHARP; CHELSEA
COULTER; KENDRA MICKEL; and
ZACHARY GUINN, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

    vs.

BRADLEY COUNTY, TENNESSEE;
SHERIFF STEVE LAWSON, in his official
capacity; CAPTAIN JERRY JOHNSON,
JR., in his official capacity; ERIC
WATSON, in his individual capacity; and
CAPTAIN GABRIEL THOMAS, in his
individual capacity,

        Defendants.

Case No.: 1:18-CV-217-CHS

**CLASS ACTION**

**COMPLAINT PURSUANT TO 42 U.S.C. 1983**

**DEMAND FOR JURY TRIAL**

**FIRST AMENDED AND SUPPLEMENTAL**
**CLASS ACTION COMPLAINT**

      Plaintiffs, (1) former inmates of the Bradley County Justice Center, a/k/a the Bradley

County Jail (the "Jail") Darrell Eden; Randy Bacon; the Estate of Christopher Brown, through

personal representative Paula Rhea Brown ("Estate of Brown"); the Estate of Martin Chouinard, through administrator *ad litem* April Hancock ("Estate of Chouinard"); Sandra Culbertson; Laura Fuller; the Estate of Brandon Gash through next of kin Harry and Sheryl Gash ("Estate of Gash"); Amanda Lennie; Shelby Long, Bryan Wampler, and Sharon Waters, on behalf of themselves and all others similarly situated; and (2) current Jail inmates Avery L. Sharp, Chelsea Coulter, Kendra Mickel, and Zachary Guinn, on behalf of themselves and all others similarly situated, bring this First Amended and Supplemental Class Action Complaint against (1) Bradley County, Tennessee; (2) Sheriff Steve Lawson, in his official capacity; (3) Captain Jerry Johnson, in his official capacity; (4) former Sheriff Eric Watson, in his individual capacity, and (5) Captain Gabriel Thomas, in his individual capacity. As set forth herein, plaintiffs and the putative classes they represent seek, respectively, damages and declaratory and injunctive relief. In support thereof, plaintiffs would allege as follows:

## INTRODUCTION

1.  Plaintiffs and putative class representatives bring this action pursuant to 42 United States Code section 1983 to enforce their rights—and those of the putative classes defined below—under the Eighth and Fourteenth Amendments to the United States Constitution, as well as the pendent state-law causes of action set forth below.

2.  Plaintiff and members of the putative classes are: (1) inmates or pretrial detainees (collectively, "inmates") injured by constitutionally inadequate medical care while previously incarcerated at the Jail; (2) current and future Jail inmates who currently are or will be exposed to its woefully deficient system of medical care, which exposes all of them to a substantial risk of serious harm (and, in the case of current inmates, often has caused and continues to cause them harm); and (3) current and future Jail inmates who are exposed to other unconstitutional

conditions of confinement, namely, official and unofficial policies and customs of Bradley County and the Bradley County Sheriff's Office ("BCSO") that result in inmates being restricted to overcrowded, often filthy, cells for long periods of time without recourse to physical exercise, posing serious risks (and often causing serious damage) to their physical and mental health.

3. As set forth herein, because Bradley County has prioritized the ***extraction*** of revenue from inmates—rather than its constitutional mandate to care for their needs—**it has generated approximately $15,000,000 over the last four years alone that has gone directly into the Bradley County General Fund**[1]—while the Jail is seriously deficient in, *inter alia*, budgeting, staffing, training, supervision, policy-making, enforcement, and institutional culture, both on part of Bradley County, the BCSO, and the contract medical-services providers ("CMSP") discussed herein.

4. As a result, the system of medical care in place at the Jail has been so deficient as to evidence deliberate indifference on part of Bradley County, the BCSO, and the CMSPs, both independently and in conjunction with each other, with predictable results: scores of inmates dead, maimed, or otherwise injured, and all exposed to the substantial risk of such injuries, which have included:

   a. Deaths (the most recent of which occurred on the date of this filing) resulting from failures of diagnosis and delays in seeking appropriate emergency care for inmates, including

      i. at least one inmate permitted to die from starvation and thirst and

      ii. another permitted to die from a drug overdose;

---

[1] Pursuant to *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) and their progeny, and continuing to the present time, the statute of limitations was tolled in this matter as to all class members on September 17, 2017, and continues through the present time.

b. lengthy delays (or total failures) to treat inmates with broken bones;

c. failures to adequately treat inmates with chronic conditions such as diabetes, hypertension, cirrhosis, hepatitis, hypothyroidism, asthma, epilepsy, chronic obstructive pulmonary disease ("COPD"), emphysema, and heart disease;

d. failures to treat inmates with terminal (or potentially terminal) conditions such as end-stage liver disease ("ESLD") and HIV;

e. failures to treat inmates who are severely intoxicated or undergoing life-threatening withdrawals from substances;

f. failures to treat inmates with dangerous seizure disorders;

g. failures to adequately treat inmates with life-threatening infections of Methicillin-resistant Staphylococcus aureus ("MRSA");

h. failures to properly treat or provide accommodation for inmates with serious cognitive or neurological deficits, including intellectual disability and cerebral palsy;

i. failures to treat victims of sexual assault and rape;

j. failures to care for pregnant inmates that have exposed both mother and child to risks of death or serious bodily harm (and which have resulted in miscarriages); and

k. failures to ensure adequate mental health care for inmates suffering from schizophrenia, bipolar disorder, psychosis, depression, anxiety, and other mental health conditions.

5. At the same time, all or most inmates confined under intolerable conditions inconsistent with society's standards of decency, including lengthy lockdowns—sometimes lasting months or weeks at a time—wherein inmates have been confined in filthy, overcrowded cells for twenty to twenty-three hours out of twenty-four (and sometimes more) while being made to sleep on

4

floors, gravely limiting their ability to care for themselves, obtain exercise, see natural light, and care for their basic needs.

6. Moreover, despite numerous indisputable indicia—spanning the administrations of Sheriffs Watson and Lawson—that the medical care being offered to Inmates at the Jail was and is woefully inadequate (and the conditions under which they are confined are terrible)—including (1) numerous prisoner deaths and dozens of lawsuits, many of which have resulted in settlements; (2) repeated failures of state jail certification inspections for a variety of reasons, including those related to overcrowding, understaffing, and the provision of medical care; (3) explicit legislative deliberations acknowledging the inadequacy of care offered to inmates and the lack of staffing; (4) widespread negative media coverage; (5) the formation of citizen activist groups specifically focused on Jail conditions and relating harrowing stories of conditions in the Jail; (6) receipt of (a) dozens of declarations from dozens of putative class members evincing serious lapses in virtually every facet of health care and (b) reports from experts seasoned in correctional administration and medicine explicating the systemic deficiencies in medical care; (7) frequent complaints from inmates' attorneys and family members outraged by their treatment—the BCSO and other elements of the Bradley County Government, including Bradley County Mayor Gary Davis ("Mayor Davis") and the Bradley County Commission ("County Commission") have knowingly and deliberately (1) failed to take appropriate corrective action to address those deficiencies, and (2) permitted them to continue with knowledge that they would inevitably lead to further injuries.

7. Specifically, despite knowledge that the medical care provided at the Jail by CMSPs Quality Correctional Health Care, Inc. ("QCHC") and, later Fast Access Correctional Healthcare ("Fast Access"), acting in concert with the understaffed and undertrained BCSO corrections division,

was entirely inadequate and had resulted in dozens or hundreds of incidents of serious harm—or death—to numerous inmates, Bradley County has failed to increase its budgetary outlays in areas touching on prisoner medical care, including adequate (1) staffing, training, and supervision of corrections deputies with respect to inmate medical care even though the corrections deputies are heavily and intimately involved in the procedures related thereto, and (2) staffing of the Jail by appropriately credentialed, trained, supervised, and competent medical personnel, whether employed by QCHC or otherwise.

8. To the contrary, under the guidance of Mayor Davis and the County Commission have doubled down on their failed policies, replacing one substandard CMSP (QCHC) with one even less capable of providing adequate care (Fast Access), which operates:  (1) under an *identical* capitation contract that incentivizes cost-cutting and profit-maximization over care; (2) with substantially less experience in correctional health or implementation of appropriate standards than its predecessor; and (3) employing largely the same undertrained, overworked, and under-supervised medical staff that was employed by QCHC, the members of which routinely (and illegally) act beyond the scope of their practice without requisite oversight and evidence deliberate indifference toward the serious medical needs of inmates.

9. Indeed, profit maximization has long been the principal goal of both Bradley County and the CMSPs with which it has contracted, and the exploitative attitude the county has taken toward the inmates under the BCSO's care has generated (1) tens of millions of dollars in revenue that the Bradley County Government uses as a principal source of funding for its operations and (2) millions of dollars of past (and potential) profit for QCHC and Fast Access.

10. For that reason, the Bradley County Government and BCSO have turned a blind eye to the CSMPs' manifest failings—described in detail below—and then relied on those entities'

purported "medical independence" in an attempt to wash their hands of responsibility for the inmates to whom the *County* owes the principal and overarching constitutional, statutory, and common law duties, which may not be contracted away.

11. For their part, the QCHC and Fast Access—and their respective CEOs, Johnny Bates, M.D. and Jonathan Kerley, D.O.—have entered into contracts with the Bradley County Government that they know are inadequate to provide a constitutionally adequate level of care to the inmates confined in the Jail and have endeavored to maximize their own profit in their execution, resulting in both excessive and unjustifiable profit to themselves and medical neglect, injury, and death to the inmates in their care.

12. For these reasons, and as further set forth herein, plaintiffs and the putative classes respectfully request that this Honorable Court award the requested relief.

## JURISDICTION AND VENUE

13. The Court has subject matter jurisdiction over this case pursuant to 28 United States Code sections 1331 and 1343.

14. The Court has supplemental jurisdiction of plaintiff's state law claims pursuant to 28 United States Code section 1367.

15. Venue in this judicial district is proper pursuant to 28 United States Code section 1391(b) because defendants have their official residence in this judicial district and a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this judicial district.

## PARTIES AND OTHER PERSONS RELEVANT TO THIS ACTION

### Former Inmates

16. Plaintiff and putative class representative Randy Bacon, who resides 775 Dockery Lane, Cleveland, TN 37323, is a former Inmate who was confined at the Jail, *inter alia*, from June 4, 2018 to November 10, 2018.

17. Paula Rhea Brown, who resides at 8933 Hiwassee Street NW, Charleston, TN 37310, is personal representative of plaintiff and putative class representative the Estate of Brown; Mr. Brown (deceased) was a former Inmate confined at the Jail from August 31, 2017 through May 10, 2018.

18. April Hancock, who resides at 102 Bailey Street McCaysville, GA 30555, is administrator *ad litem* of plaintiff and putative class representative the Estate of Chouinard; Mr. Chouinard (deceased) was a former inmate confined at the Jail from February 11, 2020 to January 14, 2021.

19. April Richard, who resides at 1697 Stonebriar Drive, Cleveland, TN 37312, is personal representative of plaintiff and putative class representative the Estate of Culpepper; Ms. Culpepper (deceased) was a former inmate confined at the Jail in November 2018.

20. Plaintiff and putative class representative Sandra Culbertson, who resides at 1411 Strawberry Lane, Cleveland, TN 37311 is a former Inmate who was confined at the Jail from, *inter alia*, November 8, 2019 to November 14, 2019 and from August 20, 2020 to January 11, 2021.

21. Plaintiff and putative class representative Darrell Eden, who resides at 926 Charlotte Avenue, Chattanooga, TN 37421, is a former Inmate who was confined at the Jail on or about September 20, 2017.

22. Plaintiff and putative class representative Laura Fuller, who resides at 1017 Ellis Drive SE, Cleveland, TN 37323, is a former inmate confined at the Jail, *inter alia*, from December 14, 2018 to January 11, 2019 and May 14, 2019 to July 24, 2019.

23. Harry Gash and Sheryl Gash (proceeding through power of attorney Darius Gash), who reside at 4100 Ocoee Street N. # 66, Cleveland, TN 37312, are next of kin of plaintiff and putative class representative Estate of Gash; Mr. (Brandon) Gash was a former inmate confined at the Jail on, *inter alia*, April 19, 2018.

24. Plaintiff and putative class representative Benjamin Newton Hannah, who resides at 155 Easley Ford Road, Old Fort, TN 37362, is a former inmate confined at the Jail from approximately June 25, 2020 through July 1, 2020.

25. Plaintiff and putative class representative Kris Holder, who resides at 2955 Candies Lane, Cleveland, TN 37312, is a former inmate confined at the Jail on January 27, 2019.

26. Plaintiff and putative class representative Amanda Lennie[2] is a former inmate confined at the Jail, *inter alia*, from October 9, 2017 to November 1, 2017; on April 16, 2018; from May 8, 2018 to August 6, 2018; and from November 15, 2020 to December 16, 2020.

27. Plaintiff and putative class representative Shelby Long, who resides at 459 McDonald Road, McDonald, TN 37353, is a former inmate confined at the Jail, *inter alia*, from November 6, 2017 to May 5, 2018.

28. Plaintiff and putative class representative Tera Miller, who resides at 881 Stone Glen Trail NW, Cleveland, TN 37312 is a former inmate confined at the Jail on or about July 15-16, 2018.

---

[2] Ms. Lennie's address is not included for reasons of personal safety.

29. Plaintiff and putative class representative Bryan Wampler, who resides at 445 Lyles Road, Cleveland, TN 37323, is a former inmate confined at the Jail from July 11, 2016 to May 17, 2019.

30. Plaintiff and putative class representative Sharon Waters, who resides at 752 12th Street SE, Cleveland, TN 37311, is a former inmate confined at the Jail from January 23, 2019 to January 31, 2019 and from April 26, 2019 to May 7, 2019.

### Current Inmates

31. Plaintiff and putative class representative Chelsea Coulter is currently confined in the Jail, 2290 Blythe Avenue, Cleveland, Tennessee 37311.

32. Plaintiff and putative class representative Kendra Mickel is currently confined in the Jail, 2290 Blythe Avenue, Cleveland, Tennessee 37311.

33. Plaintiff and putative class representative Avery Sharp is currently confined in the Jail, 2290 Blythe Avenue, Cleveland, Tennessee 37311.

34. Plaintiff and putative class representative Zachary Guinn is currently confined in the Jail, 2290 Blythe Avenue, Cleveland, Tennessee 37311, and was also formerly confined at the Jail, *inter alia*, from April 12 to April 14, 2019; July 31, 2019 to August 9, 2019; and June 14, 2020 to June 16, 2020.

### Defendants and Other Relevant Parties

35. Bradley County is a county in the State of Tennessee.

36. Eric Watson is the former Sheriff of Bradley County, having served in that position from September 1, 2014 until August 31, 2018.

37. Steve Lawson is the current Sheriff of Bradley County, who has served in that position from September 1, 2018 until the present time.[3]

38. Captain Gabriel Thomas is an employee of the BCSO who served as BCSO Captain of Corrections under Sheriff Watson and currently serves (under Sheriff Lawson) as BCSO Captain of Support Services.

39. Captain Jerry Johnson is a current employee of the BCSO who serves as BCSO Captain of Corrections under Sheriff Lawson.

40. At all times relevant to this lawsuit, Gary Davis has been (and is) the Mayor of Bradley County, Tennessee.

41. QCHC is a correctional health care company founded and with its principal place of business in Birmingham, Alabama that formerly provided health care services at the Jail.

42. Johnny Bates, M.D. is founder and CEO of QCHC and former Medical Director at the Jail.

43. Fast Access is a health care company founded and with its principal place of business in Chattanooga, Tennessee that currently provides health care services at the Jail.

44. Jonathan Kerley, D.O. is founder and CEO of Fast Access and current Medical Director at the Jail.

## **FACTS**

### **Applicable Offices within Bradley County**

45. Mr. Watson was Sheriff of Bradley County from September 1, 2014 until August 31, 2018, and Steve Lawson is the current Sheriff of Bradley County, having assumed office on September 1, 2018.

---

[3] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, with respect to claims against them in their official capacities, Sheriff Lawson and Captain Jerry Johnson are successors of former Sheriff Watson and Captain Gabriel Thomas, and are automatically substituted for them as parties.

46. Bradley County's legislative body is a fourteen-member board of county commissioners (the "County Commission"), vested with legislative and policy-making (including budgetary and taxing) powers, including for decisions related to the construction, replacement, and maintenance of county jails.

47. Bradley County's chief executive officer is a County Mayor, who is a non-voting *ex officio* member of the County Commission (and all of its committees), who has veto power over its resolutions and budget.

48. The County Mayor's primary responsibility is financial management, and he or she is responsible, inter alia, for compiling a budget for all county departments, offices, and agencies, which is presented to and voted upon by the County Commission.

49. Gary Davis has been the Bradley County Mayor since 1998.

### Allocation of Responsibility Between Sheriff and County Legislative Body for Operation and Funding of the Jail and Inmate Medical Care

50. In addition to the standards of medical care guaranteed by the Eight and Fourteenth Amendments to the United States Constitution, which form the basis for the instant class action lawsuit and are addressed *infra*, Tennessee law provides numerous requirements concerning local and private entities' obligations to care for inmates, both generally and with respect to medical care specifically, and those responsibilities are divided between a county's sheriff and local legislative body.

51. Under Tennessee law, "[t]he sheriff of [a] county has . . . the custody and charge of the jail of the county and of all prisoners committed to the jail," and also must "furnish [inmates with] adequate food and bedding," and "maintain cleanliness and hygiene for inmates." Tenn. Code Ann. § 41-4-101; *see also id.* §§ 41-4-109, -111; 8-8-201(a)(3).

52. Under Tennessee law, (1) "county governing bodies shall fund the operations of the county sheriff's department"; (2) a county may not reduce a budget over the sheriff's objection that reduces the number of positions or salaries of sheriff's department employees; and (3) if the county governing body "fails to budget any salary expenditure which is a necessity for the discharge of the statutorily mandated duties of the sheriff, the sheriff may seek a writ of mandamus to compel such appropriation." Tenn. Code Ann. § 8-20-120; *see also id.* § 8-20-101(a) (providing that a sheriff may petition a county's circuit or criminal court for deputies and assistants (and their salaries) necessary "to the proper conducting of [his] office") § 8-24-103 (providing that a county legislative body "shall make the necessary appropriation . . . [for] the authorized expenses fixed by law for the operation of the sheriff's office, including the salary of all the sheriff's deputies."); *Ramey v. Perry Cnty.*, No. M2008–01571–COA–R3–CV, 2009 WL 2357081, at *14 (Tenn. Ct. App. July 30, 2009) (holding that adequately staffing a county jail is a statutorily mandated duty that can form the basis of a writ of mandamus against the county governing body).

53. Under Tennessee law, "[t]he county legislative bodies alone have the power, and it is their duty, to provide medical attendance for all prisoners confined in the jail in their respective counties." Tenn. Code Ann. § 41-4-115(a); *see also* Tenn. Op. Atty. Gen. U90-37 (1990) ("A county government is responsible for providing prisoners sentenced to county jail or workhouse with medical care when needed."); Tenn. Op. Atty. Gen. U90-134 (1990) ("[A] county is responsible for any medical care that is necessary during the period of incarceration . . . . [including] pre-existing medical conditions.").

54. Thus, (1) with regard to funding the Jail and the deputies necessary to staff it, the Sheriff, in coordination with the County Mayor, submits a budget request for amounts needed to fund the

BCSO and Jail operations, which the County Commission reviews and approves, and (2) the County Commission (and County Mayor) exercise sole responsibility for decisions concerning the funding of inmate medical care.

### Revenue Generated from Inmates – Fiscal Years 2018 to 2021

55. Per Bradley County budget documents, the "General Fund" (1) is the "primary fund of Bradley County" that "supports most of the basic operations and services of the county," and (2) is funded by (a) local taxes, (b) licenses and permits, (c) fines, forfeitures, and penalties, (d) interest (investment) income, (e) charges for services, and (f) fee offices.

56. Prior to and at all times relevant to this lawsuit, the BCSO has elected to house (1) TDOC "backup" inmates (those sentenced but not yet transferred to a state prison), and (2) (pursuant to contracts with the United States Marshals Service ("USMS"), *inter alia*, federal pre-trial detainees.

57. In exchange for housing these persons, Bradley County receives *per diems* and becomes responsible for their primary health care.

58. In addition, the BCSO maintains a co-pay policy for inmates that requires them to pay for health services rendered at the Jail.

59. As noted above, at all times relevant to this lawsuit, Bradley County has generated tens of millions of dollars—returned to Bradley County's General Fund—from housing state and federal inmates and charging inmate copays, as set forth in **Table 1**:

**Table 1**

| Fiscal Year | Combined State and Federal Inmate Housing Revenue | Inmate Co-Pays - Collected[4] | County General Fund – Total Revenue | Inmate-Generated Revenue as a Percentage of General Fund Revenue |
|---|---|---|---|---|
| FY 2018 | $4,019,185 | $33,113.96 | $39,417,565 | 10.3% |
| FY 2019 | $3,534,822 | $33,113.96 | $38,263,280 | 9.3% |
| FY 2020 | $3,701,000 | $33,113.96 | $39,300,938 | 9.5% |
| FY 2021 | $3,701,000 | $33,113.96 | $41,927,167 | 8.9% |
| Total | $14,956,007 | $132,455.84 | $158,908,150 | 9.5% |

60. In sum, for the period of time relevant to this lawsuit, Bradley County has earned approximately **$15,000,000** for housing state and federal inmates and $132,455.84 for charging inmate co-pays, which together amount to **approximately 9.5% of Bradley County's** *entire* **general fund revenue for that period of time**.

61. By way of comparison, as shown in **Table 2**, below, the income generated for Bradley County by inmates is approximately **35% of what the county generates from property taxes and 62% of what it generates from local sales taxes**.

---

[4] Plaintiffs and putative class members do not possess the co-pay figures for each year but simply from the period September 1, 2017 to January 19, 2021; accordingly, they are averaged and presented on an annualized basis. The figures reflect only what the BCSO was able to *collect* from inmates, not what it *charged* them; the charged amounts are approximately $90,998.48 per annum, or $363,993.92 total.

**Table 2**

| Fiscal Year | Inmate-Generated Revenue (per annum) | County Property Taxes (per annum) | Local Option Sales Taxes (per annum) | County General Fund – Total Revenue (per annum) | Inmate-Generated Revenue as a Percentage of Total General Fund Revenue | County Property Taxes as a Percentage of Total General Fund Revenue | Local Option Sales Taxes as a Percentage of General Fund Revenue |
|---|---|---|---|---|---|---|---|
| FY 2018 | $4,052,298.96 | $10,380,704 | $5,940,376 | $39,417,565 | 10.2% | 26.3% | 15.1% |
| FY 2019 | $3,567,935.96 | $9,871,749 | $6,149,602 | $38,263,280 | 9.3% | 25.8% | 16.1% |
| FY 2020 | $3,734,113.96 | $11,399,065 | $6,100,000 | $39,300,938 | 9.5% | 29% | 15.5% |
| FY 2021 | $3,734,113.96 | $11,614,863 | $6,161,000 | $41,927,167 | 8.9% | 27.7% | 14.7% |
| Total | $15,088,462 | $43,266,381 | $24,350,978 | $158,908,150 | 9.5% | 27.2% | 15.35% |

62. With respect to co-pays, by way of comparison, in Fiscal year 2018, the Davidson County Sheriff's Office collected approximately $21,920 in medical-copays (approximately **two-thirds of the amount ($33,113.96) collected by the BCSO**) despite having approximately **four times the number of inmates**.

### Jail Funding – Fiscal Years 2018 to 2021

63. Bradley County's budgets provide conflicting figures for how much is spent on Jail operations, including medical care.

64. For example, while stated expenditures per inmate, per day were $73.77 for Fiscal Years 2018 and 2019, and (declined to) $64.00 in Fiscal Years 2020 and 2021, based on the Jail's average daily population ("ADP"), the actual amounts expended per inmate per day are far lower than the stated figures, as set forth in the **Table 3**.

**Table 3**

| Fiscal Year | ADP (Per Bradley County Budgets) | *Stated* Inmate Expenditure Per Day (Per Bradley County Budgets | Total Expenditure on Jail Per Annum (Per Bradley County Budgets) | *Actual* Inmate Expenditure Per Day (Total) | Expenditure on Jail Per Annum if Stated Per Inmate Expenditure Were Accurate |
|---|---|---|---|---|---|
| FY 2018 | 544 | $73.77 | $7,275,189 | $36.64 | $14,647,771.20 |
| FY 2019 | 596 | $73.77 | $7,109,722 | $32.68 | $16,047,925.80 |
| FY 2020 | 516 | $64.00 | $8,029,901 | $42.64 | $12,053,760 |
| FY 2021 | 521[5] | $64.00 | $8,187,967 | $43.05 | $12,170,560 |

65. In other words, to match the stated per inmate, per day figure set forth in the official Bradley County budgets, the *actual* budget would have to be millions of dollars per year greater than it is.

### The BCSO's Internal Planning and Oversight Protocols and Applicable Policies and Failures to Comply with Same

66. Per statute (and BCSO policy), there Sheriff has custody of, and is ultimately responsible for, all policymaking for and operations of the Jail, but delegates certain responsibilities to subordinates, namely the Captain of Jail Operations/Correction (tasked with ("[o]verseeing all

---

[5] While Fiscal Year 2021 is not complete, and this number appears to be greater than that recorded by the Tennessee Department of Corrections ("TDOC") (following the ostensible release of inmates during the COVID-19 pandemic), plaintiffs rely on this number because it is the number published by Bradley County in the Bradley County Government Official Budget (2020-2021), *available at* https://bradleycountytn.gov/uploads/2020_2021_approvedbudget.pdf (last visited May 13, 2021). To the extent that Bradley County's own Jail population figures are inaccurate, plaintiffs will revise their calculations to match.

17

operations of the [Jail]"), Shift Lieutenants, Sergeants, Corrections Officers/Deputies, and various clerical and administrative support personnel.

67. In connection with those responsibilities, the BCSO has promulgated (1) the Bradley County Sheriff's Office General Orders ("General Orders" or "G.O.") and (2) a Jail Policy and Procedure Manual ("Jail Manual").

68. The General Orders state that "[e]xtensive planning" is a "critical" need of law enforcement, such that the BCSO has ostensibly established a "planning and research function" to organize data and formulate plans on the basis of same, measured against defined agency objectives.

69. To that end, the General Orders mandate a number of budgeting, planning, operational, and oversight functions and documentation of same: (1) Budget Development (*see* G.O. §§ 15.1.1.D.1, 17.2.1-.2, Jail Manual § 2.4.III.A.1); (2) meetings of the Jail Budget Committee (*see* Jail Manual § 2.4.III.C.2); (3) Agency Goals and Objectives (*see* G.O. §§ 15.1.1.D.2, 15.2.1); (4) Multiyear Plans (*see id.* § 15.1.3); (5) Progress Report on Goals and Objectives Attainment (*see id.* § 15.2.2); (6) Annual Reports (*see* Jail Manual § 1.5); and (7) Workload Assessments (*see* G.O. § 16.1.2).

70. Despite Sheriff Lawson's occasional mention of a "four-year plan," the BCSO has *no* documents evidencing its fulfillment of the above-listed functions—which exist, in part, to ensure that the BCSO is addressing the Jail's problems and recognized needs.

71. That is, the BCSO—under both former Sheriff Watson and Sheriff Lawson—has not documented engagement in *any* of the requirements it has set for itself to ensure proper research and planning to address long-term issues (such as overcrowding, understaffing, and poor medical care), as well as oversight and administration of the Jail's operations.

## Overcrowding

72. In order to prevent overcrowding at any particular location in a jail, the optimal maximum capacity is approximately 85% of bed space.

73. Per Bradley County's published figures, the ADP has exceeded capacity *every fiscal year* in the relevant period, as follows:

| Fiscal Year | ADP | Percentage Over Certified Capacity (510) |
|-------------|-----|------------------------------------------|
| FY 2018 | 544 | 107% |
| FY 2019 | 596 | 117% |
| FY 2020 | 516 | 101% |
| FY 2021 | 521 | 102% |

74. That overcrowding has placed an additional strain on already thin institutional resources—including staff, space (including cells), medical care, maintenance, and supervision.

75. In addition to directly reducing the per capita amount of medical attention available, overcrowding also worsens medical care by limiting the ability of corrections deputies to supervise the responses, escorts, and transports necessary to ensure that inmates are able to be seen by medical personnel, particularly when combined with understaffing (discussed below).

76. With respect to conditions of confinement, the overcrowding at the Jail (coupled with understaffing) has contributed directly to: (1) overcrowded cells, (2) inmates being housed in the booking area, (3) inmates being forced to sleep on the floor, (4) inmates unable to use the kiosk to care for their needs, including medical care, and (5) inmates being locked down for excessive periods of time.

## Understaffing, Inexperience, and Lack of Training, Supervision, and Discipline

77. As discussed further below, the lack of funding for the Jail has also prevented the BCSO from paying salaries for corrections deputies sufficient to attract and retain enough deputies to properly staff it.

19

78. Specifically, although salaries have risen during the administrations of former Sheriff Watson and Sheriff Lawson (from $26,000 to $32,000), those amounts are insufficiently competitive to attract and retain corrections deputies sufficient to staff the Jail.

79. According to former Corrections Captain Allan Walsh, BCSO salaries lag behind those of McMinn and Polk Counties (with vastly smaller populations and budgets), and former BCSO employee Cassandra Stone has noted that many prospective employees opt to work for private employers with better salaries and benefits.

80. At all times relevant to this lawsuit, Bradley County documents have specified that the total Jail staff is 107 personnel, including officers, corrections deputies, and administrative and clerical staff, and (pursuant to a prior "plan of action" with the TCI), the BCSO has for years maintained that the proper number of corrections deputies to staff the Jail is approximately ninety-five (95).

81. Nevertheless, (1) it has been widely acknowledged (among BCSO personnel and members of the Bradley County Government), that employees paid out of the "Justice Center" salary allocation/budget line often do not work principally (or at all) at the Jail, and (2) the TCI has repeatedly admonished the BCSO for understaffing of the Jail.

82. For example, according to a June 2019 interview with Sheriff Lawson following a failed TCI inspection attributing the Jail's deficiencies to overcrowding and understaffing, approximately *sixty-five* corrections deputies were assigned to Jail duty.

83. These persistent insufficient staffing levels have had adversely affected BCSO morale at the Jail and further contributed to the exodus of deputies.

84. In addition, at all times relevant to this lawsuit, the Jail has been dogged by nearly constant corrections deputy turnover, such that the deputies who are employed there are inexperienced and often undertrained.

85. Former BCSO employee Gwen Beavers testified in 2019 that, since 2017, **eighty-seven** employees had left the Jail.

86. Moreover, of the 203 persons (total) who have been employed by the BCSO as corrections deputies (or officers) at the jail from Fiscal Year 2017 through Fiscal Year 2021, (1) thirty-one were (or have been) employed there for four years or longer; (2) twenty-seven were (or have been) employed there for three years or less, (3) thirty-eight were (or have been) employed there for two years or less, and (4) eighty-eight were (or have been) there for one year or, less as reflected in **Figure 1:**

**Figure 1**



87. In short, nearly half of corrections deputies staffing the Jail in the applicable period have been first-year probationers, nearly 63% have been employed for two years or less, and 76.1% have been employed for three years or less.

88. With respect to training, sixty-four of those deputies/personnel lacked documentation of even the initial *orientation* course, and (2) there was *no* training data for approximately forty-eight deputies/personnel.

89. These deficiencies in experience and training also result in corrections deputies who are inadequately prepared for tasks critical for corrections officers pertaining to inmate care, including (1) recognizing serious medical conditions of inmates, (2) responding appropriately to inmates' complaints related to medical care, and (3) implementing the BCSO's policies related to inmate medical care.

90. That frequent turnover has also been expensive, and, according to former County Commissioner Jeff Yarber has cost Bradley County approximately $435,000 over the "past few years" (as of 2019) in wasted training expenditures.

91. In addition, despite numerous instances of deputies' indefensible conduct towards inmates as it pertains to medical care (of which examples are provided below), Bradley County has *no* record of ever having disciplined a corrections deputy in connection with same.

**Inmate Medical Funding at the Jail – Fiscal Years 2018 to 2021**

92. According to the California Legislature's Legislative Analysis Office, the national average annual medical cost was **$6,352 per inmate** (as of January 2018, based on numbers assembled in 2015). See California Legislative Analyst's Office, Recent Report Compares California Inmate Health Care Costs to Rest of Nation (Jan. 18, 2018), https://lao.ca.gov/Publications

/Report/3733#:%7E:text=The%20national%20average%20was%20%246%2C352,inmates%20supervised%20in%20contract%20facilities.

93. According to a December 2017 PEW report, in 2015, the Tennessee (TDOC) annual spending for inmate health care was **$6,001 per inmate**. *See* Matt McKillop, Prison Health Care Spending Varies Dramatically by State: Why such a discrepancy, and what does it indicate?, The Pew Charitable Trusts (Dec. 5, 2017), https://www.pewtrusts.org/en/research-and-analysis/articles/2017/12/15/prison-health-care-spending-varies-dramatically-by-state).

94. In 2015, the five states with the lowest annual per capita expenditures on inmate health care were: (46) South Carolina - $3,478 per inmate; (47) Indiana - $3,246 per inmate; (48) Nevada - $3,246 per inmate; (49) Alabama - $3,234 per inmate; and (50) Louisiana - $2,173 per inmate.

95. As shown in **Table 4**, below, from September 17, 2017 to the present time, the County Commission (and Mayor Davis's) outlays for medical care at the Jail have been vastly lower than the national and Tennessee averages—and barely equal to those of Louisiana, except for Fiscal Year 2019, when Bradley County's outlay was almost $300 lower than Louisiana's.

**Table 4**

| Fiscal Year | ADP (Per Bradley County Budgets) | Total Expenditure Per Annum for Inmate Medical Care | Expenditure for Inmate Medical Care Per Inmate, Per Annum | Expenditure for Inmate Medical Care per Day | Bradley County's Expenditure as a Percentage of Tennessee Annual Expenditure (2015) |
|---|---|---|---|---|---|
| FY 2018 | 544 | $1,260,171 | $2,316,49 | $6.35 | 38.6% |
| FY 2019 | 596 | $1,121,611 | $1,881.90 | $5.16 | 31.3% |
| FY 2020 | 516 | $1,202,439 | $2,330.31 | $6.38 | 38.8% |
| FY 2021 | 521 | $1,210,707 | $2,323.81 | $6.37 | 38.7% |
| Fast Access Projection | 640 | $1,210,707 | $1,891.73 | $5.18 | 31.5% |

96. In short, at all times relevant to this lawsuit, Bradley County's level of expenditure has been approximately **30-40% of the average per capita inmate health expenditure in Tennessee** (of the TDOC), and far closer to that of Louisiana, which has **the lowest rate of inmate health spending in the entire nation.**

97. Moreover, as set forth more fully below, Bradley County has *repeatedly* declined to meaningfully expand spending on inmate health care, despite exploring the possibility on multiple occasions.

98. In fact, adjusted for medical-care inflation (the rate of which was 8.09% during the relevant period according to the United States Bureau of Labor Statistics), the amount spent during Fiscal Year 2018 ($1,260,171) equals $1,362,105.71 in Fiscal Year 2021—that is, Bradley County's Fiscal Year 2021 expenditure on medical care for inmates ($1,210,707) has not kept pace with inflation during the class period, and ***Bradley County is spending less on inmate health care in Fiscal Year 2021 than it did in Fiscal Year 2018, when this lawsuit was filed.***

99. The lack of adequate spending on inmate health care at the Jail is not a sufficient condition, in and of itself, to explain why the health care at the Jail is systemically inadequate, but it is a necessary part of that explanation.

### Guidelines Provided by the Tennessee Corrections Institute, American Correctional Association, and National Commission on Correctional Healthcare

100. Local governmental entities, acting in conjunction with the county sheriff, are obligated by law to comply with certain minimum standards in the maintenance and operation of local jails, and Tennessee has created the Tennessee Corrections Institute ("TCI") to, *inter alia*, (1) "[e]stablish minimum standards for local jails . . . including, but not limited to, standards for physical facilities and standards for correctional programs of treatment, education and rehabilitation of inmates and standards for the safekeeping, health and welfare of inmates,"

Case 1:18-cv-00217-CHS   Document 84-1   Filed 05/17/21   Page 24 of 130   PageID #: 1149

and (2) inspect on an annual basis local jails to establish compliance with those standards and report failures to do so. Tenn. Code Ann. § 41-4-140(a).

101.    Similarly, (1) the American Correctional Association ("ACA") promulgates non-binding standards for jails, referred to as the standards for Adult Local Detention Facilities ("ALDF"), which inform the national corrections community with regard to a consistent minimum standard of care for local jails of all sizes,[6] and (2) the National Commission for Correctional Healthcare ("NCCHC") promulgates non-binding standards for health care to be rendered in jails, the "Standards for Health Services in Jails," which offer guidance to the local corrections community concerning minimum reasonable standards of care in the provision of jail medical services.

102.    With respect to jail personnel, the TCI standards require, *inter alia*, that new corrections deputies receive orientation and instruction concerning the minimum standards, and those persons whose primary duties include inmate contact must complete a forty-hour basic training regimen and a certain amount of additional in-service training annually.

103.    With regard to medical services, the TCI standards require, *inter alia*, that:

a.  the local government funding agency have in place a contract with a medical services provider for inmate care;

b.  providers be notified in instances where an inmate may be in need of medical treatment, which notification must be documented;

c.  medical decisions be the "sole province" of the health-care provider and "shall not" be countermanded by non-medical personnel;

---

[6] Per Tennessee Code Annotated section 41-4-140(a)(1), TCI standards "shall approximate, insofar as possible, those standards established by the inspector of jails, federal bureau of prisons, and by the [ACA's standards]."

d.  health care staff shall work in accordance with the profession-specific job descriptions approved by the health authority;

e.  non-medical personnel assessing or treating inmates shall do so pursuant to written standing or direct orders by authorized personnel;

f.  continuity of care is required from admission to transfer or discharge from the facility, including referral to community-based providers, and jail medical personnel must give community-based providers appropriate information in accordance with consent requirements,

g.  prior to release from custody or transfer, inmates with known serious health conditions shall be referred to available community resources by the facility's health care provider currently providing treatment;

h.  "receiving screening" shall be performed (and recorded on a printed screening form) on all inmates upon admission to the facility and before placement in the general housing area, which shall include checks for (i) a serious illness, (ii) a comatose state, (iii) obvious wounds, (iv) prescribed medications, and (v) a mental health/suicide risk assessment;

i.  for inmates housed for longer than two weeks, a more complete examination must be performed;

j.  jails have suicide prevention plans and protocols in place;

k.  inmates with chronic medical conditions (*e.g.*, diabetes, hypertension, and mental illness) shall receive periodic care by qualified providers in accordance with individual treatment plans, including medication monitoring and laboratory testing; and

l.  the health authority shall develop and approve adequate protocols for identifying and evaluating major risk management events related to inmate health care, deaths, preventable adverse outcomes, and serious medication errors.

TCI Standards Ch. 1400-01-.13.

### BCSO Policies Regarding Inmate Medical Care

104.  The Jail Manual sets forth, *inter alia*, policies and procedures related to the provision of inmate health care, including:

a.  "Sick call" procedures (requests to be completed through written forms);

b.  The availability of emergency care;

c.  The availability of offsite care for conditions that cannot be addressed by Jail medical staff;

d.  Ensuring continuity of care;

e.  Annual review of "[e]ach policy, procedure, and program in the health care delivery system";

f.  Twenty-four (24) hour emergency medical care (both onsite and through emergency transport);

g.  The exercise of independent medical judgment by health care providers ("Medical, Psychiatric and Dental Staff matters involving medical judgment are the sole province of the responsible physician and dentist, respectively.");

h.  Quarterly meetings between the Jail's health provider and BCSO;

i.  Restriction of practice to areas of licensure;

j.  Inmate screenings (to be promptly reviewed by medical staff);

k.  Initial health assessments within fourteen days;

l.  Contents and maintenance of inmate medical files;

m. Notification of family members in cases of life-threatening illness;

n. Mental health services, including medication and housing assignments/classification;

o. Detoxification procedures;

p. Care for pregnant inmates;

q. Chronic care and treatment plans for inmates diagnosed with chronic diseases (*e.g.*, asthma, diabetes, and heart disease);

r. Training for corrections deputies by medical staff;

s. The care of HIV-positive inmates;

t. Procedures related to medication (including pharmaceutical practices, medication administration, storage, and record-keeping, psychotropic medications, medications brought with inmates, controlled substances, inhalers, and nitroglycerin); and

u. Co-pays.

105. As described in greater detail below, departures from the policies set forth therein by BCSO personnel are common, and those policies often do not correspond with day-to-day practice.

**The Role of Medical Service Contractors – QCHC and Fast Access – and the Allocation of Responsibility for Inmate Health Care Between Them and the BCSO**

106. Since (at least) 2009, Bradley County has contracted medical services (including mental health and dental services)[7] at the Jail to CMSP: (1) QCHC (2009 to August 31, 2020) and (2) Fast Access (September 1, 2020 to present).

107. Those relationships have at all times been governed by "Health Services Agreements" ("HSAs") and amendments thereto and extensions thereof.

---

[7] Except as otherwise specified herein, the term "medical" encompasses and includes mental health and dental care.

108.    The HSAs are versions of so-called "capitation contracts," meaning that Bradley County pays a fixed amount to the provider per year for a fixed body of services predicated on an estimated number of inmates.

109.    The HSAs are "shared-risk" capitation plans, under which (1) the contractor agrees to include as part of the fixed amount a "cost cap" under which the contractor agrees to pay for offsite care, non-formulary medications, and dental services up to a cap, and (2) once that cap is exceeded, all responsibility for additional offsite care, non-formulary medications, and dental services reverts to Bradley County.

110.    In this way, the HSAs incentivize *both* Bradley County and the contractor to minimize medical care provided to inmates.

111.    Specifically, the contractor is incentivized to (1) ensure that the cost cap is not exceeded so as to minimize costs to the county and maintain the contract, and (2) minimize the amounts spent providing the fixed services so as to increase the margin of profit realized as "base compensation."

112.    Similarly, the county is incentivized to discourage the provision of offsite medical care, non-formulary medications, and dental care to inmates beyond the cost cap.

113.    With certain differences addressed as necessary *infra*, each HSA in place at all times relevant to this lawsuit has substantially followed the above-described model and also contained (or contains) the following provisions:

   a.  All examinations and medical services will be rendered in a reasonable time following a request;

b.  All inmates will undergo a preliminary health screening conducted by a BCSO staff member trained by the Medical Director, and nursing staff will review same on a daily basis to "triage" inmates' health needs as appropriate;

c.  Within fourteen days of an inmate's confinement, nursing staff will conduct an assessment of him or her to include, *inter alia*, (1) a medical examination, (2) taking of vital signs, collection of medical history, laboratory and diagnostic examinations necessary to detect communicable disease, (3) review of medical examinations by a site physician, (4) development and implementation of a treatment plan, including housing recommendations, (5) initiation of therapy as necessary, and (6) other tests and examinations as necessary;

d.  The contractors shall provide preventative and maintenance care;

e.  The contractor shall document of receipt and disbursement of medication;

f.  The contractor shall train BCSO officers in cardiopulmonary resuscitation ("CPR"), Sudden Custody Death Syndrome, and suicide prevention;

g.  The Medical Director will oversee mental health services, including (1) evaluation, prevention, and intervention, (2) provision of a psychiatric services, and (3) medication management, and (4) training of BCSO deputies;

h.  The contractor will identify prisoners needing specialty care (emergency and non-emergency, and to include cardiology, dermatology, gynecology, laboratory services, neurology, oncology, ophthalmology, orthopedic surgery, pathology, psychiatry, and urology), notify the county immediately, and attempt to provide access to a specialty network reducing costs of same;

i.  The contractor will provide on-site emergency care and arrange for emergency transportation when necessary (the cost of which is billed to the county);

j.   Corporate staff will be on-call to on-site contractor staff and BCSO/Jail staff as needed;

k.   The Medical Director shall be a physician licensed in Tennessee who will be "responsible for and oversee the provision of inmate medical care and all clinical decision making" at the Jail and be the "responsible physician" identified in the TCI's requirements and available "at all times" to all medical staff and BCSO staff;

l.   A licensed physician or nurse practitioner shall be at the Jail a minimum of four hours per week, and, if not present available on call;

m.   An RN shall be at the Jail for forty hours per week and serve as administrator responsible for overseeing "day-to-day" provision of inmate health care services;

n.   In addition to RN administrator, two Licensed Practical Nurses ("LPNs") shall be present at the Jail at all times, for a minimum of 336 hours per week (8.4 FTEs);

o.   All contractor personnel shall obtain "[c]ompliance with all applicable regulations of the [TCI], [ACA], and [NCCHC]";

p.   All personnel shall be licensed, certified, or registered in their respective areas of expertise as required by Tennessee law;

q.   Following a reasonable opportunity to cure, Bradley County has authority to require the contractor to remove any of contractor's personnel (or contractors or assignees) if it is "dissatisfied" with same;

r.   The contractor may subcontract and delegate responsibility for health care to independent contractors;

s.   Subject to certain limitations, the contractor must furnish its policies and inmate health records to the county upon request;

t.  The contractor shall maintain "complete and accurate medical records," maintained electronically, as to each inmate, maintained in accordance with state and federal law and the county's policies and procedures, to be provided to county *in toto* following termination of the HSA;

u.  The contractor and BCSO personnel shall engage in quarterly meetings (and on an annual basis) to discuss the provision of health care and monthly reports concerning services rendered (onsite and offsite), and the RN administrator shall meet with same on a weekly basis;

v.  If a lawsuit is filed against the county concerning the contractor's medical care, the county may join the contractor "as parties defendant"; and

w.  The county and contractor are responsible to each other under cross-indemnification provisions.

114.  While, as discussed above, the Jail Manual contains a chapter concerning health care policies, QCHC *also* employed a set of policies, drafted to mirror ACA and NCCHC requirements ("QCHC Manual").

115.  By contrast, Fast Access (1) assumed responsibility for medical care at the Jail without having *any* written health care policies or procedures (related to ACA or NCCHC guidelines or otherwise), (2) still does not have such policies, and (3) only developed limited nursing protocols after operating at the Jail for *months* (although they have ostensibly been effective since September 1, 2020).

116.  It is unclear (1) *which* set(s) of policies and directives (including those contained in the HSAs) control the provision of health care at the Jail, or (2) how they are harmonized with each other, if at all, creating confusion at the level of policy.

117. Relatedly, while Bradley County and the BCSO have repeatedly taken the position that they have no involvement in health-care decision-making (apart from potentially contacting emergency personnel in "certain obvious[] situations"), these policy conflicts render the division of responsibility unclear.

118. At an operational level, BCSO corrections deputies (and/or more senior officials) are immediately present and generally at least within earshot at all times medical care is being rendered to inmates by CMSP personnel, including in the medical unit, and, hence, constantly aware of the actions and words of CMSP medical personnel.

**QCHC**

119. QCHC is a correctional health care company founded by Dr. Bates, CEO that (1) is headquartered in Birmingham, Alabama, (2) provides health care to approximately 13,000 inmates in over sixty-five jails in five states, at facilities ranging from small, twenty-bed municipal jails to large facilities with 1,000+ inmates, (3) employs approximately 400 people, and (4) had revenues of approximately $24 million in 2017.

120. QCHC provided medical care at the Jail pursuant to HSAs from 2009 through August 31, 2020.

121. For the majority of the time period relevant to this lawsuit, Dr. Bates was the designated Medical Director/Supervising Physician at the Jail.

122. The medical care rendered by QCHC at the Jail was substandard in virtually every conceivable way.

123. Former QCHC nurses (including an RN who was the Clinical Manager and supervised day-to-day operations), have averred that:

a. The resources dedicated to medical care at the Jail were not sufficient to allow medical staff to properly do their jobs, as there were too few of them, and they were overworked, underpaid, and unable to do all that was asked of them—*i.e.*, treating patients, administering medications, handling emergencies, and maintaining adequate records;

b. That excessive workload for nursing personnel was unsafe for inmates;

c. Those concerns were reported to Dr. Bates without effect;

d. The Jail was principally staffed by nurses (mostly LPNs);

e. Dr. Bates was only present for four hours per week and not always immediately available via telephone to nurses;

f. QCHC rarely engaged the Clinical Manager in "quality control" activities, and no BCSO personnel were ever present for them;

g. QCHC nurses received no formal training from QCHC concerning correctional health care;

h. QCHC nurses received only cursory training in QCHC policy and protocols;

i. LPNs examining patients sometimes failed to contact the Clinical Manager with issues beyond their scope of licensure and expertise;

j. There were not enough qualified supervisory personnel to ensure adequate supervision of nursing tasks (*e.g.*, monitor the medication administration process and LPN handling of sick calls);

k. Inmates frequently complained about not receiving medications or being seen in response to kiosk requests;

l. There was substantial delay in treatment based on QCHC and the BCSO's lack of personnel;

m. Inmate medical files were completely disorganized (even after the adoption of an electronic medical records system), which nurses did not use consistently;

n.  Despite the Clinical Manager's insistence that it was necessary, Dr. Bates refused to hire a dedicated records-management clerk;

o.  Staff turnover was common;

p.  there were not weekly or monthly meetings with BCSO personnel pursuant to HSA § 4.3, and Dr. Bates never instructed the Clinical Manager to hold them;

q.  apart from everyday interactions between LPNs and corrections deputies, the only line of communication between the BCSO and QCHC was between Dr. Bates and the Sheriff, and the Clinical Manager was not included in meetings between them;

r.  QCHC did not train corrections deputies to conduct intake screenings, which was required by the HSA;

s.  Dr. Bates (the sole decisionmaker with respect to inmate transports) was extremely reluctant to (medically) treat inmates in ways that would incur expense, either for QCHC or Bradley County—even when the inmates needed it—for example, by sending inmates to external providers and specialists or causing inmates to be "OR'd" before they attended scheduled appointments; and

t.  Dr. Bates displayed little interest in seeing that inmates received proper care or that there was continuity of care.

124.  In addition, QCHC habitually failed to follow its own policies (which themselves were inappropriately non-site specific), in various ways (both including and apart from those specifically identified with respect to class members, *infra*), *viz.*, by, *inter alia*:

a.  With the BCSO, imposing unreasonable co-pays that deterred inmates from seeking care (QCHC Manual § J-A-01);

b. Routinely failing to ensure that a responsible health authority / licensed physician supervises clinical judgments as appropriate (*id.* § J-A-02);

c. Allowing (*inter alia*, Bradley County's) cost considerations to influence clinical judgment and level of care provided (*id.* § J-A-03);

d. Failing to conduct or document requisite meetings with BCSO staff pursuant to HSA §§ 4.1-4.3 and QCHC Manual § J-A-04[8];

e. Completely failing to maintain a Continuous Quality Improvement (CQI) Program (QCHC Manual § J-A-06);

f. Routinely failing to communicate patients' special health needs to the BCSO (*id.* § J-A-08);

g. Repeatedly failing to conduct requisite reviews following patient deaths (*id.* § J-A-10);

h. Completely failing to follow the grievance mechanism for health complaints, including requisite documentation of same (*id.* § J-A-11);

i. Completely failing to follow the "near miss" clinical event reporting system, including documentation of medication errors, and ensure Medical Director review of same (*id.* § J-B-02);

j. Failing to implement and document the clinical performance enhancement/peer review and professional development systems (*id.* § J-C-02, -03);

k. Failing to train BCSO corrections deputies concerning:  (1) the proper conduct of intake screenings; (2) CPR; (3) recognizing the need for emergency care and intervention in life-threatening situations (including heart attacks and intoxication/withdrawal); (4) recognizing the manifestations of certain chronic illnesses; and (5) referral of inmates with health complaints to health staff and transfers of inmates (*id.* § J-C-04; HSA §§ 1.2(b), (g), (i));

---

[8] The BCSO has documented only *four* such monthly meetings between it and QCHC during their eleven-year relationship, from June to September 2019, and QCHC could document none.

l.  Failure to develop an adequate staffing plan (*id.* § J-C-07);

m.  Routinely failing to ensure continuity of medication in a timely manner (*id.* § J-D-01.6, -02.5);

n.  Routinely failing to create medication administration records (MARs) (*id.* § J-D-02.3);

o.  Repeatedly failing to document medication errors (*id.* § J-D-02.4);

p.  Routinely failing to monitor psychotropic medications (*id.* § J-D-02.6);

q.  Routinely failing to send patients requiring care beyond the available resources to hospitals or specialists (on both an emergency and non-emergency basis) (*id.* § J-D-05);

r.  Routinely failing to ensure that inmates meeting specific criteria upon booking are properly treated in conformity with policy (*id.* § J-E-02);

s.  Routinely failing to contact practitioners for urgent needs (*id.* § J-E-08);

t.  Routinely failing to ensure continuity-of-care policy (*id.* § J-E-12);

u.  Completely failing to follow discharge-planning policy (*id.* § J-E-13);

v.  Routinely failing to abide by chronic-disease-care policy (*id.* § J-G-01);

w.  Repeatedly failing to abide by special-needs policy (*id.* § J-G-02);

x.  Routinely failing to follow basic-mental-health services policy (*id.* § J-G-04);

y.  Routinely failing to follow policy for intoxication and withdrawal (*id.* § J-G-07);

z.  Repeatedly failing to follow policy concerning counseling and care of pregnant inmates (*id.* § J-G-09);

aa. Routinely failing to maintain health records in policy-specified format (*id.* § J-H-01);

bb. Repeatedly failing to obtain informed consent for treatment (*id.* § J-I-05); and

cc. Routinely failing to provide medically necessary care, defined as:  (1) "[c]are appropriate for the diagnosis or treatment of a patient's condition, illness, or injury that threatens well-

being, causes serious intractable pain, or can lead to significant deterioration or progression of disability"; (2) "[d]iagnostic, preventive, and treatment services (including supplies, appliances and devices), and follow-up care as determined by qualified, appropriate health providers in treating any serious condition, disease, or injury"; (3) "[b]ehavioral health care necessary for preventing, controlling or eliminating serious symptoms potentially dangerous to patient and/or others"; and (4) "[m]edical care consistent with generally accepted standards of medical practice, based on credible scientific evidence published in peer-reviewed, medical literature generally recognized by the relevant medical community as necessary for treatment of serious medical conditions" (*id.* § J-I-07).

125.    And apart from any consideration of QCHC's policies, whether they were followed or not, as a practical (and customary) matter:

a.  Procedures  were not in place to assure that individuals needing immediate medical or mental health evaluation and treatment received such care;

b.  Medications were not reviewed timely by healthcare staff to ensure the continuity of care required;

c.  Patients with chronic diseases, acute injuries, and prescribed medications often were not evaluated by providers and treatment plans formulated;

d.  nursing staff were consistently (and illegally) practicing beyond their scope, *i.e.*, LPNs and RNs  routinely made decisions about patients presenting with abnormal vital signs, complex histories, and deteriorating conditions without consulting a provider;

e.  LPNs—who are not licensed or trained to conduct chronic care evaluations—were, as a matter of policy, asked to conduct chronic care clinics;

f.  nursing staff consistently failed to conduct proper evaluations to include obtaining a complete set of vital signs, and conducting an appropriate and thorough physical assessment and/or a mental status exam as required by the presenting complaint;

g.  Nursing staff consistently failed to monitor their patients as their medical or mental health conditions required, and according to the nursing plan developed by the nurses themselves;

h.  Nursing staff consistently failed to follow nursing assessment protocols;

i.  Officials and employees frequently did not ensure that the information obtained in receiving screenings was acted upon in a timely fashion;

j.  Inmates frequently went without essential medications for long periods of time or completely;

k.  Inmates with potentially emergent conditions (*e.g.*, chest pain and shortness of breath) were told to make sick call requests (which could take days for response) when they should have been evaluated immediately;

l.  Chronic care inmates did not receive necessary individualized treatment plans;

m.  Medical records and documentation were extremely poor, in violation of the Jail Manual, QCHC Manual, and NCCHC standards;

n.  There were routine failures to send individuals to the hospital when they were exhibiting obvious signs of need for evaluation and treatment not available at the Jail; and

o.  The co-pay policy discouraged inmates from seeking care.

126.  Moreover, QCHC (1) was unable to document *any* written communications it had with the BCSO concerning inmate care, and (2) in June 2019, the TCI found that QCHC had not documented *any* orientation training for five of twenty nurses working there.

127.   Indeed, Bradley County's own testifying expert witness found *numerous* violations of the standard of care and acceptable professional standards on part of QCHC (as discussed below).

128.   In short, the care provided by QCHC at the Jail was systemically inadequate, placed every inmate at the risk of serious harm, and routinely caused serious harm to inmates (as the examples set forth below illustrate.

129.   Despite its poor performance QCHC has been richly remunerated by Bradley County over the years, including during the putative class period, as show in **Table 5**, below:

**Table 5**

| Fiscal Year | Bradley County Payments to QCHC | QCHC Profit[9] |
|---|---|---|
| FY2018 | $1,260,171 | $380,000 (approx.) |
| FY2019 | $1,108,870 | $300,000 (approx.) |
| FY2020 | $831,652.50 (est.)[10] | unknown |
| *Total* | *$3,200,693.50* | **$680,000 + FY2020 profit** |

130.   The HSA provided that, upon termination, the parties "shall negotiate an orderly transition process and produce a written plan of transition."

131.   Despite that requirement, the two-page "plan of transition" sent by QCHC to the BCSO on July 29, 2020 merely listed IT inventory that would require replacement, and (2) listed the vendors who stored electronic medical records; it made *no* provision for continuity of inmate care.

---

[9] The calculated profits are based on preliminary estimates of data furnished by QCHC and Bradley County.

[10] Plaintiffs do not currently process documents sufficient to ascertain the total amount paid by Bradley County to QCHC in Fiscal Year 2020. The cited $831,652.50 figure based on Bradley County's estimate of the total 2019-2020 expenditures at the Jail and Workhouse for medical care prorated by QCHC's eight months of services rendered then.

**Bradley County's Request for Proposal and Engagement of Fast Access**

132.     In early 2020, Bradley County sent out a Request for Proposal ("RFP") for a new CMSP, which RFP included pro-forma references to "quality care" but then specified that the proposal should (1) be **based on an [ADP] of** *six hundred forty (640) inmates for the next three (3) years*"; (2) be tailored to operate the health-care program "in a cost-effective manner," and (3) contain "specific examples of cost saving initiatives developed and implemented in other agencies where the Proposer is providing inmate health care."

133.     It also specified that "the County desires the most cost-efficient medical staffing proposal" and requested that the proposal "contain a <u>specific annualized</u> price for a base population of **up to 700 inmates**."

134.     The proposal also specified that the provider have previous or current contractual relationships with jails housing "a minimum of three hundred and fifty (350) inmates."

135.     The staffing terms of the RFP were *materially identical* to those present under the QCHC HSAs, *i.e.*, it required that (1) a Medical Director to be "available at all times" to County administrative staff and Jail staff, (2) a *single* physician or nurse practitioner to be present at the Jail *one day a week*, and "on call" at all remaining times, (3) a licensed physician merely "oversee" (in an unspecified way) clinical decision making, (4) a *single* RN be present at the Jail for forty-hours per week, and (5) *two* LPNs to be present twenty-four hours per day, seven days per week (336 hours per week (8.4 FTEs).

136.     As an alternative, the RFP asked for pricing for an additional registered intake nurse (RN) to be present twenty-four hours per day, seven days per week.

137.     Fast Access is a health-care company founded by Dr. Kerley that is principally engaged in the operation of urgent-care clinics in Chattanooga and the surrounding area.

Case 1:18-cv-00217-CHS   Document 84-1   Filed 05/17/21   Page 41 of 130   PageID #: 1166

138. Dr. Kerley's limited experience in correctional medicine (having provided such services at (1) the Sequatchie County Jail (eighty-three total beds), and (2) more recently, the Campbell County Jail (322 total beds)) did not meet the criterion specified in the RFP that the CMSP have experience with facilities of 350+ beds.

139. Nevertheless, Fast Access submitted a proposal, which stated, *inter alia*, that it would provide "fiscally responsible methods" in providing healthcare assisted by, *inter alia*, having "realistic expectation[s] for the care of inmates who are chronically ill."

140. It also specified that "PA or NP clinical providers would be onsite a minimum of 4 hours per week."

141. In addition, the proposal stated that (1) Fast Access would *develop* (a) a pharmaceutical plan and formulary, (b) a medical records system, and (c) policies and procedures; (2) clinical staff would follow appropriate standards of care; (3) Dr. Kerley would be the "actual operator"; and (4) "ALL inmates with acute, chronic, or high-risk health problems will be discussed with the Sheriff's Department leadership to develop the best plan of care pertaining to what is appropriate within the facility and the logistics of outside care."

142. In other words, Dr. Kerley apparently planned to take over an unfamiliar 510-bed facility with: (1) *no* written policies (much less policies mirroring ACA and NCCHC standards), (2) *no* developed formulary, and (3) *no* electronic medical records system in place.

143. In addition, with respect to Bradley County's request for an alternative plan with greater staffing, Dr. Kerley wrote the he did *not* recommend "the option of 24-hour RN coverage," because "[t]he cost/benefit does not make sense for the return on investment at the current census," and he would recommend it only "once the ADP is *over 800*."

144.    Similarly, he opined that the RN-staffing combination "would be the first step in a graduated process **once the ADP is over 1000.**"

145.    In short, Bradley County and Dr. Kerley have given every indication that they expect the inmate population at the Jail to grow substantially in the near future.

146.    Fast Access assumed responsibility for health care at the Jail pursuant to HSA on September 1, 2020 and is the current medical services provider.

147.    On information and belief, Fast Access retained many or most of the nursing personnel employed by QCHC when its contract with Bradley County expired but is paying them less than QCHC did.

148.    On information and belief, Fast Access assumed responsibility for health care without having *any* written policies mirroring correctional industry standards (*e.g.*, NCCHC standards), a functional records system, or a functional pharmaceutical system.

149.    As illustrated by the treatment of certain inmates below, the deficiencies in health care present at the Jail under QCHC remain under Fast Access and have arguably worsened.

### The Jail's Inmate Housing Areas, Lockdown Policy, and Capacity and Composition of Inmate Population

150.    The Jail Manual provides that BCSO policy is to "meet capacity requirements" and "inmate space requirements."

151.    The Jail has a "pod" layout, wherein "inmate housing areas" (*i.e.*, cells), in various configurations (*e.g.*, two-bunk, three-bunk, *etc.*) open into larger "dayroom areas" where it is contemplated inmates will spend most of their time.

152.    Per the Jail Manual, BCSO policy is to "meet capacity requirements" and "inmate space requirements," such that each cell will (1) "[b]e of the proper square footage per inmate, that is at least 35 square feet of unencumbered space per occupant for single cells and 25 square

feet of unencumbered space per occupant for double occupancy," and (2) provide a sleeping surface with a mattress and pillow . . . at least 12 inches off the floor, a writing surface and proximate area to sit, storage for personal items, and a place to suspend clothes," (3) contain toilets and sinks that are accessible 24 hours per day without staff assistance, and (4) make provision for disabled inmates.

153. Per the Jail Manual, dayrooms, *inter alia*, provide for "varied inmate activities," and a minimum of 35 square feet per inmate.

154. In addition, the Jail Manual provides for multi-purpose and counseling rooms and an exercise area "allowing each inmate to have at least one hour of exercise daily."

155. Per the Jail manual, "lockdowns" (*i.e.*, confinement to a locked cell) exist for (1) emergency purposes (*e.g.*, bomb threat, suicide, fire, riot); and (2) as punishment for disciplinary infractions; nothing therein contemplates extended lockdowns separate from those legitimate penological purposes.

156. A county jail may hold pre-trial detainees, those convicted of misdemeanors, locally sentenced felons, backup felons (*i.e.*, felons sentenced to confinement in a state prison who the State of Tennessee has not taken into custody, often for reasons of space), and others, such as federal prisoners under the jurisdiction of the USMS.

157. Counties in Tennessee may choose to contract with the state to house state inmates or not, and non-contracting counties (like Bradley County) are entitled to request that the TDOC take physical custody of felons housed in local jails (sentenced to more than one year) within fourteen days of the request.

158. At all times relevant to this lawsuit, the Jail's TCI-certified capacity (following the completion of the Brian K. Smith Workhouse on or about July 27, 2017) has been between 506 and 510 inmates, and the Jail has held all classes of inmates listed above.

159. But for the presence of income-generating state and federal inmates, the Jail would not be overcrowded.

160. At all times relevant to this lawsuit and to present, as a result of overcrowding and understaffing, inmates have been subject to lockdowns—ranging from 20/4 (*i.e.*, twenty hours in the cell and four hours out), to 23/1, to periods lasting up to 26.5 hours at a time.

161. In addition, inmates subject to those lockdowns are often in cells with more inmates than the cell is designed to hold, with the result that inmates: (1) are forced to sleep for long periods of time on the floor, and (2) have vastly less space than provided for in *any* applicable set of correctional guidelines (*i.e.*, the ACA or TCI), as well as Bradley County's own written policy.

162. Those conditions naturally result in filthy cells, and inmates are frequently not furnished with supplies adequate to cleaning them, particularly when (as often happens) the cells' toilet apparatus overflows; for example, in June 2019, the TCI found that the daily sanitation inspections and laundry/mattress cleaning and disinfection logs were not consistently completed.

163. Moreover, the cramped conditions pose an undue risk of disease to inmates, and infections of all types (including MRSA) are common, as has been, of course, COVID-19.

164. In addition, inmates confined under these conditions are unable to exercise or otherwise take basic measures to care for their physical and mental health; for example, in June 2019, the TCI found that logs showing that inmates were allowed one hour of exercise per day outside cells were not being consistently completed.

45

165.    These lockdowns can last for weeks or even months at a time.

166.    Throughout the period of time relevant to this lawsuit, the Jail has repeatedly failed TCI inspection items predicated on overcrowding and space, including in years 2018 (inmates housed in booking as permanent assignment without uniforms, hygiene supplies, or bedding; sleeping on concrete floors on dilapidated mattresses; broken sinks and toilets), and June and August 2019 (*i.e.*, non-compliant square footage ratios in male housing; a finding that most deficiencies were attributable to overcrowding and staff shortages).

167.    To the extent that Jail overcrowding has recently been reduced, such reduction appears to be a temporary effect of the COVID-19 pandemic (in which many correctional facilities, including the Jail, released misdemeanants, *see* Bureau of Justice Statistics, Impact of COVID-19 on the Local Jail Population, January-June 2020 (Mar. 2021), *available at* https://www.bjs.gov/content/pub/pdf/icljpjj20.pdf)), and a post-COVID "return to normalcy" will likely occur, as evidenced by the Jail's request for proposal (discussing an ADP of 700 inmates), the Fast Access HSA (contemplating an ADP of 640 inmates), and Dr. Kerley's staffing opinions (discussing inmate ADPs of 800 and 1000).

168.    Based on those projections, the Jail's overcrowding would reach levels not yet seen.

### Bradley County Government and BCSO's Knowledge of the Jail's Deficiencies in Medical Care and Conditions of Confinement

169.    According to former County Commissioner Dan Rawls, Mayor Davis and the County Commission have, at all times relevant to this lawsuit, been generally aware of (1) poor medical care for inmates; (2) inmate overcrowding; (3) understaffing by corrections deputies; (4) compensation for corrections deputies that was not competitive with both that of neighboring counties (for corrections positions) and local private employers; (5) frequent turnover of

46

corrections deputies; (6) relatedly, a frequent lack of training for those corrections deputies employed at the Jail; and (7) poor conditions and treatment of inmates generally.

170. That knowledge came from various sources, including (1) the Jail's repeated failures of TCI inspections; (2) jail statistics presented to the Commission; (3) presentations from BCSO/Jail personnel; (4) complaints from and discussions with constituents, BCSO/Jail personnel, and inmates; (5) presentations from healthcare providers at the Jail; (6) presentations from Bradley County's insurer; (7) numerous lawsuits against Bradley County, the BCSO (and its agents and personnel, including the Sheriff), and QCHC; (8) media investigations and news reports; and (9) discussions by the assembled Commissioners during the discharge of their duties.

171. In May 2017, representatives from the Local Government Insurance Pool (the "Pool"), which insures Bradley County, made a report to the Commission concerning a potential raise in premiums, in which they stated that: (1) Bradley County had paid approximately $9.1 million into the Pool compared with $10.7 million in claims; (2) Bradley County was not contributing its fair share to the Pool; (3) from the Pool's standpoint, Bradley County had not had a "good year" in a decade; and (4) the BCSO—and specifically incidents at the Jail—accounted for forty-one percent (41%) of all incurred claims.

172. In June 2017, Mr. Rawls pointed out to the Commission that there were then nineteen outstanding lawsuits against the County stemming from the BCSO/Jail.

173. In early March 2018, County Commissioner Thomas Crye opined that the Jail was understaffed and "overfilled on state prisoners, and the consequence is our citizens that are arrested are placed in holding cells with no clothes. . . . [t]he d-mn dogs and cats over at the SPCA get treated better than that," to which Commissioner Charlotte Peak responded that

Commissioner Crye had "come over to the dark side with [her]" concerning the need for decent inmate treatment.

174.    Commissioner Crye also observed that understaffing was a principal cause of the Jail's problems.

175.    When he was Sheriff, Mr. Watson appears to have been aware of these conditions but wholly indifferent to them, blaming a failed February 2018 TCI inspection on the inmates themselves:

> It's always going to be a problem[;] it's never going be solved, unless we just go back to the old days and just take the mattresses away from them, just treat 'em like they used to in the '50s and '60s where you where you get the water hose and the fire hydrant and hook it up and just spray 'em down . . . . You can't do that no more. They have more rights than the schools. It's sad.

176.    By contrast, Sheriff Lawson is well aware of the problems, noting in an interview after a failed June 2019 TCI inspection: "It's tough to run this Jail. It's tough when it's overcrowded; it's tough when it's understaffed."

177.    With respect to inmate medical care, Mr. Rawls avers that (1) the Commission was concerned principally with keeping costs down and was not being given reliable information from the BCSO concerning the deficiencies of care that were present, and (2) the political unpopularity of issues pertaining to inmate rates disincentivized the County Commission from addressing the problem.

178.    However, the County Commission and Mayor Davis were *very* aware of the substantial revenue generated by the Jail for housing state and federal prisoners, and Mr. Rawls avers that seemingly every discussion the County Commission had about the Jail "reverted to the revenue it generated (or could generate)."

179.    In Mr. Rawls's opinion, Mayor Davis and the County Commission consider the Jail a "profit center" for Bradley County.

180.    Indeed, just *one month* after the Jail had been so overcrowded it appeared inmates would have to spent the night in patrol cars outside and dozens of inmates were being held in booking and failed a TCI inspection in part based on overcrowding, the County Commission authorized 2016 Resolution 43, which authorized Mayor Davis to contract with the USMS to house 100 *additional* (federal) prisoners.

181.    In addition, the allocation of amounts spent on the Jail and inmates was determined separately from and without reference to the amounts generated by housing state and federal prisoners—that is, increases in revenues generated by housing inmates did not translate into increased expenditures for inmate needs, including health care.

182.    In early 2018, Commissioner Milan Blake noted that the County Commission "frowned on" dipping into reserves to pay for Jail expenditures, rather than "moving already budgeted money around," and, although he stopped short of calling the revenues generated by state and federal inmates "the icing on the cake," he noted that revenue was "over and above" what was projected.

183.    Similarly, in August 2018, Captain Thomas noted that the BCSO's contract with the USMS to house federal prisoners at the Jail was a "significant revenue source" for Bradley County.

184.    Unfortunately for the inmates and the BCSO corrections deputies, additional revenue they generated did not translate into additional expenditure on their basic needs or salaries, respectively.

185.   In sum, at all times relevant to this lawsuit, the Bradley County Government and BCSO have known that:

a.   Inmates were subjected to poor conditions generally at the Jail;

b.   Inmates often received inadequate medical care at the Jail;

c.   the Jail routinely failed TCI inspections;

d.   dozens of inmates filed lawsuits against Bradley County for various causes of action, including deliberate indifference to serious medical needs, many of which were settled for substantial sums of money paid by the taxpayers of Bradley County;

e.   the Jail was routinely and seriously overcrowded such that inmates were frequently locked down for twenty-three hours per day in overcrowded cells and made to sleep on the floor;

f.   the Jail was generally understaffed by BCSO deputies;

g.   BCSO deputies, including patrol deputies and corrections deputies, were paid less than in surrounding counties and by local private employers;

h.   Because of the poor pay, it was (and is) difficult to keep enough corrections deputies on staff to fully staff the Jail and meet the minimum training requirements;

i.   While these conditions were present, Bradley County generated (and continues to generate) millions of dollars annually in revenue in exchange for housing state and federal prisoners; and

j.   Despite the income generated by the housing of state and federal prisoners, the Jail's budget for, *inter alia*, spacing, staffing, training, and medical care has failed to keep pace with the Jail's population and the needs of the inmates (or even inflation), and the County's constitutional obligations concerning inmate housing and care.

50

## Bradley County Government and the BCSO's
## Considered Decisions not to Improve Conditions

186.    Despite ample knowledge of the deplorable Jail conditions and medical care, the Bradley County Government has done nothing meaningful about it over a period of years.

187.    For example, in or about March 2019, the BSCO requested QCHC to provide it with estimates to increase medical personnel staffing at the Jail, and Dr. Bates responded that (1) increasing the mental health professional's hours from twenty to forty per week, (2) increasing psychiatric services from two to sixteen per week, and (3) hiring a Registered Nurse to serve as an "intake nurse" at booking 24/7 would require an increase in the annual HSA price from $1,115,805.00 to $1,662,165.00, and to *also* add a full time Nurse Practitioner would increase the cost to $1,834,000.00 per annum.[11]

188.    Bradley County elected not to make any of the above-described changes.

189.    Instead, in the August 2019 HSA extension, Bradley County increased the mental health provider's hours from twenty to forty and a psychiatric provider's from two to eight, but *only* when offset by a $50,000.00 reduction in the cost cap, for a net expenditure increase of just $47,180.00 (and while retaining the ability to limit cost-cap overages by limiting inmate send-outs and other medical treatment).

190.    Mayor Davis's opposition to property tax increases has been a hallmark of his time in office, and the County Commission last approved a tax increase in 1996.

191.    Indeed, despite serious impetus from certain County Commissioners (namely Commissioner Crye) to seek a small tax increase to address pressing needs—including salary needs of county employees—Mayor Davis has steadfastly opposed any such policies.

---

[11] Per the 2019 ADP of 596, $1,834,000.00 in total annual expenditure would make the average expenditure approximately $3,077.18, or about half the average 2015 Tennessee expenditure.

192.    On or about July 15, 2019—soon after the Jail failed a TCI inspection—the County Commission voted nine to five in favor of a modest property tax increase to pay for salary improvements, but **Mayor Davis vetoed the budget** for the first time in his tenure as County Mayor, preferring that Bradley County continue to rely on the extraction of revenue from Jail inmates to shore up the budget.

193.    And while Sheriff Lawson has the statutory authority to seek judicial intervention in procuring additional deputies and necessary monies for Jail operations (if not increased medical expenditures) from local circuit and criminal courts, he has declined to do so.

**Allegations Pertaining to Putative Class Representatives and Class Members**

The following allegations illustrate how the conscious policies, institutional failures, and unofficial customs described above have (1) injured (even killed) persons confined in the Jail, and (2) exposed all such persons in the past, at present, and in the future, to substantial risks of serious harm.

All injuries described herein have directly resulted from: (1) the systemic deficiencies in health care at the Jail, on part of Bradley County, the BCSO, and the CMSPs, singly and/or in combination; and (2) the (a) affirmative policies and customs, (b) official policies, (c) failures to train and supervise, and (d) unofficial customs of Bradley County, the BCSO, and the CMSPs, singly and/or in combination.

**Fiscal Year 2018 (July 1, 2017 to June 30, 2018) –**
**Former Sheriff Watson's Last Full Fiscal Year in Office—QCHC Medical Contractor**

**Christopher Brown (Putative Class Representative)**

194.    Mr. Brown was incarcerated at the Jail from August 31, 2017 to May 10, 2018.

195.    Upon his confinement, Mr. Brown suffered from gastroesophageal reflux disease ("GERD"), Type II diabetes, Hepatitis C, and cirrhosis, which, at the time of his incarceration, had progressed to ESLD, for which he was prescribed a number of medications.

196.    Following his confinement, (1) no records indicate that Mr. Brown received proper medications or evaluation for months despite exhibiting symptoms of ESLD, including slurred speech and confusion, bloody emesis, gastrointestinal bleeding (including black, tarry stool), and ascites; and (2) he suffered repeated episodes of hypoglycemia because of poor management of his diabetes.

197.    QCHC and the BCSO ignored Mr. Brown's (and his family's) repeated complaints, and only after his lawyer provided a physician's letter warning the BCSO that Mr. Brown's condition would be difficult to monitor in the Jail and would worsen and cause pain without proper treatment did QCHC prescribe additional medications and begin documenting his medication administration.

198.    Nevertheless, those medications were inadequate, and he missed doses, eventually developing severe ascites causing him to gain thirty pounds in a week.

199.    Although a paracentesis was indicated, QCHC (and the BCSO) failed to arrange for same in a timely fashion, and Mr. Brown only received same after he was sent to the hospital following a possible cardiac event and kept because of his dangerously high ammonia levels.

200.    Bradley County's identified expert testified that Mr. Brown's care was inadequate, and that Dr. Bates was not sufficiently involved with his treatment.

201.    In providing medical care for Mr. Brown, the BCSO failed to follow its own policies (including Jail Manual § 9.1(J) (Non-Institutional Resources), (N) (Special Medical Programs), 9.6 (Dispensing of Medication), and QCHC failed to follow its own policies

(including QCHC Manual J-D-01.08 (Medication Administration Record), J-E-12 (Continuity of Care During Incarceration), J-G-01 (Chronic Disease Management), J-G-02 (Patients with Special Needs)).

202.    Mr. Brown suffered (1) a severe worsening of his condition, and (2) severe pain and suffering while incarcerated at the Jail.

### Darrell Eden (Putative Class Representative)

203.    At the time of his incarceration on September 20, 2017, Mr. Eden had a significant medical/surgical history and a number of serious health problems, including COPD, emphysema, right lung dysfunction, blood clots, removal of upper lobe of right lung, and adherence of right lung to chest wall.

204.    While driving to work, Mr. Eden crashed his car into a concrete wall at 70 mph, breaking his finger (on his right hand), left ankle, and seven ribs (two of which were displaced fractures), and also likely suffered a concussion.

205.    He was arrested for DUI (which charge was later dismissed) and transported to the Jail, where he was booked, and his intake screening form states that he "was in wreck" and had visible injuries to the left ankle and right wrist, despite which medical staff was not summoned.

206.    While in the booking area, Mr. Eden developed substantial pain from the injuries he sustained in the car accident, it was very difficult for him to walk on his broken ankle or use the hand with the broken finger, and his broken ribs were painful and presented special dangers given his pulmonary health problems, because a lung puncture from a broken rib could cause him to suffocate and die.

207.    Mr. Eden's wife was very concerned because of his health problems and called the Jail to inform the BCSO about those health problems, including his emphysema and COPD, and was told that Mr. Eden would be medically evaluated and treated.

208.    In addition, Mr. Eden repeatedly requested medical care and a hospital transport from multiple BCSO personnel multiple times over the course of his confinement, but, despite his repeated requests, was never medically evaluated or otherwise cared for by anyone at the Jail, with the exception of his fellow inmates, who helped him to stand and use the toilet (which he could not do on his own).

209.    Mr. Eden was released sometime after 5:00 p.m., in "bad shape" (in the bail bondsman's words) after being booked and fingerprinted (including his broken finger) and, evidencing his obvious injuries, transported by a BCSO deputy to his car in a wheelchair.

210.    Ms. Eden drove Mr. Eden directly to Erlanger East Hospital ("Erlanger East") where he was coughing up blood and admitted immediately, and later transported via stretcher and ambulance to the Baroness Erlanger Emergency Department ("Erlanger Downtown") for a CT scan, where he was admitted in serious condition and diagnosed with, *inter alia*, bilateral rib fracture, left ankle fracture, and metacarpal neck fracture and treated with, *inter alia*, morphine.

211.    After discharge, Mr. Eden was admitted to a rehabilitation facility for ten to fourteen days, given a wheelchair and a walker.

212.    In providing medical care for Mr. Brown, the BCSO failed to follow its own policies (including Jail Manual § 9.1(A)-(B), and QCHC failed to follow its own policies (including QCHC Manual J-E-02 (Receiving Screening)).

213.    While incarcerated at the Jail, Mr. Eden suffered severe and unnecessary pain and was subjected to a serious risk of harm, including death.

## Brandon Gash (Putative Class Representative)

214.  On April 19, 2018, Brandon Gash was arrested for, *inter alia*, possession of methamphetamine and transported to the Jail.

215.  At some point during his arrest, Mr. Gash consumed an unknown quantity of methamphetamine, which was known to the arresting officers (and, later, BCSO corrections deputies and QCHC medical personnel).

216.  Upon booking, Ms. Gash was sweating profusely, incoherent, and barely capable of walking or holding his head up, and his blood pressure was substantially elevated (at 160/100).

217.  Despite Mr. Gash's plainly emergent and life-threatening condition, which was known to QCHC personnel and/or BCSO deputies (who observed that he was "extremely intox[icated]!"), they declined to send him to an emergency room for evaluation and treatment.

218.  Instead, LPN Sheila Farmer attempted to contact a QCHC physician, who was unavailable.

219.  LPN Farmer then attempted to contact Nurse Practitioner LaDonna Hubbard, who also was not available, but was finally able to contact Nurse Practitioner Amy Franks.

220.  Without examining Mr. Gash, Nurse Practitioner Franks order .2 milligrams of clonidine, which Mr. Gash "refused" (while he was profusely sweating, mumbling gibberish to himself, shaking uncontrollably, and, per officer J. Stephenson, "unable to respond to any commands or questions").

221.  LPN Farmer placed Mr. Gash on observation and advised Shift Lieutenant Carol Edwards to "give him a couple of cartons of milk to see if he would drink it," because it might "cause him to throw up" if he had "ingested anything,"

222.  Lieutenant Edwards placed those cartons next to the unresponsive Mr. Gash, telling him that "the milk was there for him and he should drink it, per medical."

223.    After placing him on medical observation, and instead of providing Mr. Gash with medical care, BCSO personnel strip searched him for additional contraband.

224.    Sergeant Christa Murray called incoming Sergeant Ward to tell her that Mr. Gash "may be going to the hospital if medical decide[d] to send him out," and BCSO deputies "checked on" Mr. Gash periodically for the next six hours, at which time he stopped breathing.

225.    Only then did QCHC evaluate Mr. Gash and arrange for emergency transport, but Mr. Gash was pronounced dead at Tennova.

226.    In addition to exhibiting deliberate indifference to Mr. Gash's plainly obvious serious medical needs, the conduct of both BCSO personnel and QCHC personnel violated their respective policies in numerous ways. (*See, e.g.*, Jail Manual §§ 5.1.I.6 (requiring deputies to be trained in "[c]aring for intoxicated . . . and chemical dependent persons"; 14.1.III.A.1-4 (requiring intake deputies to "observe the arrestee for . . . degree of intoxication" and the shift lieutenant to "determine whether the inmate should be (a) refused and taken to the hospital"); QCHC Manual J-G-06 ("Inmates experiencing severe, life-threatening intoxication . . . will be transferred to a community hospital."); J-A-10 (Procedure in the Event of an Inmate Death)).

227.    Bradley County's identified expert testified that (1) Mr. Gash (a) "should have been considered for a higher level of care at that time," and (b) "would have had access to potentially more effective interventions if he had been transported to an actual medical facility," and (2) the failure to send him to the hospital "may [have been] a standard of care violation."

228.    The failure of the BCSO and QCHC to provide appropriate care for Mr. Gash's condition caused or contributed substantially to his death.

**Shelby Long (Putative Class Representative)**

229.    Shelby Long was incarcerated at the Jail from November 6, 2017 until May 5, 2018.

230. Ms. Long suffers from hypothyroidism and, at the time of her incarceration, was approximately two months pregnant.

231. She told the booking deputy that she was pregnant and had a thyroid condition, and he told her that a nurse would examine her.

232. However, she was not then examined by a nurse and was placed (in booking) in a shower room with a wet, concrete floor, where she remained for three days without mattress or pillow.

233. At that point, she began bleeding from her vagina, thought she was miscarrying, and pressed the emergency button.

234. A nurse eventually came to her, and she told the nurse that she was pregnant; the nurse forced her to urinate in a cup in front of the others in the shower room and in front a deputy.

235. A few hours later, the nurse returned and told her that the test was negative; she was transferred to a cell, and then taken to the medical unit and again told the nurses she was pregnant and had been bleeding from her vagina.

236. A nurse again told her that her test was negative, and that in order to be treated as if she were pregnant, the nurse would need to see outside records; Ms. Long signed a release for same.

237. As documented on the history and physical dated November 10, 2017 (and confirmed in records obtained on November 14, 2017), Ms. Long also told the nurse that she had a thyroid condition for which was prescribed levothyroxine and was taking prenatal vitamins.

238. Despite that documentation, QCHC personnel (1) did not enroll her in chronic care or contact a provider about her medication, and (2) despite receiving records confirming pregnancy (and, hence, likely miscarriage), performed no physical examinations (*e.g.*, pelvic examination or ultrasound) and did not give her a requested STD test (responding that QCHC

"d[id] not check for STDs unless you are having symptoms"), even after she later complained numerous times of urinary tract issues and continued vaginal discharge.

239. Because her hypothyroidism was untreated, Ms. Long gained thirty-five pounds in a month, and only after *three months* of incarceration, and repeated complaints, was given laboratory tests (for TSH) related to her thyroid condition.

240. When that test revealed an extraordinarily high TSH of 182.2, the nurse practitioner ordered Methimazole, which treats *hyper*thyroidism, not *hypo*thyroidism, and, as a result of this potentially life-threatening medication error, Ms. Long's TSH increased to 228.3 by March 27, 2018.

241. The Methimazole was not discontinued until March 31, 2018, and, by April 13, 2018, Ms. Long had gained another thirteen pounds.

242. Even after discovering their error, QCHC personnel failed to evaluate Ms. Long to ensure no other abnormalities or injuries had occurred.

243. In providing medical care for Ms. Long, the BCSO failed to follow its own policies (including Jail Manual § 9.1(M) (Pregnant Inmates) and 9.6 (Dispensing of Medication / Pharmaceutical & Inventory)), and QCHC failed to follow its own policies (including QCHC Manual J-D-01.08 (Medication Administration Record), J-D-1.09 (Medication Errors), J-G-01 (Chronic Disease Management), J-G-07 (Care of the Pregnant Inmate), J-G-09 (Pregnancy Counseling), J-G-09.01 (Determination of Pregnancy)).

244. Bradley County's identified expert testified that (1) Ms. Long (a) should have been obstetrically evaluated after her miscarriage, (2) QCHC violated the standard of care by refusing to give her an STD test, and (3) Nurse Practitioner Franks "did not know what she was doing" and violated the standard of care in prescribing methimazole.

245.    While confined at the Jail, Ms. Long was exposed to substantial risks of serious harm, and, in fact, suffered serious harms.

**<u>Bryan Wampler (Putative Class Representative)</u>**

246.    Bryan Wampler was incarcerated at the Jail from July 11, 2016 to May 17, 2019.

247.    Mr. Wampler suffers from ulcerative colitis, Chron's Disease, and irritable bowel syndrome (for which conditions he was prescribed prednisone), and hypertension (for which he was prescribed lisinopril) and, at the time he was incarcerated, he had recently been injured in a motorcycle crash, for which he had been prescribed physical therapy.

248.    Despite his prescription for physical therapy, QCHC simply discontinued it upon his incarceration, and one nurse told him, simply: "Get up and walk."

249.    In addition, (1) Mr. Wampler was not scheduled for a chronic care visit, (2) although he informed the medical staff that he was prescribed twenty milligrams of prednisone per day, they forced him to take sixty milligrams a day, causing him to gain fifty pounds, develop cataracts, and suffer worsening of his hypertension, and (3) although he was also prescribed lisinopril, he did not receive it for months, during which time his blood pressure rose to dangerous levels.

250.    On June 10, 2018, Mr. Wampler slipped and fell in the Workhouse, quickly realizing that his leg was seriously injured (in fact, he had broken his femur).

251.    Although he informed Deputy Mah about his leg injury numerous times, Deputy Mah refused to call the medical staff, and each time Mr. Wampler complained, Deputy Mah told him to "put it in the kiosk."

252. Many hours later, an LPN came by on med pass, and Mr. Wampler showed her his leg, and she reacted by saying: "Oh my God, your leg!" but did not then take Mr. Wampler to the medical station and told him that he would have to wait for an x-ray.

253. The following morning, Mr. Wampler was taken to the medical unit for an x-ray (revealing the broken femur) and then sent back to the Workhouse.

254. Several hours later, he was sent to the hospital for immediate surgery, approximately twenty hours after he first complained that he had injured his leg.

255. After undergoing surgery that involved hardware installation, Mr. Wampler was given a wheelchair and then a walker, and when the treating physician attempted to prescribe him narcotic pain medication, Deputy Callahan directly countermanded that order.

256. Upon his return, QCHC medical staff failed to (1) develop an adequate treatment plan, (2) properly monitor Mr. Wampler, or (3) keep him apprised of his condition, and he received only a short regimen of Ibuprofen and Tylenol.

257. When he complained, Deputy Callahan told him he was "just being a pu--y."

258. On a return visit to the orthopedist in late June 2018, the BCSO transport officer forced Mr. Wampler to walk on his non-weightbearing leg, telling him that he would have to do so "[i]f [he wanted] go to the f---ing doctor."

259. After Mr. Wampler mentioned that to the doctor during that appointment, the deputy retaliated against him on the ride back to the Jail by driving recklessly and slinging him around in the back of the car, exposing him to pain and substantial risks of harm, including re-injury.

260. At a subsequent follow-up appointment in late July 2018, Dr. Spangler prescribed Mobic and physical therapy, but, despite those orders, Mr. Wampler did not receive Mobic for approximately one month and did not begin physical therapy until late September 2018.

261.   The delay in physical therapy worsened Mr. Wampler's long-term healing and prognosis, and he continues to have difficulty walking and straightening his leg.

262.   Bradley County's identified expert testified that (1) QCHC should have evaluated Mr. Wampler upon his incarceration to determine whether he still required physical therapy, (2) should have prescribed lisinopril earlier to treat Mr. Wampler's high blood pressure, (3) there "may have been delay" in Mr. Wampler's treatment for a broken femur, which was "certainly" painful; (4) BCSO Deputy Callahan should not have countermanded a doctor's order, (5) it was improper for the deputy to force Mr. Wampler to walk on a non-weightbearing leg and sling him around the car, and (6) it should not have taken a month for Mr. Wampler to receive prescribed Mobic.

263.   While incarcerated, Mr. Wampler was frequently locked down 23/1 for weeks at a time in overcrowded cells; *e.g.*, a one-man cell with four people (total) or a two-man cell with five people (total) and made to sleep on the floor with a thin mat.

264.   In providing medical care for Mr. Wampler, the BCSO failed to follow its own policies (including Jail Manual § 9.1(C) (Health Screening and Examinations), 9.1(Q) (Emergency Medical Care), and QCHC failed to follow its own policies (including QCHC Manual J-D-01.08 (Medication Administration Record), J-E-04 (Initial Health Assessment), J-E-08 (Emergency Services), J-I-07 (Medically Necessary Care)).

265.   While confined at the Jail, Mr. Wampler suffered substantial risks of serious harm, injuries from improper medications, substantial pain and suffering from various delays in care, and permanent disfigurement from the failure to ensure he received physical therapy in a timely fashion.

**Fiscal Year 2019 (July 1, 2018 to June 30, 2019) –
Sheriff Lawson's First Year in Office – QCHC Medical Contractor**

**Randy Bacon (Putative Class Representative)**

266.    Mr. Bacon, who suffers from type II diabetes, hypertension, high cholesterol, hypothyroidism, bipolar disorder, and depression, was confined at the Jail from June 4, 2018 to November 10, 2018.

267.    Following booking, and despite his requests, Mr. Bacon received no mental health medications for three weeks (during which period he became severely depressed and anxious), at which point they were replaced by different mental health medications, which were ineffective (and about which no provider ever followed up).

268.    Although Mr. Bacon was prescribed insulin (not Metformin, which did not work and made him sick, as he related to QCHC personnel), a provider prescribed Metformin, which was eventually replaced with insulin medications.

269.    In addition, during the period of Mr. Bacon's confinement:

a.    QCHC personnel did not properly monitor his vital signs or blood sugar levels, physically examine him, assess his diagnoses, or articulate a treatment plan, and he suffered at least twenty-seven (27) episodes of hypoglycemia, with the lowest reading reaching a critical 39 mg/dL, he was charged co-pays for blood sugar checks in excess of one a day, and he was consistently achy, hungry, and shaky in the Jail because his diabetes was so poorly managed;

b.    despite being aware of his current medications, QCHC did not provide Mr. Bacon with his other prescribed medications (for hypertension, high cholesterol, or hypothyroidism), and there were multiple occasions on which he received *none* of his medications; and

c.    he was discouraged by excessive co-pays from seeking care (most notably for his mental health medications), threatened with medication discontinuation by a nurse for asking what

medications he was being given, and instructed to tell his mother to quit calling about his health issues.

270.    After Mr. Bacon's finger was broken when other inmates assaulted him, QCHC personnel refused to order an x-ray or render *any* treatment beyond ibuprofen and "buddy-taping" his finger, despite their knowledge of a clear deformity and the fact that it was healing improperly.

271.    Upon Mr. Bacon's release, he visited a doctor about his fingers and was told that only surgery could potentially repair them given the time that had elapsed since the injury, and he continues to have substantial pain, deformity, and loss of grip strength in that hand.

272.    Bradley County's identified expert testified that (1) blood sugars below (a) 50 mg/dL are dangerous, and (b) 70 mg/dL are "borderline"; and (2) QCHC personnel violated the standard of care in failing to treat Mr. Bacon's finger.

273.    In providing medical care for Mr. Bacon, the BCSO failed to follow its own policies (including Jail Manual § 9.1(F) (Mental Health Services), 9.1(N) (Special Medical Programs), 9.7 (Inmate Co-payment for Medical Services), and QCHC failed to follow its own policies (including QCHC Manual J-D-01.6 (Continuity of Medication), J-D-02.3 (Medication Administration Record), J-D-02.4 (Medication Errors), J-D-02.5 (Psychotropic Medication), J-D-02.6 (Monitoring Psychotropic Medication), J-E-04 (Initial Health Assessment), J-E-05 (Mental Health Screening & Evaluation), J-G-01 (Chronic Disease Services), J-G-04 (Basic Mental Health Services), J-I-07 (Medically Necessary Care)).

274.    While confined at the Jail, Mr. Bacon (1) suffered unnecessary and substantial pain as a result of the mismanagement of his diabetes and mental health conditions, (2) was exposed to serious risks of harm by the mismanagement of his diabetes and failure to provide other necessary medications for his serious health conditions, (3) suffered unnecessary and

substantial pain as a result of the failure to treat his broken finger, and (4) suffered permanent disfigurement as a result of the failure to treat his broken finger.

### Denise Culpepper (Putative Class Representative)

275.   Ms. Culpepper, who suffered from a number of serious health conditions, including prediabetes, high blood pressure, high cholesterol, fibromyalgia, restless legs syndrome, anxiety, and COPD, for which she was prescribed a number of medications and an inhaler, was confined in the Jail in November 2018 for approximately thirty-six hours.

276.   Ms. Culpepper brought all of her prescribed medications with her to the Jail, gave them to the BCSO corrections deputy at booking, and told the deputy she needed them at the appointed times.

277.   At approximately 4:00 p.m., she asked a deputy for her afternoon medication doses, and a QCHC nurse arrived approximately thirty minutes later with what she said was Ms. Culpepper's blood pressure medication.

278.   Ms. Culpepper responded that she did not require the blood pressure medication at that time and asked where her other medications were.

279.   When the nurse responded that the pill she had brought with her was "all [Ms. Culpepper] was getting," Ms. Culpepper refused the medication because she was not supposed to take it at that time.

280.   That evening, she asked deputies for her medications multiple times, but she received none of them, and she could not sleep that night (on the floor) because of her restless legs syndrome and fibromyalgia pain.

281. The next morning and afternoon, she asked for her medications again, but no one brought them to her; a deputy told her "not to worry about it" because she would be released that evening.

282. When she was released that evening and asked that her medications be returned, some of her Gabapentin was missing, which she noted on the "medication return form."

283. The nurses and/or BCSO would not accept the form with that annotation, and as a condition of releasing her, forced her to sign another one stating (falsely) that all of her medications were being returned.

284. In providing medical care for Ms. Culpepper, the BCSO failed to follow its own policies (including Jail Manual § 9.1(B) (Inmate Screening), 9.6 (Dispensing of Medication/Pharmaceutical & Inventory), and QCHC failed to follow its own policies (including QCHC Manual J-E-02 (Receiving Screening); J-D-01.6 (Continuity of Medication), J-D-02.3 (Medication Administration Record), J-I-07 (Medically Necessary Care)).

285. Bradley County's identified expert testified that (1) Ms. Culpepper was possibly at an increased risk of harm based on the denial of her medications, although she did not suffer a "serious medical condition" (*e.g.* a "stroke" or "myocardial infarction") as a result, and (2) he had no reason to dispute that she was in pain or discomfort from her (unmedicated) conditions while confined in the Jail.

286. As a result of not receiving her medications at the Jail while incarcerated, Ms. Culpepper was exposed to substantial risk of serious harm, and she suffered substantial pain and discomfort as a result of not receiving them.

## Cassidy Arthur (Putative Class Member)

287.    Ms. Arthur was incarcerated at the Jail beginning on November 8, 2018 for a period two or three weeks.

288.    At the time Ms. Arthur was booked into the Jail, she was suffering from cellulitis caused by MRSA and had visible boils/sores all over her body, including her face, for which she was being treated with antibiotics.

289.    Despite requests for treatment for MRSA (and her obvious condition), Ms. Arthur was not taken to the medical unit for several days after being confined.

290.    At that visit, she saw a nurse who (1) simply looked at her sores and, without further examination, told her she did not have MRSA, (2) told her it was against the rules for her parents to bring her antibiotics, (3) did not give her any medication or treatment, and (4) mocked her, stating in front of other nurses, guards, and inmates: "The Disney princess wants her parents to bring her antibiotics."

291.    Ms. Arthur's parents repeatedly called the Jail to ask about bringing her antibiotics but were told it was not allowed.

292.    When she was released from the Jail, Ms. Arthur immediately re-commenced the antibiotics she had been prescribed, and her sores/boils healed approximately one month later, leaving permanent scarring.

293.    Bradley County's identified expert testified that (1) the nurse who examined Ms. Arthur initially (a) was not qualified to make a diagnosis or exclude a diagnosis of MRSA and (b) was practicing outside the scope of her license or failing to follow protocol, and (2) someone exhibiting cellulitis should be treated for it.

294.    During her confinement, Ms. Arthur was locked down in a filthy cell for twenty-three hours per day in a two-person cell with four other women (three on the floor and two in bunks), such that there was no walking room in the cell and impossible to move without encroaching someone else's bed-space.

295.    In providing medical care for Ms. Arthur, the BCSO failed to follow its own policies (including Jail Manual § 9.1(B) (Inmate Screening), (C) (Health Screening and Examinations), 9.6 (Dispensing of Medication / Pharmaceutical & Inventory), and QCHC failed to follow its own policies (including QCHC Manual J-D-01.6 (Continuity of Medication), J-E-02 (Receiving Screening), J-E-04 (Initial Health Assessment), J-I-07 (Medically Necessary Care)).

296.    While confined in the Jail, Ms. Arthur suffered substantial and unnecessary pain and suffering, and her lack of medication treatment there caused or contributed to permanent scarring.

**Scott Eleazer (Putative Class Member)**

297.    In late 2018, Mr. Eleazer broke his elbow and/or bones in his forearm, for which he was given a cast or splint and prescribed medication.

298.    Several days later, he was arrested and his arm injury aggravated, and he asked to see a nurse immediately at booking, but received no medical attention for approximately twelve hours (while he was in great pain); despite repeated requests, he was told he would have to "put it in the kiosk."

299.    When, many hours later (at his earliest opportunity), he placed a request in the kiosk (and thereafter made additional requests in the kiosk and to nurses at med pass) he was not seen for thirty-six to forty-eight hours.

300. When he was finally seen, he received only Tylenol, and was thereafter not taken to a scheduled follow-up orthopedics appointment.

301. After he reinjured his arm several days later, the on-duty nurse decided to send him to the hospital, where he was told he had reinjured his arm and given Lortab and a sling.

302. The next morning, the guard took Mr. Eleazer's sling (as contraband), and a nurse told him he could not receive Lortab, which was against Jail policy.

303. The nurse who ordered that Mr. Eleazer be sent to Tennova later told him that she had gotten in trouble for sending him to the hospital, and that her superiors had told her she should not have done so because of the cost.

304. In providing medical care for Mr. Eleazer, the BCSO failed to follow its own policies (including Jail Manual § 9.1(Q) (Emergency Medical Care), and QCHC failed to follow its own policies (including QCHC Manual J-E-08 (Emergency Services), J-G-10 (Aids to Impairment), J-I-07 (Medically Necessary Care)).

305. As a result of the failures to properly and timely treat his broken elbow and permit him to keep a prescribed sling, Mr. Eleazer suffered unnecessary and substantial pain while confined at the Jail.

### Amanda Couch (Putative Class Member)

306. Ms. Couch was incarcerated at the Jail in March 2019, at which time she was in her third trimester of pregnancy suffered from chronic hypertension (and possibly preeclampsia), for which she was prescribed labetalol, which she told BCSO deputies and QCHC personnel.

307. Following booking, she was confined for twenty-three hours a day in a two-bed cell with four other women, three of whom were also pregnant, and two of whom forced to sleep on thin, dirty mattresses on the floor.

308. A cellmate detoxing from a narcotic repeatedly vomited and defecated on the floor of the cell and was unable to clean it up despite the deputies' orders that she do so.

309. Despite her conditions, Ms. Couch was given medication and blood pressure checks only once a day.

310. At one point, she began to feel bad (and experience pain in her lower back, sides, and stomach) and repeatedly pressed the emergency call button.

311. When that failed, and, because she was sweating, extremely red in the face, and disoriented, her cellmate tried.

312. Because no response was forthcoming, Ms. Couch's cellmate began beating on the door and yelling that Ms. Couch was possibly going into labor in the cell.

313. Despite the attempts to get help, she was not seen by medical staff for approximately an hour and a half; the nurse said she was "fine," left, and returned another thirty minutes later with a blood pressure cuff, at which point Ms. Couch was unable to speak properly.

314. Eventually, a guard came to the cell with a wheelchair and told Ms. Couch that a judge had reviewed her blood pressure reading and agreed to release her to go to the hospital.

315. On her way to Tennova, the EMTs told her that her blood pressure was extremely high.

316. Upon admission to Tennova, her blood pressure was in the 180/110 range, and the physicians induced labor, and she stayed in the hospital for days while they tried to bring her blood pressure down.

317. In providing medical care for Ms. Couch, the BCSO failed to follow its own policies (including Jail Manual § 9.1(M) (Pregnant Inmates), and QCHC failed to follow its own policies (including QCHC Manual J-G-01 (Chronic Disease Services), J-G-03 (Infirmary Care), J-G-09 (Counseling and Care of the Pregnant Inmate), J-E-08 (Emergency Services)).

318.    As a result of the failure to properly treat her hypertension and/or preeclampsia and properly monitor her, Ms. Couch suffered unnecessarily, and she and her unborn child were exposed to substantial risks of serious harm or death.

### Laura Fuller (Putative Class Representative)

319.    Ms. Fuller has a number of serious health conditions, including (1) heart arrythmias that cause cardiac arrest (for which she has undergone three cardiac ablations and been prescribed numerous heart medications, including metoprolol and flecainide); (2) seizures, for which she is prescribed Keppra and Vimpat; (3) musculoskeletal conditions (including scoliosis and a serious shoulder injury) and resulting pain, and (4) mental health conditions, including anxiety and depression.

320.    Ms. Fuller has been confined in the Jail multiple times dating back to 2017, and her longest periods of confinement there lasted from (1) December 14, 2018 to January 11, 2019, and (2) May 14, 2019 to July 24, 2019.

321.    On or about December 14, 2018, Ms. Fuller told an LPN who examined her that she was prescribed Keppra, metoprolol, and flecainide, but she did not receive flecainide.

322.    Ms. Fuller also informed BCSO deputies that she had been raped four days prior to being arrested, and they told her, *inter alia*, that QCHC personnel would treat her for the rape and employ a rape kit.

323.    Over the next few days, Ms. Fuller experienced dizziness and chest pain multiple times, and made complaints about same on the kiosk, but she was given no treatment and was not seen by a provider.

324.    On December 17, 2018, when nothing had been done about her rape, Ms. Fuller requested sick call, where an LPN told her that "medical cannot do anything for rape."

Case 1:18-cv-00217-CHS   Document 84-1   Filed 05/17/21   Page 71 of 130   PageID #: 1196

325.    The next day (December 19) Nurse Practitioner Patrick McCormick, saw Ms. Fuller. When she told him that she wanted an STD test because she had been raped, he responded skeptically and told her that it should have been done during her initial intake and refused to do it because she had not separately requested it on the kiosk.

326.    Mr. Fuller did not then receive STD testing despite developing symptoms and repeatedly requesting it.

327.    On December 28, 2018, she again requested an STD test, received one, and, on January 10, 2019, was finally given an antibiotic (three weeks after her first request).

328.    When Ms. Fuller was reincarcerated at the Jail in May 2019, she again recited her medications—Keppra, metoprolol, and flecainide, but she was not given flecainide at any point during that period of incarceration, and she was only given metoprolol approximately one month after being incarcerated, after she complained of dizziness, chest pain, and tachycardia.

329.    In late June 2019, Ms. Fuller began to bruise badly all over her body, which was confirmed by Nurse McCormick, who wrote (without explanation) "suspect self inflicted bruising" and ordered "no interventions."

330.    Throughout this period of incarceration, Ms. Fuller continually experienced chest pain, blurred vision, tachycardia, dizziness, but the medical staff did not ensure that she had necessary medication or monitor her closely, and a nurse told Ms. Fuller that she was attempting to use her heart condition as an excuse to get out of Jail.

331.    The statements and conduct of those QCHC personnel directly contravened the operative QCHC policy, No. J-B-04, which required, *inter alia*:  (1) emergency treatment and forensic evidence-gathering for rapes occurring within 120 hours (as Ms. Fuller's had when she was booked), (2) notification of a provider, (3) interaction in a "neutral and non-judgmental

manner, (3) crisis-intervention counseling by a mental health provider, and (4) examination and prophylaxis for sexually transmitted disease.

332.    In providing medical care for Ms. Fuller, the BCSO failed to follow its own policies (including Jail Manual 9.6 (Dispensing of Medication/ Pharmaceutical & Inventory), § 14.14 (Reporting and Notification of Sexual Offenses), and QCHC failed to follow other of its own policies (including QCHC Manual J-D-01.6 (Continuity of Medication), J-D-02 (Medication Services), J-D-02.3 (Medication Administration Record), J-G-01 (Chronic Disease Services)).

333.    Bradley County's identified expert testified that (1) Ms. Fuller should have received indicated medications, and (2) Ms. Fuller should have been evaluated for rape and the QCHC LPN was practicing outside of her scope regarding Ms. Fuller's rape.

334.    Ms. Fuller's medical treatment at the Jail exposed her to substantial risks of serious harm and caused physical and psychological pain.

335.    During her incarceration, Ms. Fuller was continually housed in two-person cells holding three to five inmates and locked down for twenty-three hours per day, and, despite her seizures and scoliosis, was forced at times to sleep on the floor.

**Kris Holder (Putative Class Representative)**

336.    On January 27, 2019, Mr. Holder was arrested for suspected DUI following an episode of syncope that caused him to wreck his car.

337.    The Jail's booking deputy documented that he did not exhibit signs of alcohol or drug influence, and that he had a 50% heart blockage and a prior heart attack, but Mr. Holder was not evaluated until approximately three hours later (by an LPN), whom he told he was experiencing severe chest pain and had a history of heart attack.

338.   During the examination, (1) Mr. Holder's blood pressure was elevated, (2) he was tachycardic, (3) his EKG was abnormal, (4) he was not given other appropriate physical examination, including auscultation of heart and lungs, inspection, auscultation, and palpation of abdomen, and/or neurological evaluation, (5) he was not given blood pressure medication, but nitroglycerin tablets, and (6) the provider ordered that there was "no need" to send him to the hospital.

339.   When, approximately one hour later, Mr. Holder again complained of chest pain at 5/10; his blood pressure was 160/90, and he was still tachycardic, the provider made no further orders.

340.   Mr. Holder was released later that day and transported immediately to the hospital via ambulance where he was admitted, diagnosed with cardiac ischemia, and received stents arthroscopically.

341.   Bradley County's identified expert testified that the decision not to send Mr. Holder to the ER may have been a standard of care violation.

342.   In providing medical care for Mr. Holder, the BCSO failed to follow its own policies (including Jail Manual § 9.1(A) (Medical Staff and Services), and QCHC failed to follow its own policies (including QCHC Manual J-E-08 (Emergency Services)), J-I-07 (Medically Necessary Care).

343.   The above-described actions (and inactions) placed Mr. Holder at an unreasonable risk of serious harm and caused unnecessary pain and suffering.

**Tera Miller (Putative Class Representative)**

344.   On July 16, 2018, Tera Miller was arrested and transported to the Jail after an altercation with her ex-husband, who had drugged her, and she became extremely intoxicated.

345. Her arrest report states that Ms. Miller was so "heavily intoxicated and belligerent" that the arresting officer was unable to collect a statement from her.

346. Although Ms. Miller arrived at the Jail covered in bruises and in a severely altered mental state, she was not referred to the emergency department or closely monitored.

347. She later tested positive for benzodiazepines and trazodone, which, in combination with alcohol, could have been fatal.

348. In providing medical care for Mr. Holder, the BCSO failed to follow its own policies (including Jail Manual § 5.1.I.6 (requiring deputies to be trained in "[c]aring for intoxicated . . . and chemical dependent persons"; 14.1.III.A.1-4 (requiring intake deputies to "observe the arrestee for . . . degree of intoxication" and the shift lieutenant to "determine whether the inmate should be (a) refused and taken to the hospital"); QCHC Manual J-G-07 (Intoxication and Withdrawal).

349. The failure to adequately assess and treat Ms. Miller, who was severely intoxicated and covered in bruises, exposed her to an unreasonable risk of harm.

**Briona Turner (Putative Class Member)**

350. Ms. Turner was incarcerated at the Jail from March 25, 2019 to March 29, 2019, while she was six-months pregnant.

351. A recovering addict, Ms. Turner was prescribed eight milligrams per day of Subutex/buprenorphine by her high-risk OB-GYN; the BCSO informed her that she would be given necessary medication from the Jail's pharmacy.

352. Upon her confinement, Ms. Turner was placed into a two-person cell with four other women (including another pregnant woman) and made to sleep on the floor while locked down 23/1, and the cell later held five women (three of whom were pregnant).

353. Another woman was withdrawing from heroin but was not being treated by the medical staff for it and continually vomited and defecated on the floor.

354. When she did not receive Subutex the first night she was there, she complained to a guard and called her husband, who the BCSO told to bring the medication in a sealed baggie with her name on it.

355. That night, she was given a two-milligram version of the pill, *i.e.*, a quarter of her prescribed dosage.

356. The detoxing inmate in her cell discovered she was getting Subutex and threatened Ms. Turner with physical violence if she did not give it to her (and the nurse was not supervising pill administration to make sure that did not happen).

357. Because she missed doses of the Subutex and also was not getting the proper dosage, Ms. Turner began experiencing withdrawal symptoms.

358. When Ms. Turner was released and saw her high-risk OB-GYN, he was upset that they had not given her the correct dosage of her medication, because the sudden discontinuation (and lower dosage) could have caused her to go into preterm labor or otherwise have had serious negative effects on the baby, including death.

359. In providing medical care for Ms. Turner, the BCSO failed to follow its own policies (including Jail Manual § 9.1(M) (Pregnant Inmates), and QCHC failed to follow its own policies (including QCHC Manual J-D-01.6 (Continuity of Medication), J-G-07 (Intoxication and Withdrawal), J-G-09 (Counseling and Care of the Pregnant Inmate)).

360. The above-described actions and inactions caused Mr. Turner unnecessary pain and suffering and subjected her and her unborn child to a substantial risk of serious harm or death.

## Sharon Waters (Putative Class Representative)

361.  Ms. Waters, who is cared for by her sister, has been incarcerated at the Jail twice: from January 23, 2019 to January 31, 2019 and April 26, 2019 to May 7, 2019.

362.  Prior to her incarcerations, Ms. Waters was diagnosed with (physical) tremors, developmental disorders (including limited intellectual functioning), and certain mental health conditions, including schizoaffective disorder, for which she was prescribed a number of medications, including Artane, Mobic, Olanzapine, valium, and propranolol.

363.  Despite her conditions, Ms. Waters was semi-autonomous, could perform numerous activities of daily living, and had an active social life in her church and community.

364.  When she was arrested in January 2019, her sister informed the arresting deputies about her medications, and the screening form then completed included some of her medications but did not document her health conditions.

365.  After becoming verbally aggressive and stating that she had recently attempted suicide, she was placed on suicide watch and assessed by LPC Anna McCurdy, who, *inter alia*, referred her to an APN for "psychosis," and documented hallucinations and numerous mood issues and cognitive deficits.

366.  Despite those findings, LPC McCurdy cleared her from suicide watch and placed her in general population.

367.  Although it was noted during her incarceration that her tremors were "becoming worse," and that she was "shaking due to Parkinson's," the LPN who completed her intake history and physical form wrote that Ms. Waters was receiving psychiatric treatment but she was "not sure" if Ms. Waters was currently taking psychotropic medication, and there is no record of what, if any, medications Ms. Waters received at the Jail during that incarceration.

368.    In addition, although Ms. Waters made multiple complaints of chest pain during that time, but the medical staff wrote that they were "unable to perform an EKG due to her shaking form Parkinson's" and there "was no underlying need for [an] EKG."

369.    When Ms. Waters was again arrested in April 26, 2019, her sister gave the arresting officer a list of Ms. Waters's medications and offered to send them to the Jail but was told that they would not be accepted.

370.    In booking, Ms. Waters had uncontrollable body movements and an unsteady gait; Sergeant Brown said day shift would call a judge to see if she could be released on her own recognizance.

371.    The same day, LPN Bowers verified Ms. Waters's prescribed medications as: Mobic, Propranolol, Artane, Vistaril, and Xanax, and NP McCormick ordered meloxicam, propranolol, trihexyphenidyl, and olanzapine (but did not place her on a withdrawal protocol for benzodiazepines although her Xanax was discontinued).

372.    There is no record that Ms. Waters received her medications at that time or at any time while at the Jail, and she avers that she did not receive them.

373.    Despite her numerous known conditions, (1) Ms. Waters was placed in a cell with an abusive cellmate who sexually abused her, pushed her down, and forced her face into excrement on cell floor, and (2) when she complained to the guards, they told her that they did not like "narcs and tattletales."

374.    On April 30, 2019, because Ms. Waters complained of chest pain and was given an EKG, which was abnormal (for ST&T wave abnormalities with prolonged QT) and indicated possible "lateral ischemia," the (unnamed) nurse practitioner did not order an emergency evaluation and gave no orders other than "increasing fluids" and "Tums."

375.    On May 4, 2019, LPN Kenjerski was called to Ms. Waters's cell because she was curled up on the floor in front of the cell door but did not assess her or notify a provider, and LPN Hughes (1) later found her on the floor incontinent of urine and trying to pick up a non-existent "baby" off of the floor, but (2) did not assess her or contact a provider.

376.    On May 5, 2019, Ms. Waters had again been incontinent and, because she had "declined in her activities of daily living" and was "excessive[ly] sleep[ing]," LPN Hughes called the nurse practitioner and deputies, after which a BCSO Lieutenant then contacted Ms. Kile and asked "what was wrong" with her sister.

377.    Ms. Kile said that Ms. Waters's symptoms indicated she had not been receiving Artane and, when she learned Ms. Waters was not talking or walking, asked that she be transported to the hospital. (She was not.)

378.    As of May 6, 2019, Ms. Waters had not eaten in three days and "refused" to go the bathroom, whereupon LPN Bowers threatened her with suicide watch (but did not assess her or contact a provider).

379.    On May 7, 2019, Ms. Waters was taken to court, where she resembled a "zombie," and released from the Jail.

380.    After her release, Ms. Waters lost essentially all of her functioning, was diagnosed with "conversion disorder," and was hospitalized for extended periods of time (in a nearly catatonic state), remains essentially bedridden and, as of March 19, 2020, had lost over a hundred pounds, began wearing adult diapers, and developed serious bedsores.

381.    She remains a shadow of her former self and requires substantial medical caretaking.

382.    In providing medical care for Ms. Waters, the BCSO failed to follow its own policies (including Jail Manual § 4.3.III.C (Classification), 6.14 (Housing Management), 9.1(F)

(Mental Health Services), and QCHC failed to follow its own policies (including QCHC Manual J-D-01.6 (Continuity of Medication), J-D-02.3 (Medication Administration Record), J-D-02.5 (Psychotropic Medication), J-D-02.6 (Monitoring Psychotropic Medication), J-E-12 (Continuity of Care During Incarceration), J-G-02 (Patients with Special Health Needs), J-G-03 (Infirmary Care), J-G-04 (Basic Mental Health Services), J-I-07 (Medically Necessary Care)).

383. Bradley County's identified expert testified that (1) the BCSO booking sergeant recognized that Ms. Waters "might be too sick to be in jail" and "the officers . . . recognized that . . . they should have kept her out of jail," and (2) the nurse practitioner did not do enough for her.

384. While incarcerated at the Jail, Ms. Waters was exposed to serious risks of harm—and, in fact, suffered enormous and permanent harms.

### Fiscal Year 2020 (July 1, 2019 to June 30, 2020) – Sheriff Lawson's First Full Fiscal Year in Office – QCHC Medical Contractor

### Sandra Culbertson (Putative Class Representative)

385. Sandra Culbertson, who has been incarcerated at the Jail a number of times for varying periods of time, (1) suffers from a number of health conditions, including high blood pressure, high cholesterol, heart disease (including ischemic cardiomyopathy), coronary artery disease (arteriosclerosis), prior myocardial infarction, and congestive heart failure (with an ejection fraction of 30-35%), for which she has been prescribed numerous medications, and, (2) prior to the events described below, had received two stents (in 2013 and 2014).

386. Ms. Culbertson was incarcerated at the Jail from November 8, 2019 to November 14, 2019.

387. During that period of incarceration, Ms. Culbertson began experiencing chest pains and shortness of breath, but the deputy ignored her for approximately an entire day; after her

condition worsened, her cellmates made an emergency call that was responded to in approximately forty-five minutes.

388.    Ms. Culbertson was taken to the medical unit in extreme pain and informed the nurses that her cardiologist had warned her that her next heart attack would likely be fatal.

389.    The nurses had to use a laptop in the room to Google proper lead placement in order to perform her EKG, and after it was taken, the provider ordered nitroglycerin, after which the nurses sent her back to her cell.

390.    Ms. Culbertson was not again assessed by medical personnel for two days.

391.    After those two days, Ms. Culbertson was permitted to use the kiosk, and she informed medical that she was still in pain, but nothing was done for her.

392.    Soon thereafter, she was released from Jail, after which time she went to the hospital, where she was admitted and told that she should have been sent to the hospital from the Jail, and underwent an arthroscopic stent procedure.

393.    In providing medical care for Ms. Culbertson, the BCSO failed to follow its own policies (including Jail Manual § 9.1(Q) (Emergency Medical Care), and QCHC failed to follow its own policies (including QCHC Manual J-D-01.6 (Continuity of Medication), J-D-02 (Medication Services), J-D-02.3 (Medication Administration Record), J-D-05 (Hospital and Specialty Care), J-E-08 (Emergency Services), J-G-03 (Infirmary Care) J-I-07 (Medically Necessary Care)).

394.    While confined in the Jail, Ms. Culbertson was exposed to a serious risk of harm or death, and suffered serious and unnecessary pain.

## Zachary Guinn (Putative Class Representative)

395.    Zachary Guinn suffers from seizures (epilepsy) and mental health problems (including bipolar disorder and anxiety) for which he has been prescribed, *inter alia*, Buspar, Celexa, and benzodiazepines and has also been prescribed opioid medications; eventually, Mr. Guinn became addicted to benzodiazepines and opioids and received treatment for those addictions.

396.    Mr. Guinn was confined at the Jail multiple times from 2017 to 2020, for periods spanning one to three days.

397.    When Mr. Guinn was booked into the Jail on April 12, 2019, he informed the booking Deputy Kelly and the examining nurse that he (1) had mental health problems (including anxiety), (2) took 100 milligrams of "pain pills" and eight milligrams of benzodiazepines daily, (3) had seizures, (4) had received psychiatric treatment and was then prescribed psychotropic medications, (5) had been hospitalized for substance use and undergone drug detoxification, and (6) was prescribed Viibryd (an antidepressant) and Seroquel (an antipsychotic).

398.    The same date, Mr. Guinn tested positive for opiates, "oxy," and benzodiazepines.

399.    On July 31, 2019, Mr. Guinn was again incarcerated at the Jail and booked by Deputy Kelly, who documented *none* of the health conditions or history of drug use listed in April 2019, despite the fact that Mr. Guinn again recited them and Deputy Kelly had previously written them down.

400.    On August 5, 2019, LPN Amy Hughes (1) documented that Mr. Guinn (a) had "said the magic word" and expressed a desire to harm himself, and (b) suffered from bipolar disorder and anxiety for which he was prescribed Viibryd and Buspar (which he had last been taken four to five days previously), and (2) placed him on suicide watch.

401. On August 6, 2019, LPN Hughes (who evidently did not consult the prior records) completed a form in which she (1) failed to document Mr. Guinn's history of seizures, (2) noted that he (a) had received psychiatric care, was prescribed psychotropic medication, and had been hospitalized and detoxed for heroin, (b) was having auditory and visual hallucinations, (c) had difficulty answering questions, (d) tested positive for amphetamines, benzodiazepines, and THC, and (e) was prescribed Xanax, a Flovent inhaler, and suboxone.

402. At that point, QCHC personnel began monitoring Mr. Guinn for signs of opiate withdrawal.

403. The same day, having opined that Mr. Guinn was "slow to respond" such that she had to "r/o [rule out] borderline intellectual function," APRN Heather Bowen assessed "unspecified schizophrenia spectrum and other psychotic disorder" and obtained Mr. Guinn's "informed consent" to receive Haldol (an antipsychotic) and Cogentin (an anti-tremor medication).

404. Following their administration, Mr. Guinn began feeling "dazed and loopy"

405. At approximately 2:00 a.m. on August 7, 2019, RN Colwell was called to Mr. Guinn's cell because he was bleeding from the mouth (having bitten his tongue following a seizure), and, because of elevated blood pressure and heart rate, he was taken to booking for observation, but he was not given a physical or mental evaluation.

406. Over approximately the next eight hours, Mr. Guinn was evidently scheduled to see a provider (Nurse Practitioner McCormick), reported that his mind felt "fuzzy," had a swollen tongue.

407. By noon, he had defecated on himself, responded to commands with notable difficulty, was sweating profusely, was tachycardic, and had moderate tongue edema secondary to biting it during the seizure.

408.    An hour later, Mr. Guinn (who was unable to respond or stand) was transported to the hospital by EMS (who were afraid to assist him until he was "cuffed up" for fear of his being "combative").

409.    On August 8, 2019 and August 9, 2019, nursing staff called the hospital daily to check on Mr. Guinn's condition and were informed that his bloodwork was "out of whack," he was dehydrated and on intravenous antibiotics, and he had difficulty swallowing.

410.    On August 9, 2019 at approximately 0742 hours, RN Colwell obtained a report that indicated Mr. Guinn was on seizure precautions due to seizure activity the day before, and that he was still incontinent and his condition was declining.

411.    Mr. Guinn was released from custody while still in the hospital so that he would become responsible for the medical bills.

412.    When he regained consciousness, he was in extreme pain from a badly infected and swollen tongue, and he suffered permanent damage to his tongue.

413.    In providing medical care for Mr. Guinn, the BCSO failed to follow its own policies (including Jail Manual § 9.1(Q) (Emergency Medical Care), 9.6 (Dispensing of Medication), and QCHC failed to follow its own policies (including QCHC Manual J-D-01.6 (Dispensing of Medication), J-D-02 (Medication Services), J-D.02.3 (Medication Administration Record), J-D-02.5 (Psychotropic Medication), J-D-02.6 (Monitoring Psychotropic Medication), J-D-05 (Hospital and Specialty Care), J-E-08 (Emergency Services), J-G-06 (Inmates with Alcohol and Other Drug Problems), J-G-07 (Intoxication and Withdrawal)).

414.    Bradley County's identified expert has testified that this course of treatment constituted a standard of care violation on part of QCHC.

415. While incarcerated at the Jail, Mr. Guinn experienced serious and unnecessary pain and suffering, was exposed to substantial risks of serious harm and death, and, in fact, suffered serious harm.

**Fiscal Year 2021 (July 1, 2020 to June 30, 2021) –**
**Transition from QCHC to Fast Access**

**Zachary Guinn (Putative Class Representative) (QCHC)**

416. On June 14, 2020, Mr. Guinn was again incarcerated at the Jail; he again told the booking deputy about his medical conditions, including mental health problems and seizures, and was taken to F-Pod (the COVID-19 "quarantine" pod).

417. LPN Tasha Bowers contacted his pharmacy and, because he had not "filled any of his maintenance meds," he was given no medication during this period of incarceration.

418. On June 15, 2020, QCHC medical personnel were called to F-Pod because Mr. Guinn was unresponsive to verbal stimuli; when they arrived, he (again) related his history of seizures and stated that he had been taking twenty milligrams of Xanax and one milligram of heroin daily.

419. Barely responsive, Mr. Guinn gave a urine drug test which was positive for methamphetamine, amphetamine, and benzodiazepine.

420. Nurse Practitioner McCormick ordered that Mr. Guinn be monitored, and, when Mr. Guinn was observed vomiting over six hours later "because of the drugs he had previously taken," he was instructed to "keep hydrating."

421. When medical staff next checked on Mr. Guinn approximately one hour later, he had again vomited, was unresponsive to verbal stimuli, and was given Narcan.

422. At that point, LPN Brooks instructed Lieutenant Ritenour to call EMS, and, upon EMS's, arrival, Mr. Guinn began convulsing uncontrollably.

423.    Mr. Guinn awoke in the hospital ICU on a ventilator and was told he had aspirated vomit during a seizure and was receiving seizure medication through an IV, and the physician diagnosed seizure activity, severe metabolic acidosis, severe lactic acidosis, elevated ammonia levels, and respiratory failure secondary to inability to protect airway, pneumonia, polysubstance abuse, acute kidney injury, and leukocytosis.

424.    Mr. Guinn later saw the QCHC nurse who had ordered he be sent to the hospital, and she told him that he was close to death when they found him.

425.    QCHC's policies operative at the time of Mr. Guinn's incarcerations require that: (1) the person conducting a receiving screening to determine if possible drug withdrawal is present and persons suffering same are referred immediately for care and medical clearance (J-E-02(2)(a)); (2) persons at risk for possible drug withdrawal be placed on close observation (J-E-02(5)(c)); and (3) patients experiencing withdrawal are (a) transferred immediately to an acute care facility, (b) monitored by qualified health professionals (under physician supervision), and/or (c) referred to mental health providers.

426.    None of those policies was followed concerning Mr. Guinn, and QCHC otherwise breached with applicable professional standards in numerous ways by failing to properly monitor, examine, and ensure adequate care for Mr. Guinn (who was at serious risk for both drug withdrawal *and* seizure) exhibited, *inter alia*, indicia of seizures, noncompliance with medication, and abnormal vital signs and behavior.

427.    In addition, in providing medical care for Mr. Guinn, the BCSO failed to follow its own policies (including Jail Manual § 9.1(Q) (Emergency Medical Care), 9.6 (Dispensing of Medication), and QCHC failed to follow its own policies (including QCHC Manual J-D-01.6 (Dispensing of Medication), J-D-02 (Medication Services), J-D.02.3 (Medication

Administration Record), J-D-02.6 (Monitoring Psychotropic Medication), J-D-05 (Hospital and Specialty Care), J-E-08 (Emergency Services), J-G-06 (Inmates with Alcohol and Other Drug Problems), J-G-07 (Intoxication and Withdrawal)).

428.    While incarcerated at the Jail, Mr. Guinn (again) experienced serious and unnecessary pain and suffering, was exposed to substantial risks of serious harm and death, and, in fact, suffered serious harm.

**Benjamin Newton Hannah (Putative Class Representative) (QCHC)**

429.    Benjamin Newton Hannah suffers from cerebral palsy, longstanding spinal/cervical damage, degenerative disc disease, and broken/severely injured toes for which he has undergone surgery, as well as a severe limp that causes him to drag his toe; he walks with difficulty in the best of times.

430.    Mr. Hannah was arrested for DUI and incarcerated at the Jail from approximately June 25 to July 1, 2021, after he crashed his car in a ditch.

431.    That wreck knocked him unconscious and exacerbated his pre-existing injuries; he also suffered visible injuries, including head wounds.

432.    When Mr. Hannah was booked, he immediately told the booking deputies about the above-listed conditions, that he was disabled, and that the crash had exacerbated his injuries, but he received no medical attention, and the deputies took his shoes, despite his protest that he needed them because of his broken toes and the way he walks/limps; he was barefoot for the entire time he was in the Jail.

433.    Although Mr. Hannah was obviously in serious pain and could barely walk, he received no medical care despite repeated requests to deputies.

434.    After he had been in L-Pod for approximately four days, the guards gave him a piece of paper to fill out to send to the medical unit about his health problems; at some point after he filled out that slip of paper, a nurse came into the pod.

435.    Thinking she was there to see him, Mr. Hannah approached her; a guard told Mr. Hannah threatened to "knock him out" if he "messed with" the nurse.

436.    The guards would not give him a wheelchair, so a fellow inmate helped him assemble a makeshift wheelchair from a mop bucket and plastic chair.

437.    Eventually, Mr. Hannah was permitted to use the kiosk (which had not been explained to him), and a fellow inmate helped him make a sick call, and he also repeatedly asked guards if he could be taken to the hospital.

438.    After five days in the Jail, Mr. Hannah was finally taken to the medical unit, in a (real) wheelchair; because the deputy had to fetch it from medical, he told Mr. Hannah he was going to be "p-ssed off" if he found out Mr. Hannah had been walking.

439.    The examining nurse told him that nothing was broken, so she could only give him ibuprofen (which did not help), and she could not let him have a wheelchair in the pod because it would require paperwork.

440.    Mr. Hannah was then transferred to F-Pod, where he was on 23/1 lockdown and forced to sleep on the floor in an overcrowded cell.

441.    Soon thereafter, Mr. Hannah was bonded out by a local activist group, and went to the hospital, where he was x-rayed and told that he had dislocated/dislodged ribs and a contused left side, heart, and lung.

442.    In providing medical care for Mr. Hannah, the BCSO failed to follow its own policies (including Jail Manual § 9.1(A) (Medical Staff and Services), (B) (Inmate Screening), (I) (Sick

Call), (J) (Non-Institutional Resources), (Q) (Emergency Medical Care), and QCHC failed to follow its own policies (including QCHC Manual J-E-02 (Receiving Screening), J-E-08 (Emergency Services), J-G-02 (Patients with Special Health Needs), J-G-03 (Infirmary Care)).

443. While incarcerated at the Jail, Mr. Hannah was in severe pain and exposed to substantial risks of serious harm.

**Tammi Tarver (Putative Class Member) (QCHC)**

444. On July 5, 2020, Ms. Ms. Tarver became overheated and fell while walking, injuring her shoulder, ribs, elbows, and head and causing disorientation.

445. She was (erroneously) arrested for public intoxication and transported to the Jail, where she arrived bleeding from the elbows, knees, and head.

446. Despite making numerous requests for medical care, and even though a female deputy observed that she should be transported to the hospital, Ms. Tarver was not given any medical treatment or even asked any questions about her injuries.

447. A day after she was released, she visited her primary care physician, who told her that she had been having a medical emergency related to her pancreatitis and heat overexposure and should have been taken directly to the hospital for treatment, and following diagnostic examinations, she was assessed with broken ribs and as having had a concussion with loss of consciousness.

448. Bradley County's identified expert testified that Ms. Tarver should have been taken to the emergency room.

449. In providing medical care for Mr. Hannah, the BCSO failed to follow its own policies (including Jail Manual § 9.1(A) (Medical Staff and Services), (B) (Inmate Screening), (I) (Sick Call), (J) (Non-Institutional Resources), (Q) (Emergency Medical Care), and QCHC failed to

follow its own policies (including QCHC Manual J-E-02 (Receiving Screening), J-E-08 (Emergency Services), J-G-02 (Patients with Special Health Needs), J-G-03 (Infirmary Care)).

450.　While confined at the Jail, Ms. Tarver experienced serious and unnecessary pain and suffering and was exposed to serious risks of substantial harm.

**Martin Chouinard (Putative Class Representative) (QCHC / Fast Access)**

451.　Mr. Chouinard, who suffered from a number of serious health conditions, including HIV, cirrhosis, emphysema, and atherosclerosis, was confined at the Jail from February 11, 2020 to January 14, 2021; when he was booked, Mr. Chouinard weighed approximately 200 pounds.

452.　In approximately June 2020, Mr. Chouinard began noticing blood in his stools on a daily basis and was told by nurses it was hemorrhoids and given him a cream.

453.　The cream did not remedy the bleeding, which continued daily and steadily worsened, and Mr. Chouinard sought additional treatment on numerous occasions, but nurses continued to tell him it was only hemorrhoids.

454.　In addition, Mr. Chouinard developed a rash across large parts of his body so painful that he fashioned a makeshift sling to limit the pain caused by movement.

455.　He requested care for the rash numerous times but was told it was psoriasis, and although the nurses eventually gave him a steroid shot, it did not alleviate the pain, and it was difficult for him to sleep.

456.　Mr. Chouinard also developed problems swallowing, which made it difficult for him to eat, and he was frequently delirious.

457.　Although he began to lose weight at a rapid pace, the nurses told him that he was "putting on" and overstating his pain, and that it was "all in his head."

Case 1:18-cv-00217-CHS   Document 84-1   Filed 05/17/21   Page 90 of 130   PageID #: 1215

458. Instead of receiving treatment, Mr. Chouinard was punished for making requests by being placed on suicide watch (despite not expressing indicia of suicidality), which discouraged him from seeking help.

459. Fellow inmates were also seriously concerned and attempted to request medical care for Mr. Chouinard on his behalf, and at one point, a guard radioed a nurse that Mr. Chouinard needed to go to the hospital, but the nurse said that he did not because "it was not a medical emergency."

460. By November or December 2020, Mr. Chouinard had become too weak to leave his cell, could barely sleep or eat from the pain, and weighed approximately 130 pounds.

461. By December, Mr. Chouinard had become incontinent, soiling his uniform daily, and he could not eat.

462. In December 2020, Mr. Chouinard wrote a (nearly illegible) letter to his daughter, April Hancock, that reads as follows:

> April,
>
> I love you. I have been really hurting and can't sleep for past two months. These nurses aren't worth a d-mn. If any time you need to get a hold of me call Lance's girlfriend. If you can spare 30 or 40 something send it to her. . . . I owe a debt to medical and they will take it. She can get a care pack for me.

463. When his lawyer contacted the U.S. Marshals about his lack of care, the nurses complained to Mr. Chouinard about that contact, and also instructed Mr. Chouinard to tell his daughter to stop calling them because it was making it worse for him.

464. Other nurses told Mr. Chouinard that something was seriously wrong with him, and that he needed proper medical attention, but that they did not want to contradict their superior nurse and lose their jobs.

465. On or about January 14, 2021, Mr. Chouinard was finally transported to the hospital, where he was diagnosed with sepsis and lapsed into a coma—although he was still handcuffed to the bed.

466. A BCSO deputy at the hospital attempted to prevent his daughter, Ms. Hancock, from being with him at his deathbed, but another BCSO deputy told Ms. Hancock that she thought what had happened to Mr. Chouinard was "not right."

467. Mr. Chouinard died on January 17, 2021, and the autopsy lists his cause of death as dehydration and starvation ketosis with sequelae of HIV infection as a contributing factor.

468. In other words, the BCSO and Fast Access permitted Mr. Chouinard to persist in agony for months and then die of starvation and thirst.

469. In providing medical care for Mr. Chouinard, the BCSO failed to follow its own policies (including Jail Manual § 9.1(A) (Medical Staff and Services), (E) (Notification of Designated Person/Inmate Sickness, Death and Accidents), (Q) (Emergency Medical Care), 9.5 (Management of HIV/AIDS Inmates; QCHC failed to follow its own policies (including QCHC Manual J-B-01.7 (HIV Infected Inmates)); Fast Access did not have any policies to violate, although it does not appear it followed the nursing assessment protocols ostensibly in place as of September 1, 2020 (relating to diarrhea, hemorrhoids, nausea, mental health).

### Jayson Chambers (Putative Class Member) (Fast Access)

470. Jayson Chambers, who suffers from substantial mental and cognitive problems, including bipolar disorder and is prescribed Trileptal, Zoloft, and hydroxizine, was incarcerated at the Jail, *inter alia*, from August 27, 2020 to late April 2021.

471. In his most recent period of incarceration, Mr. Chambers made multiple complaints and requests in the kiosk for his mental health medications, but the nurses he saw told him that he

could not have his medications in the Jail because they were against the rules, and, in late February or early March 2021, Nurse Susan and the guards also told him that he would get in trouble if he put any additional requests on the kiosk about his medicine.

472.    Without his medications, Mr. Chambers constantly paced and cried and would go to sleep and wake up crying.

473.    While he was incarcerated, the cells in which Mr. Chambers was confined were often overcrowded, and he was often locked down for twenty-three hours at a time, once for an entire week.

474.    In providing medical care for Mr. Chambers, the BCSO failed to follow its own policies (including Jail Manual § 9.1(A) (Medical Staff and Services), (F) (Mental Health Services), 9.6 (Dispensing of Medication / Pharmaceutical & Inventory); Fast Access did not have any policies to violate, although it does not appear it followed the nursing assessment protocols ostensibly in place as of September 1, 2020 (relating to mental health).

475.    While confined in the Jail, Mr. Chambers was subjected to unnecessary pain and suffering.

**Sandra Culbertson (Putative Class Representative) (Fast Access)**

476.    Ms. Culbertson was again incarcerated at the Jail from August 28, 2020 to January 11, 2021.

477.    Ms. Culbertson received no medications for approximately the first week of that confinement and for months afterward, and, although the Fast Access medical staff gave her some of the medications she requires for her conditions, they did not give her those medications consistently, and became angry with her when she told them so.

478.    Ms. Culbertson continually experienced numerous heart-related symptoms, including heart vibrations, nausea, shortness of breath, headaches, chest pain, and dizziness, and her blood

pressure was frequently at dangerous levels (although nurses taking her blood pressure often did so multiple times until they got a reading that they "liked").

479.  On October 1, 2020, she was told (1) to "let medical know" if she felt like she was having a heart attack, and (2) that, apart from administering CPR if she went into cardiac arrest, there was nothing the nurses could do for her.

480.  Ms. Culbertson made numerous complaints about these symptoms and requested to see a cardiologist and/or go to the hospital, and members of Ms. Culbertson's family frequently complained to BCSO deputies and Sheriff Lawson.

481.  At some point, someone (either BCSO personnel or nurses) began deleting Ms. Culbertson's kiosk entries without responding to them, and, at med passes, the nurses stated that Ms. Culbertson's complaints were an act "because of that lawsuit," and she "would be okay."

482.  At one point, Dr. Kerley told her the problem was anxiety, instructed her to sleep on her stomach, and refused to permit her to keep nitroglycerin on her person.

483.  In early December, after months of incarceration, Ms. Culbertson was taken to see a cardiologist at Erlanger East; on the date of her visit, her blood pressure was 201/108.

484.  The cardiologist told her something "was wrong," observed that she had not received necessary medications during her incarceration, and ordered (a) an echocardiogram, (b) an increased dosage of metoprolol, (c) Flexeril, and (d) that nitroglycerin be made available to her prn.

485.  Dr. Kerley reviewed these orders but did not order Flexeril or make nitroglycerin available to Ms. Culbertson.

486.   On December 16, 2020, Ms. Culbertson had a medical emergency and had severe symptoms of chest pain, dizziness, and shortness of breath, and despite a blood pressure reading of 170/110, the nursing staff refused to do anything for her.

487.   Deputy Lee broke down crying and prayed with her (and a group of other inmates), and stated that she could lose her job for doing that.

488.   Nurse Amanda told her that she was only making requests on the kiosk and complaining of chest pain because it would "look good for her lawsuit," and told her that she could not expect much help from medical in the Jail when she was non-compliant outside of it.

489.   Fortunately, someone in authority relented, and Ms. Culbertson was transported to Erlanger Downtown.

490.   The BCSO did not notify Ms. Culbertson's family that she had been transported to the ER; after an inmate informed her sister, she called the BCSO, but they refused to tell her if Ms. Culbertson had been transported to the ER, citing HIPAA.

491.   Upon admission to Erlanger Downtown, Ms. Culbertson's blood pressure was 243/161, and her mean arterial pressure was 192.

492.   The providers at Erlanger (1) noted that she had not been receiving her other medications and was not being permitted to have nitroglycerin in the Jail, (2) opined that her chest pain was "2/2 untreated heart failure," and (3) warned her that they could take no further indicated action (*e.g.*, angioplasty or further stenting) unless she could get her medications *regularly* (which was not happening at the Jail).

493.   The providers tried to impress upon the corrections deputy present with Ms. Culbertson that it was essential she get her medications, and she was discharged with prescriptions for "all of her heart failure medications," including Lisinopril, metoprolol, rosuvastatin . . . ." and

nitroglycerin, to be taken prn; those prescriptions were sent to a pharmacy in Cleveland and *also* printed out to be given directly to the Jail's medical staff.

494.    When she got back to the Jail, Nurse Amanda spoke hatefully to her and told her that she was only making complaints "because of the lawsuit, acting like we're just going to let you die."

495.    Nurse Amanda also told her that she would not get any nitroglycerin, either to keep on her person or administered in the medical unit.

496.    After filing a sick call request at some point days or weeks later, Nurse Margaret told her: "You are not getting nitroglycerin.  The doctor told you twice that you are not getting it.  What don't you understand?"

497.    Dr. Kerley later told her, incorrectly, that it was against the Jail's policy for her to have nitroglycerin and, despite repeated requests during instances of chest pain, she never received it.

498.    When Nurses Amanda, Kayla, and Margaret came by during med pass and she complained about chest pain, they screamed at her:  "You just came back from the hospital, and they told you nothing was wrong with you."

499.    The nurses began instructing the guards to pull Ms. Culbertson out of her cell in the middle of the night and bring her to the medical unit, where they argued with her.

500.    Ms. Culbertson did not receive regular blood pressure checks from the period between her return from Erlanger and her release on January 11, 2021.

501.    Following her release, Ms. Culbertson has been on a regimen of numerous additional heart medications to strengthen her heart in anticipation of further interventions.

502. In providing medical care for Ms. Culbertson, the BCSO failed to follow its own policies (including Jail Manual § 9.1(A) (Medical Staff and Services), (E) (Notification of Designated Person), (Q) (Emergency Medical Care)), 9.6 (Dispensing of Medication / Pharmaceutical & Inventory); Fast Access did not have any policies to violate, but it appears not to have followed the chest pain nursing protocol purportedly effective as of September 1, 2020.

503. While confined at the Jail, Ms. Culbertson was made to suffer seriously and unnecessarily, exposed to substantial risks of serious harm and death, and actually suffered serious harms.

### Jeremy Brock (Putative Class Member) (Fast Access)

504. Mr. Brock was incarcerated at the Jail from January 17, 2021 to January 21, 2021.

505. Upon booking, Mr. Brock's hand and wrist were broken and visibly swollen and purple, and, although he immediately showed a nurse after his booking and told her he was in substantial pain, he was not then treated.

506. After he attempted suicide by hanging, Mr. Brock was first placed on suicide watch and then placed, naked, in a restraint chair, from which he continued to complain to the guards about the pain in his hand; a nurse told him that it looked bad, but that she did not know if it was broken, and did nothing for it.

507. He was eventually taken back to general population, where he continued to complain about his (extremely swollen and discolored) hand to the guards and make sick call requests, but he received *no* treatment for his hand during the four days in which he was incarcerated.

508. After he was released, Mr. Brock underwent x-rays that revealed three fractures in his hand and wrist.

509. In providing medical care for Mr. Brock, the BCSO failed to follow its own policies (including Jail Manual § 9.1(A) (Medical Staff and Services), (F) (Mental Health Services),

9.6 (Dispensing of Medication / Pharmaceutical & Inventory), (Q) (Emergency Medical Care); Fast Access did not have any policies to violate, although it does not appear it followed the nursing assessment protocols ostensibly in place as of September 1, 2020 (relating to mental health, contusion, and sprain/strain).

510.   While he was incarcerated, Mr. Brock was subjected to unnecessary pain and suffering through the failure to provide any treatment for his broken hand the entirety of his incarceration—a period of approximately four days.

511.   Moreover, the lapses in mental health exposed Mr. Brock to a risk of suicide, which he attempted.

### Amanda Lennie (Putative Class Representative) (QCHC/Fast Access)

512.   Ms. Lennie suffers from a number of physical and mental health conditions, including SVT, PTSD, schizophrenia, agoraphobia, and panic disorder, and she has been prescribed a number of medications for her mental health conditions, including Invega/palperidone and risperidone.

513.   While incarcerated at the Jail in 2018, she informed the guards and nurses about her mental health problems and medications but saw no one concerning those issues for approximately a month.

514.   When she finally did see someone, she was given a dose of Haldol that removed her ability to function at all.

515.   After other inmates complained to the guards about the effects on her, the medical staff reduced the dosage, after which she eventually "came out of it"; nevertheless, the bad side effects remained, but she feared that if she refused it, she would have been denied *any* antipsychotic medication and could have had a psychotic episode.

516.   Ms. Lennie was again incarcerated at the Jail from approximately November 15, 2020 until December 16, 2020.

517.   She told the booking deputy about her mental health issues and asked to see a doctor; the deputy told her to make a sick call request.

518.   Despite asking for mental health medications, she did not receive any for that entire period of incarceration.

519.   On or about December 10, 2020, Ms. Lennie began noticing pain on the top/bridge of her foot; at first, there was no abrasion or sign of injury, but, after about a day, a painful sore (that hurt *inside* her foot, and resembled a pimple or blister) developed.

520.   When, after a day or two, the pain was so bad that she could hardly walk, she made a sick call request and was taken to the medical unit, where a nurse told her it was a blister.

521.   She told the nurse that she did not think it was an ordinary blister, but the nurse merely treated it with a topical ointment and band aid and sent her back to her cell.

522.   Ms. Lennie's pain progressively worsened, and the "blister" had doubled in size, attracting the attention of her cellmates, who asked a guard if she could go back to the medical unit.

523.   The guard told Ms. Lennie that the nurses wanted to examine it during med pass before they saw her in the medical unit again, and about seven hours later (during which time the wound continued to enlarge) a nurse told her they would go back to medical and start her on amoxicillin (which Ms. Lennie told the nurses was an ineffective antibiotic for her).

524.   She also told the medical staff that she thought something was seriously wrong with her foot and that she needed to go to the hospital, but they did not send her.

525.   That night, the pain in her foot became excruciating, and her foot became severely swollen, up to the ankle.

526. The next morning, she was taken to the medical unit in a wheelchair; while the previously skeptical nurse remarked with irritation that she did not understand why they had put her on antibiotics, because it was a blister, other nurses began taking pictures of her foot.

527. By lunchtime, the swelling had worsened, and her foot and ankle had turned purple.

528. She was in a great deal of pain and told the guards, who told her the nurses would give her more Tylenol, which they did hours later, along with a Rocephin shot.

529. She was taken back to her cell, and spent the night in agony, despite doing her best to keep as still as possible.

530. At some point that night, the guards moved her to an upstairs cell and forced to climb stairs despite having placed her in a wheelchair before.

531. The first Rocephin shot was ineffective, and, by the next morning, the swelling and discoloration had worsened; she was taken back to the medical unit for another shot, and told the nurses that it was not working.

532. She had a large, inflamed pustule on her foot with black drainage, and the nurses examined it with a flashlight but told her she would not go to the hospital unless it was "very severe."

533. Because the Jail was understaffed with corrections deputies that day, she could not go back to her cell and had to wait in the "trap" for a shift change.

534. While she was there, a nurse came and told her she was going to examine the wound again.

535. She took a picture with a guard's phone, and, after she had been back in her pod for about twenty minutes, she was transported to Tennova, where the physicians noted that her wound was 4 cm x 4 cm with a "well-circumscribed black ring with purulent discharge inside."

536. The hospital staff there told her she had a serious MRSA infection, and she underwent extensive surgery and kept her in the hospital for several days with IV Vancomycin (an extremely powerful antibiotic).

537. The attending physician told her they were keeping her because they feared the infection would go septic, and that she could have lost her foot.

538. Ms. Lennie could not walk unassisted for about a month after discharge and required months of follow-up wound care.

539. She got a job at Holiday Inn Express in January 2021 but could not keep up because of her foot and had to quit.

540. In providing medical care for Mr. Lennie, the BCSO failed to follow its own policies (including Jail Manual § 9.1(A) (Medical Staff and Services), (F) (Mental Health Services), 9.6 (Dispensing of Medication / Pharmaceutical & Inventory), (Q) (Emergency Medical Care); Fast Access did not have any policies to violate, although it does not appear it followed the nursing assessment protocols ostensibly in place as of September 1, 2020 (relating to mental health, abrasions/lacerations, and boils/folliculitis/furuncle).

541. While confined at the Jail, Ms. Lennie was subjected to unnecessary pain and suffering, exposed to substantial risks of serious harm or death, and, in fact, suffered serious harm.

542. During her periods of confinement, Ms. Lennie was frequently locked down 23/1 in overcrowded cells in which inmates had to sleep on the floor, which she described as being "like hell," particularly for a person with untreated mental health conditions.

## Current Inmates

### Kendra Mickel (Putative Class Representative) (Fast Access)

543.  Ms. Mickel has been incarcerated in the Jail multiple times since 2017; the two longest periods were from June 16, 2017 through December 28, 2017 and December 6, 2020 to present.

544.  Ms. Mickel suffers from numerous mental health conditions, including PTSD, social anxiety disorder, schizophrenia, and bipolar disorder, for which she has been prescribed numerous medications and for which she was previously institutionalized at Moccasin Bend.

545.  She managed those conditions with her medications prior to being incarcerated.

546.  During her most recent incarceration, Ms. Mickel received *no* medications of any kind for approximately one month.

547.  At that point, she was evaluated by a counselor and given Risperdal but not her other mental health medication.

548.  Because the Risperdal made her feel strange and caused auditory hallucinations and insomnia, and she made numerous sick call requests and was placed on a list to see a psychiatric provider but did not see anyone for at least a month.

549.  Eventually, she was switched to Zyprexa, which causes her nightmares and auditory hallucinations and does nothing to address her anxiety or depression.

550.  When she stopped taking the Zyprexa because of those side effects, and when the medical staff and/or BCSO personnel realized, she was "fired" from her job in the kitchen and moved from the "dorm" pod into a "lockdown" pod.

551.  The Zyprexa (which she calls the "nightmare medication") continues to give her nightmares, but if she stops taking it again, she could lose the ability to receive *any* mental health medication, so she has continued to take it.

552. In short, Ms. Mickel has been (1) subjected to dangerous discontinuity in her mental health medications, (2) delayed in receiving *any* medications for unreasonably long periods of time, (3) treated only with medications that have intolerable side effects, and (4) punished and threatened for failing to take those medications.

553. During this period of confinement, Ms. Mickel has been repeatedly (and once for a month and a half at a time) been confined in pods in which she is locked down in overcrowded cells (four women in two-bed cells) for twenty to twenty-three hours per day and made to sleep on the floor.

554. In providing medical care for Ms. Mickel, the BCSO failed to follow its own policies (including Jail Manual § 9.1(A) (Medical Staff and Services), (F) (Mental Health Services), 9.6 (Dispensing of Medication / Pharmaceutical & Inventory); Fast Access did not have any policies to violate, although it does not appear it followed the nursing assessment protocols ostensibly in place as of September 1, 2020 (relating to mental health).

555. Ms. Mickel is currently subject to substantial risks of serious harm concerning her serious medical needs at the Jail, as well as intolerable and inhumane conditions of confinement.

### Avery Sharp (Putative Class Representative)<br>(QCHC/Fast Access (current inmate))

556. Avery Sharp suffers from numerous serious physical and mental health conditions, including hypertension, GERD, asthma, traumatic brain injury (subdural hemorrhage), ADHD, oppositional defiant disorder, intermittent explosive disorder, depression, dysthymia, anxiety, panic attacks, substance abuse, and he has been hospitalized for his serious mental health conditions.

557. He has been treated for those conditions with numerous medications, including (1) Lisinopril, metoprolol Clonidine, Omeprazole, and Albuterol (for physical problems), and (2)

Effexor, Venlafaxine, Abilify, Lexapro, Seroquel, Trazodone, Haldol, Wellbutrin, Invega, Ativan, and Zoloft (for mental health problems).

558.    Following his confinement at the Jail in March 2020, Mr. Sharp has requested (on numerous occasions, through multiple means): (1) an inhaler, (2) Lisinopril and clonidine (instead of the Norvasc/amlodipine, which caused severe headaches), and (3) proper medications for his mental health conditions.

559.    It took him almost a year to get an inhaler, and he still is not getting proper mental health medications (having only recently been offered Risperdal, which he declined because of its serious side effects, including gynecomastia).

560.    On information and belief, Mr. Sharp was not seen by a mental health provider for nearly a year following his incarceration.

561.    In providing medical care for Mr. Sharp, the BCSO failed to follow its own policies (including Jail Manual § 9.1(A) (Medical Staff and Services), (F) (Mental Health Services), 9.6 (Dispensing of Medication / Pharmaceutical & Inventory); QCHC failed to follow its own policies, including J-D-01.6 (Continuity of Medication), J-D-02 (Medication Services), J-D-02.5 (Psychotropic Medication), J-D-02.6 (Monitoring Psychotropic Medication), J-G-01 (Chronic Disease Services); Fast Access does not have any policies to violate, although it does not appear it followed the nursing assessment protocols ostensibly in place as of September 1, 2020 (relating to mental health, shortness of breath/asthma/COPD, and upper respiratory symptoms).

562.    Mr. Sharp is currently subject to substantial risks of serious harm concerning his serious medical needs at the Jail.

563.    For the great majority of his incarceration, Mr. Sharp has been locked down in overcrowded cells (*e.g.*, four men in a two-man cell, with two sleeping on the floor) for twenty-three to twenty-six-hour periods at a stretch, although sometimes he was locked down only for twenty hours at a time.

564.    As inmates in those conditions are practically on top of one another, it is very difficult for them to move around, and toilets' being flushed typically causes backup into other cells.

565.    Mr. Sharp has thus been prevented from caring for basic mental and physical health needs, including exercise and natural light, for long periods of time.

### **Chelsea Coulter (Putative Class Representative) (Fast Access)**

566.    Ms. Coulter was diagnosed with Type I diabetes at age five and has managed that condition with an insulin pump since age eight.

567.    Ms. Coulter's physicians have, on occasion, tried to use other means of insulin administration, including long-acting, short-acting, and long and short-acting combinations of insulin, but those methods have never worked, and the result has always been diabetic ketoacidosis; she has been in the ICU multiple times when these alternative regimens were attempted.

568.    In short, the pump is the only insulin regimen that has worked to control Ms. Coulter's diabetes, which she has effectively managed with the pump for decades.

569.    When Ms. Coulter was previously incarcerated at the Jail approximately two years ago for a three-day period, the guards and/or nurses took her insulin pump immediately (because they said it was a suicide risk) and gave her no insulin by any other means, with the result that her blood sugar spiked and she began vomiting and requested insulin.

570. In addition, her mother, Sheri Cate, called and pleaded with the nursing staff to permit her to use the insulin pump, but they told her that the Jail's doctor would handle it.

571. Ms. Coulter was eventually—and incorrectly—prescribed Metformin, and, when she was released, she was extremely sick and required immediate medical attention.

572. On April 13, 2021, Chelsea Coulter was incarcerated at the Jail, and she remains confined there.

573. As of that date, Ms. Coulter was approximately twenty weeks pregnant.

574. Because of her diabetes, a circumvallate placenta, a blood clot in her umbilical cord, and a finding of a cyst in the baby's choroid plexus, this pregnancy is precarious and has been classified "high-risk," and she is under the care of (1) OB-GYNs at Life Circle in Cleveland, and (2) Regional Obstetrical Group (a high-risk obstetrical practice in Chattanooga).

575. Because her father immediately contacted the BCSO to inform it that she needed her insulin pump (and was told the BCSO would do what it could, although the final decision rested with Fast Access), she was temporarily permitted to keep the pump (and brought with her additional pump "sets," including reservoirs, for when they needed to be changed).

576. After that, her blood sugar began to spike because she needed to be able to change the set, but the LPNs said that the sets were locked in the head nurse (Rebecca's) office and could not be retrieved because the head nurse had a day off and no one else had access.

577. When the head nurse returned, she told Ms. Coulter that her subordinates did not know how to manage pumps and, therefore, she would switch Ms. Coulter from the pump to insulin injections and blood-sugar monitoring.

Case 1:18-cv-00217-CHS   Document 84-1   Filed 05/17/21   Page 106 of 130   PageID #: 1231

578. Ms. Coulter began crying and explained to the head nurse (1) what happened when she tried to manage her diabetes with injections, and (2) that she knows how to manage her pump by herself, having done so since the age of eight; nevertheless, it was taken from her.

579. Fast Access took Ms. Coulter's insulin pump from her over the objection of a treating physician who warned that Ms. Coulter had experienced diabetic ketoacidosis the last time it was removed.

580. The head nurse said she would (1) consult Ms. Coulter's high-risk obstetrician (informing him that she could do a better job of blood sugar management through short and long-acting insulin than Ms. Coulter could do with her pump) and (2) travel with Ms. Coulter to her OB-GYN appointments and "do the talking."

581. Ms. Coulter has been on a short-acting insulin regimen for approximately two weeks with predictably poor results—her blood sugar has been inconsistently tested, erratic, and poorly managed.

582. She frequently feels awful, and her OB-GYNs are unhappy with this course of treatment.

583. Ms. Coulter has not been permitted to see her OB-GYNs since being incarcerated.

584. On May 6, 2021, Ms. Coulter's blood sugar was 50 mg/dL.

585. In providing medical care for Mr. Coulter, the BCSO failed to follow its own policies (including Jail Manual § 9.1(A) (Medical Staff and Services), (M) (Pregnancy), 9.6 (Dispensing of Medication / Pharmaceutical & Inventory); Fast Access did not have any policies to violate, although it does not appear it followed the nursing assessment protocols ostensibly in place as of September 1, 2020 (relating to pregnancy).

586. Ms. Coulter and her baby are both currently facing an extreme risk of harm, and Ms. Coulter has experienced needless suffering.

**Zachary Guinn (Putative Class Representative) (Fast Access)**

587.    Mr. Guinn was reincarcerated at the Jail in early May 2021 after being sentenced for approximately six to nine months for old charges and is currently incarcerated there.

588.    At the time of his confinement, Mr. Guinn was being treated for a spider bite on his abdomen.

589.    In addition, on information and belief, Mr. Guinn was taking benzodiazepine medication.

590.    On information and belief, since being confined, Mr. Guinn has repeatedly requested treatment for the spider bite, the redness from which has been expanding but has not been properly treated for it.

591.    In addition, on information and belief, Mr. Guinn is (again) not receiving his necessary seizure medication or being adequately treated for withdrawal from benzodiazepines (and possibly also opioids).

592.    Mr. Guinn's family members have repeatedly requested that BCSO and Fast Access staff give Mr. Guinn proper treatment for his conditions, but those staff will not discuss any of his treatment, citing HIPAA.

593.    Based on this apparent lack of treatment, and the systemic deficiencies discussed elsewhere herein, Mr. Guinn is presently exposed to a substantial risk of serious harm.

594.    In addition, Mr. Guinn is exposed to the BCSO's policy and/or unofficial "lockdown" policy.

## CLASS ALLEGATIONS

Plaintiffs seek to certify three classes: (1) two classes for declaratory and prospective injunctive relief pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure and (2) one class for damages pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

### 23(b)(2) Prospective Injunctive Relief Classes

595.    Plaintiffs Avery Sharp, Kendra Mickel, Chelsea Coulter, and Zachary Guinn ("Prospective Relief Putative Class Representatives") bring this claim on behalf of themselves and, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the following classes:

> **All persons who are now or, in the future will be, confined at the Bradley County Jail and subjected to the system of medical care and medical policies, practices, or customs of the Bradley County Sheriff's Office and any entity with whom Bradley County contracts to provide medical services to such persons.**
>
> **All persons who are now, or in the future will be, confined at the Bradley County Jail and subjected to the BCSO's official or unofficial "lockdown" policies under which inmates may be locked down in overcrowded cells for twenty hours per day or more for indefinite periods of time.**

These classes of persons (the "Prospective Relief Medical Care Class" and "Conditions Class") exclude defendants and any members of their immediate family, as well as immediate family members of the judges.

596.    Plaintiffs reserve the right to modify the Conditions Class definitions and/or propose subclasses as appropriate when more information becomes available (*e.g.*, a "twenty-hour" subclass, a "twenty-three-hour" subclass, and/or a "twenty-four-hour-plus" subclass).

597.    The Prospective Relief Putative Class Representatives seek relief from the wrongdoing of defendant Bradley County for themselves and for all members of the Prospective Relief Medical Care Class and Conditions Class through Rule 23 of the Federal Rules of Civil

Procedure. These putative classes meet the statutory prerequisites of Federal Rule of Civil Procedure 23(a), as set forth herein.

598.    As discussed above, the Jail's capacity is 510 inmates, the average daily number of inmates during the class period has been substantially higher, and the number and identity of putative class members is ascertainable through discovery. Accordingly, joinder of all class members would not be feasible, and the threshold for numerosity is presumptively met.

599.    The Prospective Relief Putative Class Representatives' claims are typical of the claims of those classes, as Bradley County's and the CMSPs' relevant policies, practices, and customs apply to all current and future inmates. The Prospective Relief Putative Class Representatives will fairly and adequately represent the interests of all members of the Prospective Relief Medical Care Class and Conditions Class and do not have any interests antagonistic to those to any putative class identified this lawsuit. Rule 23(b)(2) Putative Class Representatives has retained counsel with experience in class action and constitutional litigation.

600.    The "Prospective Relief Medical Care Class" and "Conditions Class" claims involve many common questions of both law and fact. The facts relevant to this action are:

   a.    The policies of Bradley County—through the actions of the County Mayor and County Commission (both express and unwritten or customary)—concerning

         i.    revenue generated from housing state and federal inmates and charging excessive inmate co-pays;

         ii.   funding for:

               1.    staffing of the Jail (specifically as it bears on inmate medical care and the number of corrections deputies);

2.  training for and supervision of corrections deputies and other corrections staff (specifically as it bears on inmate medical care); and

3.  inmate medical care;

b.  within its funding parameters, the BCSO's policies (both express and unwritten or customary concerning:

    i.  staffing of the Jail (specifically as it bears on inmate medical care and sufficient deputies to permit inmates generally to be out of their cells for adequate periods of time);

    ii.  training for and supervision of corrections deputies (specifically as it bears on inmate medical care); and

    iii.  the provision of medical care to inmates in conjunction with QCHC and Fast Access;

c.  The policies, decisions, failures to train and supervise, and unofficial customs of QCHC and Fast Access concerning all matters pertaining to inmate care (discussed at length above);

d.  Bradley County and the BCSO's knowledge, approval of, and/or acquiescence in the unconstitutional policies, decisions, failures to train and supervise, and unofficial customs of QCHC and Fast Access;

e.  The overall systems at the Jail of medical care and confinement (related to cell assignment, confinement, sleeping arrangements, and access to exercise);

f.  the actors involved in these various decisions.

601.  The injuries sustained by the Prospective Relief Putative Class Representatives flow from a common nucleus of operative fact:

a. The Bradley County legislative arm's knowing and deliberate failure, over a period of years and despite ample cause for concern, to ensure that

   i. the Jail's capacity corresponded with the inmate population (specifically as any overcrowding bears on inmate medical care and conditions of confinement for inmates);

   ii. the BCSO had means to adequately staff the Jail and train and monitor those staffing it (specifically as it bears on inmate medical care and inmate lockdowns); and

   iii. the contract in place with a medical services provider (and the resources provided thereto) was sufficient to ensure that inmates received constitutionally adequate medical care;

b. Bradley County and the BCSO's knowing, willful—and even malicious—policies and operational decisions concerning

   iv. the number of inmates housed in the Jail pursuant to arrangements with the state and federal governments;

   v. deputy allocation among and between various departments of the BCSO;

   vi. training and supervision of corrections deputies and other staff;

c. CMSP QCHC and Fast Access's knowing, willful—even malicious—policies, decisions, failures to train, supervise, and discipline, and unofficial customs concerning the medical treatment rendered to inmates; and

d. The injuries sustained by plaintiff and all putative class members involve common questions of law concerning the right of plaintiff and Inmate Class members to receive

adequate medical care and Bradley County's obligations under the Eighth and Fourteenth Amendments to the United States Constitution.

602. This action may be maintained as a class action pursuant to Rule 23(b)(2) because the systems of medical care and inmate population management and Bradley County and Fast Access's policies and practices that form the basis of this complaint apply generally to all members of the Inmate Class. Whatever particular injuries—and damages—the individual class members have sustained as a result of unconstitutionally inadequate medical care and conditions of confinement, Bradley County and Fast Access's customs or policies actually and proximately caused them, and prospective injuries to Class members can be remedied by class-wide injunctive and declaratory relief.[12]

## Rule 23(b)(3) Damages Classes

603. Plaintiffs Darrell Eden, Randy Bacon, the Estate of Brown, the Estate of Chouinard, Sandra Culbertson, the Estate of Culpepper, Laura Fuller, the Estate of Gash, Benjamin Newton Hannah, Amanda Lennie, Shelby Long, Tera Miller, Bryan Wampler, and Sharon Waters ("Putative Damages Class Representatives") bring this claim on behalf of themselves and, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, the following class:

> **All persons previously confined at the Jail from September 17, 2017 with obvious or diagnosed medical conditions who either (a) received no medical care or (b) suffered a worsening of their condition and/or unnecessary pain despite any medical attention they received.**

---

[12] In the alternative, the classes seeking prospective injunctive relief may be certified pursuant to Rule 23(b)(1), because separate injunctive-relief actions by individual class members could create a risk of (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would substantively impair or impede their ability to protect their interests. Prospective Relief Putative Class Representatives reserve this as a possible alternate basis for seeking certification.

This classes of persons (the "Damages Class") exclude defendants and any members of their immediate family, as well as immediate family members of the judges.

604.     Plaintiffs reserve the right to modify this class definition and/or propose subclasses as appropriate (*e.g.*, "denied care," "delayed care," and/or "insufficient care" subclasses, or subclasses predicated on specific types of care, *e.g.*, related to chronic care, emergency care, or medications, or specific health conditions, *e.g.*, diabetes, broken bones, hypertension, MRSA), namely at class certification.

605.     Plaintiffs seek relief from the wrongdoing of defendant Bradley County for themselves and for all members of the through Rule 23 of the Federal Rules of Civil Procedure.  The putative Damages Class meets the statutory prerequisites of Federal Rule of Civil Procedure 23(a), as set forth herein.

606.     As discussed above, the Jail's capacity is 510 inmates, the average daily number of inmates during the class period has generally been substantially higher, and internal documents from Bradley County document thousands of requests for medical care at the Jail submitted by inmates during the putative class period.

607.     In addition, as the Jail houses, *inter alia*, pre-trial detainees, misdemeanor convicts, locally sentenced felons, backup felons, "contract" state felons, and "contract" federal prisoners, inmate turnover is high, and inmates are located across the state and beyond, both in correctional facilities and outside of them.

608.     As the facts discussed above strongly indicate, of the inmates housed in the Jail during the relevant period, there are likely hundreds or thousands of members of the Damages Class. Therefore, members of the class are so numerous that joinder would be impracticable.

609. The number and identity of putative class members is ascertainable through discovery. Notice to class members can be given through various means, including (1) the already-established channels the BCSO uses to communicate with individuals in its custody, (2) direct mail; and (3) publication through various media, including newspapers, the internet, and other public organs.

610. The Putative Damages Class Representatives' claims are typical of the claims of that class, as the overall system of medical care at the Jail and Bradley County's and the CMSPs' relevant policies, practices, and customs are the common source of injury to all Putative Damages Class members, and all claim violations of the same federal and state statutes predicated on identical legal theories and a common nucleus of facts.

611. The Putative Damages Class Representatives will fairly and adequately represent the interests of all members of the Putative Damages Class and do not have any interests antagonistic to those to any putative class identified this lawsuit. The Putative Damages Class Representatives has retained counsel with experience in class action and constitutional litigation.

612. The Putative Damages Class claims involve many common questions of both law and fact. The facts relevant to this action include:

    a. The system of medical care operative at the Jail during the class period;

    b. The policies of Bradley County—through the actions of the County Mayor and County Commission (both express and unwritten or customary)—concerning

        vii. revenue generated from housing state and federal inmates and charging excessive inmate co-pays;

        viii. funding for:

1. staffing of the Jail (specifically as it bears on inmate medical care and the number of corrections deputies);

2. training for and supervision of corrections deputies and other corrections staff (specifically as it bears on inmate medical care); and

3. inmate medical care;

c. within its funding parameters, the BCSO's policies (both express and unwritten or customary) concerning:

   ix. staffing of the Jail (specifically as it bears on inmate medical care);

   x. training for and supervision of corrections deputies (specifically as it bears on inmate medical care); and

   xi. the provision of medical care to inmates in conjunction with QCHC and Fast Access;

d. The policies, decisions, failures to train and supervise, and unofficial customs of QCHC and Fast Access concerning all matters pertaining to inmate care (discussed at length above);

e. Bradley County and the BCSO's knowledge, approval of, and/or acquiescence in the unconstitutional policies, decisions, failures to train and supervise, and unofficial customs of QCHC and Fast Access;

f. the actors involved in these various decisions.

613. The injuries sustained by the Damages Class flow from a common nucleus of operative fact:

e. The Bradley County legislative arm's knowing and deliberate failure, over a period of years and despite ample cause for concern, to ensure that

116

xii.   the Jail's capacity corresponded with the inmate population (specifically as any overcrowding bears on inmate medical care);

xiii.   the BCSO had means to adequately staff the Jail and train and monitor those staffing it (specifically as it bears on inmate medical care); and

xiv.   the contract in place with a medical services provider (and the resources provided thereto) was sufficient to ensure that inmates received constitutionally adequate medical care;

f.   Bradley County and the BCSO's knowing, willful—and even malicious—policies and operational decisions concerning

xv.   the number of inmates housed in the Jail pursuant to arrangements with the state and federal governments;

xvi.   deputy allocation among and between various departments of the BCSO;

xvii.   training and supervision of corrections deputies and other staff; and

g.   CMSP QCHC and Fast Access's knowing, willful—even malicious—policies, decisions, failures to train, supervise, and discipline, and unofficial customs concerning the medical treatment rendered to inmates.

614.   The injuries sustained by plaintiff and all putative class members involve common questions of law concerning the right of plaintiffs and the Damages Class to receive adequate medical care and Bradley County's obligations under the Eighth and Fourteenth Amendments to the United States Constitution.

615.   This action may be maintained as a class action pursuant to Rule 23(b)(3) because (1) questions of law and fact common to members of the Inmate Class—set forth above— predominate over questions affecting only individual members and can be resolved for all

members of a class in a single adjudication, and (2) a class action will be superior to other available methods for fairly and efficiently adjudicating the controversy. Specifically:

a. Members of the Inmate Class do not stand to appreciably benefit from individually controlling the prosecution of separate actions, and many members of the putative Damages Class individually have modest damages claims and would be without effective strength to bring defendants into court;

b. There is practically no other pending litigation concerning the violation of Inmates' constitutional rights (and related state law causes of action) against Bradley County;

c. It is eminently reasonable to concentrate the litigation in this forum, which is the forum in which the entire situs of the action exists and will remain, and many or most of the members of the putative Damages Class reside in the area; and

d. A class action concerning these matters will be achievable in an orderly and just fashion.

## Rule 23(c)(4) Issues Class

616. In the alternative, plaintiffs and putative class representatives claim that the above-captioned action may be maintained, in whole or in part, on the basis of Rule 23(c)(4) to address particular issues;

617. Certifying separate issues can reduce the range of disputed issues herein and achieve substantial judicial efficiencies;

618. In this case, an Issues Class may be certified with respect to the claim that, for all or part of the putative class period, (a) there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care, and/or (b) the system of medical care at the Jail has created a risk sufficiently obvious as to constitute deliberate indifference to all inmates' medical needs.

## CAUSES OF ACTION

### Count I:  42 United States Code Section 1983 – Violations of the Eighth and Fourteenth Amendments to the United States Constitution

**(as to Bradley County; Sheriff Lawson, in his official capacity; Captain Johnson, in his official capacity, Former Sheriff Watson, in his individual capacity, and Captain Thomas, in his individual capacity)**

619.  Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

620.  Bradley County violated plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution, and that violation was caused by and is directly attributable to (1) its illegal official budgetary policy, (2) its policy of inadequate training and supervision of corrections deputies and other Jail personnel with respect to inmate medical care, (3) its entrenched custom of tolerating and/or acquiescing in federal rights violations, and, hence, its (4) affirmative policies and customs, and/or (5) the grossly deficient system of medical care.

621.  At all times relevant hereto, Sheriff Watson, Captains Thomas, Walsh, Dyer, and Johnson, and Mayor Davis were acting under color of state law and their office and in the course and scope of their employment.

### Bradley County's Violation of Plaintiffs' Constitutional Rights

622.  The Eighth Amendment to the United States Constitution, incorporated as to the states through the Fourteenth Amendment to the United States Constitution, provides that all citizens, including members of the Inmate Class may not be subjected to cruel and unusual punishments.

623.  Each plaintiff identified above suffered (or suffers) from medical conditions that were (or are) either (1) readily and obviously identifiable to a layperson as requiring treatment or (2) diagnosed by a medical professional as mandating treatment.

624.  As a result of (1) the constitutionally inadequate system of medical care in place at the Jail, and/or (2) the deliberate indifference of persons involved with their treatment, each plaintiff

suffered (or is suffering) a denial, delay, or insufficiency of care that has caused them serious harm, pain and suffering, and/or exposure to unreasonable risks of serious harm.

### Bases for Bradley County's *Monell* Liability

### Bradley County's Responsibility for Unconstitutional Policies, Practices, and Customs of QCHC and Fast Access

625.    Bradley County's constitutional duty to provide medical care to inmates is affirmative and non-delegable, and it may not shield itself from § 1983 liability by contracting out that duty to CMSPs.

626.    As shown above, Bradley County provides medical care to inmates pursuant to HSAs with CMSPs, *i.e.*, QCHC and Fast Access.

627.    To the extent that Bradley County delegated final decision-making authority concerning inmate medical care to QCHC and Fast Access, their policies became (and become) those of Bradley County.

628.    In the alternative, to the extent that Bradley County retains all or some authority over inmate medical care, it had (and has) actual and constructive knowledge that QCHC and Fast Access probably did (and will) violate constitutional rights, and it is not entitled to adopt a policy of inaction in the face of such knowledge.

629.    As described above, QCHC and Fast Access each had (and have) unconstitutional official policies and unofficial customs, and have failed (and are failing) to properly train, supervise, and/or discipline their personnel.

630.    In addition, each has maintained a system of health care totally inadequate to meet basic constitutional requirements.

631.    Accordingly, Bradley County is fully responsible for the actions and inactions of the CMSPs.

**Affirmative Policy or Custom**

632.     Regardless of whether individual agents or employees of Bradley County (or a CMSP) has violated plaintiffs' Eighth and Fourteenth Amendment rights to adequate medical care by acting with deliberate indifference, Bradley County *itself* has manifested deliberate indifference to their serious medical needs through its acts, policies, and/or customs as set forth above (and below), singly and in combination—*i.e.*, the official policies, deficient system of care, failures to employ adequate staff (and ensure adequate training, supervision, and discipline of same), and unofficial customs, evidenced by repeated instances of unconstitutional conduct.   These affirmative policies and customs amount to systemic deliberate indifference.

633.     Similarly, the affirmative policies and customs of Bradley County (acting through Mayor Davis, the County Commission, and its Sheriffs and Jail administrators), have resulted in the unconstitutional conditions of confinement discussed above.

634.     In like fashion, the CMSPs' above-described policies (*e.g.*, minimizing costs, understaffing, delaying care, prescribing known ineffective medication, failing to develop treatment plans, failing to supervise nurses, employing ineffective medical records systems, permitting personnel routinely to practice illegally outside the scope of their licensure and training, failing to train, supervise, and discipline employees, routinely failing to follow policies) evince an affirmative policy and custom of systemic deliberate indifference on part of those entities—fully known to Bradley County, which is responsible for their failures whether it retains authority over them or has delegated its medical decision-making authority to them.

## Systemic Conditions

635.    As established above, there are such systemic and gross deficiencies in the priorities, medical decision-making, staffing, facilities, equipment, training, supervision, record-keeping, procedures, and virtually every other relevant facet of the system of care present at the Jail (which is the joint creation of Bradley County, the BCSO, and CMSPs) that plaintiffs—and the entire inmate population—has been and is effectively denied access to adequate medical care at the Jail.

## Illegal Official Policy or Legislative Enactment

636.    In official legislative enactments and policies pertaining to the Jail, Bradley County (specifically Mayor Davis and, to a lesser extent, the County Commission) have deliberately chosen to use the Jail as a profit center for the County at the expense of the inmates whose suffering generates their revenue.

637.    Mayor Davis and the County Commission have simultaneously decided to underfund the BCSO, Jail, and CMSPs such that those entities are *unable* to provide constitutionally adequate medical care to inmates at the Jail.

638.    Similarly, the unconstitutional conditions of confinement discussed above are directly attributable to the decisions to keep the Jail overcrowded and understaffed.

639.    That lack of funding has resulted in the following conditions at the Jail directly connected with the failures and outcomes described above.

640.    The County Commission and County Mayor were (and are) aware at all relevant times of these deficiencies.

641. The decision, in the face of such knowledge, to permit the dangerous and unreasonable state of affairs to persist amounts to a deliberate course of action chosen from among various alternatives.

642. Similarly, the failure of the BCSO to follow its own policies both those (1) set forth in the General Order related to budgeting, planning, operational, and oversight functions, and those (2) in the Jail Manual, related to medical care—represents an official policy of deliberate indifference.

643. Similarly, the repeated failures to engage in meaningful oversight of the CMSPs—despite contractual mechanisms for doing so—reflects a policy of deliberate indifference.

644. Finally, the discretionary, policy-level decisions of the CSMPs described above—beginning with the acceptance of the relevant contract terms—constitutes official policies for which Bradley County is responsible.

### Failure to Train and/or Supervise

645. Operating with one hand tied behind its back as a result of inadequate outlay for deputy salaries, and despite the undeniable presence of dedicated and hardworking corrections deputies, the BCSO has failed to ensure that the corrections deputies it employed (and employs) were (and are) adequately trained with respect to inmate medical care (and inmate safety more generally), as evidenced by the repeated constitutional violations and numerous inmate deaths that plainly resulted from the nonfeasance and even malfeasance of BCSO corrections deputies.

646. Former Sheriff Watson, Sheriff Lawson, and Captains Thomas and Johnson each bear direct responsibility for the training and supervision of the corrections deputies under their authority, with respect to inmate oversight and care, both medical and otherwise.

647. As noted above, on information and belief, the BCSO has failed to provide and properly document that corrections deputies consistently underwent orientations, contractually mandated training concerning inmate health, and the TCI-training protocols, which represent the *minimum* level of training required to maintain jail certification.

648. Despite notice of deficiencies, Bradley County has failed to enact policies that would prevent the substantial turnover in deputy staffing—and the concomitant lack of training and inexperience—at the Jail, and the BCSO has failed to ensure that their training complies with the minimum standards set by law.

649. In addition, (1) there is a clear history of failures by the BCSO/Jail personnel to address repeated complaints of constitutional violations pertaining to treatment of inmates, including medical care, and (2) it is plainly obvious that the failure to train corrections deputies with regard to addressing inmate medical care would pose the risk of violations of the Eighth and Fourteenth Amendments.

650. Finally, the failure of the BCSO to produce records showing that *any* deputies have been disciplined concerning their malfeasance in the treatment of inmates reveals a complete lack of oversight and, hence, deliberate indifference.

### Existence of a Custom of Tolerance or Acquiescence of Federal Rights Violations

651. In addition to (1) the County Mayor and County Commission's knowing, deliberate, and illegal decisions to underfund medical care, staffing, and training, and (2) the BCSO's failure to train and supervise its employees properly with respect to inmate medical care, unconstitutional mistreatment of prisoners regarding their medical care has become an unofficial custom in Bradley County, which tolerates both federal rights violations and the

manifold deficiencies of the CSMPs outlined above such that there is a clear pattern of depriving inmates of adequate medical care.

652.    The County Mayor, County Commission, and BCSO are all well aware of those actions, inactions, and problems, which have persisted for years and show no sign of abating, and their repeated deliberative decisions amount to tacit approval of the dangerous and unconstitutional *status quo*.

653.    That tacit approval is more than a collection of sloppy or reckless oversights—instead, it evinces obvious, deliberate indifference to the harm being caused to inmates' constitutional rights by Bradley County and the BCSO.

654.    The (1) systemically inadequate conditions at the Jail and (2) Bradley County's (a) affirmative policies and customs, (b) official policies and enactments, (c) failures to train and supervise, and (d) custom of tolerating or acquiescing in federal rights violations, and (3) the subjective deliberate indifference of each involved agent and employee of Bradley County and the CMSPs—both singly and in combination—are the moving force behind the violation of plaintiffs' constitutional rights and the resulting injuries.

### Count II: Willful and Wanton Conduct and/or Gross Negligence

### (as to Bradley County, Former Sheriff Watson, and Captain Thomas)

655.    Plaintiffs incorporates each and every allegation set forth above as if fully set forth herein.

656.    A county is liable for the non-negligent tortious actions of Sheriff's deputies under Tennessee Code Annotated sections 8-8-302 and 8-8-303.

657.    At all times relevant to this action, and with respect to all actions described herein, each agent and employee of the BCSO was acting within the course and scope of his or her employment.

658. In (1) refusing to ensure that inmates—including plaintiffs—received appropriate and timely medical care in view of their repeated complaints, and in particular with respect to obvious presentations of injury, (2) making threats toward inmates, and (3) physically retaliating against inmates as described above, BCSO deputies (always present for inmate interactions with medical staff) have repeatedly evinced such an entire want of care toward inmates that would raise a presumption of a conscious indifference to the consequences, whether that conduct is characterized as an act or an omission to act.

659. Put another way, deputies have routinely exhibited reckless, willful, and wanton conduct toward inmates.

660. In such cases, those deputies are individually liable for inmates' injuries on a theory of willful and wanton conduct and/or gross negligence, and, accordingly, Bradley County is liable for those reckless actions (and inactions) of BCSO deputies pursuant to Tennessee Code Annotated sections 8-8-302 and 8-8-303.

661. In addition, plaintiffs and putative class members incarcerated at the Jail during Mr. Watson's administration (and Captain Thomas's captaincy of the Jail) suffered deprivations of their Eighth and Fourteenth Amendment rights at the hands of Bradley County and its agents and employees.

662. Those rights were clearly established at the time of the violation.

663. The actions taken with respect to those persons were objectively unreasonable in light of those clearly established rights.

664. By statute, former Sheriff Watson had custody of the Jail, and Captain Thomas, his direct subordinate, was given authority over corrections and the Jail.

665. Both former Sheriff Watson and Captain Thomas were intimately familiar with the significant, documented deficiencies of inmate medical care and were directly empowered to ensure and responsible for ensuring that the policies they had put or left in place were being followed by their subordinates.

666. Similarly, former Sheriff Watson and Captain Thomas were to supervise the provision of medical care by QCHC (including by meeting with its personnel pursuant to the terms of the HSAs), but they did not do so.

667. In addition, former Sheriff Watson entered into an agreement with the USMS to house 100 federal inmates simultaneously with the Jail's being so overcrowded arrestees were being turned away.

668. In short, Sheriff Watson and Captain Thomas were reckless, willful, and wanton with respect to the health care rendered to inmates and, as supervisors of the Jail who essentially abandoned their duties to inmates, are liable for their failures of supervision.

## <u>Count IV: Punitive Damages</u>

### (as to Bradley County, Former Sheriff Watson, and Captain Thomas)

669. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

670. At all times relevant to this action, and with respect to all actions described herein, each agent and employee of the BCSO was acting within the course and scope of his or her employment.

671. Punitive damages are available for the gross negligence of defendants pursuant to Tennessee Code Annotated sections 8-8-302 and 8-8-303, and Bradley County is liable for punitive damages for the actions or inactions of its agents or employees on a theory of vicarious liability or *respondeat superior*.

672. In taking the above-described actions, numerous deputies acted with intent, malice, and recklessness concerning inmates, as did former Sheriff Watson and Captain Thomas.

673. Accordingly, Bradley County, former Sheriff Watson, and Captain Thomas are liable for punitive damages to plaintiffs in this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, plaintiff requests the following relief:

1. Issuance of service of process to defendants;

2. A declaration that the suit may be maintained as a class action pursuant to Rule 23(a) and 23(b)(1)-(3) and issuance of an order (1) certifying that it may be maintained as a class action, (2) appointing plaintiffs and their counsel to represent the classes, and (3) directing that reasonable notice of this action be given by Bradley County to all members of the above-described Damages Class;

3. That the Court grant any reasonable request to amend this complaint to conform to the discovery and evidence obtained in this class action;

4. Empanelment of a jury to try this matter;

5. An award to each plaintiff putative Damages Class member of compensatory damages in an amount to be proved at trial;

6. Pursuant to Tennessee Code Annotated sections 8-8-302 and -303, and 29-39-104, an award to each putative Damages Class member of punitive damages for the intentional, malicious, and reckless conduct of Bradley County's agents, officers, employees, and persons and entities with whom it is in privity of contract—under color of state law and of their office and in the course and scope of their employment.

7. A declaration that the policies, practices, and procedures of Bradley County described herein were and are in violation of the rights of plaintiffs and members of the Prospective Relief Putative Classes under the Eighth and Fourteenth Amendments to the United States Constitution, which prohibits it and all persons acting in concert therewith from inflicting cruel and unusual punishments (including the deprivation of medical care for serious medical needs and subjection to unconstitutional conditions of confinement);

8. A preliminary and permanent injunction that enjoins Bradley County, its agents, employees, officials, and all persons acting in concert with them under color of state law, from subjecting members of the Prospective Relief Putative Classes to the unconstitutional policies and practices described herein;

9. An order mandating that Bradley County and its agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as is practicable, a plan—that comports with the advice of medical and correctional experts and the applicable standards of care—to eliminate the substantial risks of serious harm and unconstitutional conditions to which members of the Prospective Relief Putative Classes are presently exposed;

10. An award to plaintiffs and members of all classes their reasonable attorney's fees pursuant to 42 United States Code section 1988;

11. An award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure;

12. An award of pre- and post-judgment interest in the amount of ten percent (10%) per annum pursuant to Tennessee Code Annotated section 47-14-123 in an amount according to the proof presented at trial; and

13. An award to plaintiffs and all putative class members of all such further relief as the Court may deem just and proper.

Dated: May 17, 2021.                          Respectfully submitted,

                                              By: /s/ C. Scott Johnson
                                              C. Scott Johnson, BPR No. 019810
                                              William J. Rieder, BPR No. 026551
                                              Joseph Alan Jackson II, BPR No. 030203
                                              Brian C. Bush, BPR No. 036513
                                              SPEARS, MOORE, REBMAN & WILLIAMS, P.C.
                                              601 Market Street, Suite 400 | P. O. Box 1749
                                              Chattanooga, TN  37401-1749
                                              Telephone: (423) 756-7000
                                              Facsimile:  (423) 756-4801
                                              csj@smrw.com
                                              wjr@smrw.com
                                              jaj@smrw.com
                                              bcb@smrw.com

                                              By: /s/ J. Allen Murphy, Jr.
                                              J. Allen Murphy, Jr. BPR No. 019146
                                              (application for admission and *pro hac vice* motion forthcoming)
                                              LAW FIRM OF J. ALLEN MURPHY, JR.
                                              3555 Keith Street, Suite 213
                                              Cleveland, TN 37312
                                              Telephone: (423) 790-7310
                                              Facsimile:  (423) 790-7312
                                              allen@jallenmurphy.com